UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MERCHANTS MUTUAL INSURANCE COMPANY,

Plaintiff,                              CASE:_____,

v.

WILLIAM SCHWITZER & ASSOCIATES, P.C.,
WILLIAM D. SCHWITZER,
GIOVANNI "JOHN" C. MERLINO,                 (*"Schwitzer Defendants"*)

ALL COUNTY FOOT AND ANKLE, L.L.P.,
GIANNI PERSICH, M.D.,                       (*"All County Defendants"*)

KOLB RADIOLOGY P.C.,
THOMAS M. KOLB, M.D.,                       (*"Kolb Defendants"*)

NYC MEDICAL & NEUROLOGICAL
OFFICES, P.C.,
MEHRDAD GOLZAD, M.D.,                       (*"NYCMNR Defendants"*)

PAIN PHYSICIANS NY, P.L.L.C,
LEON REYFMAN, M.D.,
BOLESLAV KOSHARSKYY, M.D.,
MARK COHEN, M.D.,
CROTONA PARKWAY ASC, LLC
D/B/A CROTONA SURGERY CENTER,
ISLAND AMBULATORY SURGERY CENTER, LLC,      (*"PPNY Defendants"*)

ORTHOPAEDICS SPINE & SPORTS
MEDICINE, LLC d/b/a/ TOTAL ORTHOPEDICS,
JEFFERY THOMPSON, D.O.,
MITCHELL LONG, D.O.,
ABHISHEK KUMAR, M.D.,
SHIVEINDRA JEYAMOHAN, M.D.,
ROBERT DRAZIC, D.O,
VADIM LERMAN, D.O.,                         (*"Total Ortho Defendants"*)

BROOKLYN MEDICAL PRACTICE, P.C.
ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C.,
BIG APPLE PAIN MANAGEMENT PLLC,
NORTH SHORE FAMILY CHIROPRACTIC, P.C.,
UNICORN ACUPUNCTURE, P.C.,

**SAYEEDUS SALEHIN, M.D.,**
**STANISLAV AVSHALUMOV, D.O.,**
**RICHARD J. APPLE, M.D.,**
**TODD LEBSON, DC,**
**DEKUN WANG, L.AC,**                                    (*"410 Ditmas Defendants"*)

**COMMUNITY MEDICAL IMAGING, P.C.,**
**ANDREW MCDONNELL, M.D.,**                             ("*CMI Defendants*")


**Defendants.**

---

**COMPLAINT**

---


**TABLE OF CONTENTS**

I.       JURISDICTION AND VENUE……………………………………………................ 3
II.      PARTIES…………………………………………………………………................ 3
         a.  Plaintiffs………………………………………………………….................3
         b.  Defendants……………………………………………………….................. 3
             i.   Schwitzer Defendants…………………………………………………3
             ii.  Medical Provider Defendants……………………………………... 4
             iii. Relevant Non-Parties: Funders, Runners, and Non-Physician Owners….. 11
III.     FACTUAL BACKGROUND……………………………………………………… 16
         a.  Fraud Scheme……………………………………………………………... 16
         b.  The Fraud Scheme Enterprise………………………………………………… 34
             i.   Schwitzer Defendants……………………………………………… 38
             ii.  PPNY Defendants……………………………………………………… 38
             iii. Kolb Defendants…………………………………………………………42
             iv.  Total Ortho Defendants………………………………………………44
             v.   All County Defendants……………………………………………… 46
             vi.  NYCMNR Defendants……………………………………………… 47
             vii. 410 Ditmas/CMI  Defendants………………………………………49
IV.      Defendants' Pattern of Racketeering Activity ……………………………… 56
             i.   Claimant A ……………………………………………… ……… 56
             ii.  Claimant B ……………………………………………………… 82
             iii. Claimant C …………………………………………………… 92
             iv.  Claimant D ……………………………………………………… 103
V.       PLAINTIFFS' JUSTIFIABLE RELIANCE ………………………………… 113
VI.      DAMAGES ……………………………………………………...………..…... .115
VII.     CAUSES OF ACTION ……………………………………………………… 117
VIII.    JURY TRIAL DEMAND ……………………………………………………… 171

Plaintiffs **MERCHANTS MUTUAL INSURANCE COMPANY**, by and through their attorneys THE WILLIS LAW GROUP, PLLC, allege as follows:

## I.    <u>JURISDICTION AND VENUE</u>

1.      This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 USC § 1964 and 28 USC § 1331 over such claims, and over the remaining claims herein under supplemental jurisdiction pursuant to 28 USC § 1367.

2.      Venue is proper in this District pursuant to 18 USC § 1965 and 28 USC § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside or conduct business in this District.

## II.    <u>PARTIES</u>

3.      Plaintiff MERCHANTS MUTUAL INSURANCE COMPANY ("Merchants") is a corporation duly organized and existing under the laws of the State of Massachusetts. At all times relevant herein, Merchants was authorized to conduct business in New York and maintained a principal place of business in Buffalo, New York. Merchants maintains an umbrella of underlying entities which are under shared ownership and control, including Merchants Preferred Insurance Company and Merchants National Insurance Company, and in commerce generally operates under the shared trade name of Merchants Insurance Group. As relevant to certain allegations made herein, Merchants is duly authorized to conduct insurance business in the State of New Jersey.

### i.   <u>Schwitzer Defendants</u>

4.      Defendant WILLIAM SCHWITZER & ASSOCIATES, P.C. ("Schwitzer Firm") is a professional corporation duly organized and existing under the laws of the State of New York.

At all times relevant herein, the Schwitzer Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

5.      Upon information and belief, Defendant WILLIAM D. SCHWITZER ("W. Schwitzer") resides in and is a citizen of the State of New York. He is also the founder and managing partner of Schwitzer Firm. At all times relevant, W. Schwitzer was licensed or otherwise authorized to practice law in the State of New York.

6.      Upon information and belief, Defendant GIOVANNI "JOHN" C. MERLINO ("Merlino") resides in and is a citizen of the State of New York. He is also a partner, manager, and/or employee of Schwitzer Firm. At all times relevant, Merlino was licensed or otherwise authorized to practice law in the State of New York.

7.      Schwitzer Firm, W. Schwitzer, and Merlino are collectively referred to herein as the "Schwitzer Defendants" or the "Legal Service Defendants."

ii.   Medical Provider Defendants

8.      Defendant ALL COUNTY FOOT AND ANKLE, L.L.P. ("All County") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, All County maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

9.      Defendant GIANNI PERSICH, M.D. ("Persich" and, together with All County, the "All County Defendants") resides in and is a citizen of the State of Florida. At all relevant times herein, Persich has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of All County.

10.    Defendant KOLB RADIOLOGY P.C. ("Kolb Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Kolb Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

11.    Upon information and belief, Defendant THOMAS M. KOLB, M.D. ("Kolb" and together with Kolb Practice, the "Kolb Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kolb has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Kolb Practice.

12.    Defendant NYC MEDICAL & NEUROLOGICAL OFFICES, P.C. ("NYCMNR") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the NYCMNR maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

13.    Upon information and belief, Defendant MEHRDAD GOLZAD, M.D. ("Golzad" and together with NYCMNR Practice, the "NYCMNR Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Golzad has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of NYCMNR Practice.

14.    Defendant PAIN PHYSICIANS NY, P.L.L.C ("PPNY") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, PPNY maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

15.    Defendant LEON REYFMAN, M.D. ("Reyfman") resides in and is a citizen of the State of New York. At all relevant times herein, Reyfman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of PPNY.

16.    Defendant BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of PPNY.

17.    Defendant MARK COHEN, M.D. ("Cohen") resides in and is a citizen of the State of New York. At all relevant times herein, Cohen has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of PPNY.

18.    Defendant CROTONA PARKWAY ASC, LLC D/B/A CROTONA SURGERY CENTER ("Crotona ASC") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Crotona ASC maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Crotona ASC is, upon information and belief, entirely owned by Defendant Reyfman and non-party Boleslav Kosharskyy (another PPNY principal).

19.    Defendant ISLAND AMBULATORY SURGERY CENTER, LLC ("Island ASC," and together with PPNY, Reyfman, Kosharskyy, Cohen, and Crotona ASC, the "PPNY Defendants") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Island ASC maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Island ASC is,

upon information and belief, majority owned and controlled by Defendants Reyfman and Kosharskyy.

20.     Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC s/d/b/a/ TOTAL ORTHOPAEDICS & SPORTS MEDICINE ("Total Ortho") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

21.     Defendant JEFFERY THOMPSON, M.D. ("Thompson") resides in and is a citizen of the State of New York. At all relevant times herein, Thompson has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director, and/or employee of Total Ortho.

22.     Defendant MITCHELL LONG, D.O. ("Long") resides in and is a citizen of the State of New York. At all relevant times herein, Long has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director, and/or employee of Total Ortho.

23.     Defendant SHIVEINDRA JEYAMOHAN, M.D. ("Jeyamohan") resides in and is a citizen of the State of New York. At all relevant times herein, Jeyamohan has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director, and/or employee of Total Ortho.

24.     Defendant ABHISHEK KUMAR, M.D. ("Kumar") resides in and is a citizen of the State of New York. At all relevant times herein, Kumar has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director, and/or employee of Total Ortho.

25.      Defendant ROBERT DRAZIC, M.D. ("Drazic") resides in and is a citizen of the State of New York. At all relevant times herein, Drazic has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director, and/or employee of Total Ortho.

26.      Defendant VADIM LERMAN, D.O. ("Lerman" and together with Total Ortho, Thompson, and Jeyamohan, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director, and/or employee of Total Ortho.

27.      Defendant BROOKLYN MEDICAL PRACTICE, P.C. ("Brooklyn Med") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Brooklyn Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Brooklyn Med maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

28.      Defendant ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C. ("Advanced") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Advanced maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Advanced maintained a limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

29.      BIG APPLE PAIN MANAGEMENT PLLC ("BAPM") is a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, BAPM maintained its principal place of business in the State of New York and is

authorized to and does conduct business in New York. Advanced maintained a limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

30.    NORTH SHORE FAMILY CHIROPRACTIC, P.C., ("NSF Chiro") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, NSF Chiro maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. NSF Chiro maintained a limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

31.    UNICORN ACUPUNCTURE, P.C. ("Unicorn") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Unicorn maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Unicorn maintained a limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

32.    SAYEEDUS SALEHIN, M.D. ("Salehin") resides in and is a citizen of the State of New York. At all relevant times herein, Salehin has been licensed or otherwise authorized to practice medicine in the State of New York and was the (or at least the nominal) owner, operator, officer, director, and/or employee of Brooklyn Med.

33.    STANISLAV AVSHALUMOV, D.O. ("Avshalumov," and together with Advanced, "Advanced Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Avshalumov has been licensed or otherwise authorized to practice medicine in the State of New York and was the (or at least the nominal) owner, operator, officer, director, and/or employee of Advanced.

34.    RICHARD J. APPLE, M.D. ("Apple") resides in and is a citizen of the State of New York. At all relevant times herein, Apple has been licensed or otherwise authorized to practice

medicine in the State of New York and was the (or at least the nominal) owner, operator, officer, director, and/or employee of BAPM.

35. TODD LEBSON, DC ("Lebson") resides in and is a citizen of the State of New York. At all relevant times herein, Lebson has been a licensed or otherwise authorized chiropractor in the State of New York and was the (or at least the nominal) owner, operator, officer, director, and/or employee of NSF Chiro.

36. DEKUN WANG, L.AC ("Wang") resides in and is a citizen of the State of New York. At all relevant times herein, Wang has been licensed or otherwise authorized to practice acupuncture in the State of New York and was the (or at least the nominal) owner, operator, officer, director, and/or employee of Unicorn.

37. Brooklyn Med and Salehin, Advanced and Avshalumov, BAPM and Apple, NSF Chiro and Lebson, and Wang and Unicorn are collectively referred to as the "410 Ditmas Defendants."

38. Defendant COMMUNITY MEDICAL IMAGING, P.C. ("CMI") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, CMI maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

39. Defendant ANDREW MCDONNELL, MD ("McDonnell," and collectively with CMI, the "CMI Defendants") was at all times relevant herein a physician licensed to practice medicine in the State of New York, employed by, and the "on-paper" owner of, CMI.

40. The All County Defendants, Kolb Defendants, NYCMNR Defendants, PPNY Defendants, Total Ortho Defendants, 410 Ditmas Defendants, and CMI Defendants are collectively referred to as "Medical Provider Defendants."

41.     The Schwitzer Defendants and Medical Provider Defendants are collectively referred to herein as "Defendants."

iii.  <u>Relevant Non-Parties: Funders, Runners, and Non-Physician Owners</u>

42.     "Funders" are litigation finance companies which advance money to claimants during the pendency of a claim and/or lawsuit as a "purchase of receivables." Funders will also frequently pay upfront amounts to medical providers, including Medical Provider Defendants, to induce performance of surgeries. Advances are structured so as to be considered non-recourse advances and not "loans," as they are provided at rates which would in other circumstances be usurious. This structure incentivizes the prolonging of lawsuits and rendering of unnecessary care, often leaving Claimants as the party (in theory supposed to be recovering near 66.6%) receiving the smallest portion of recovery.

43.     By way of example, a closing statement filed by Schwitzer Firm with the Office of Court Administration on July 8, 2025, in the matter *Santos S. Sanchez Fuentes v. YJL Broadway Hotel, LLC*, et al., Index No. 160915/2017 (Sup. Ct. N.Y. County), demonstrated that from a $3,750,000 recovery, Case Cash, a Funder, received $1,782,934.86; the attorney's fee was $950,000; and the claimant received $500,000.

44.     W. Schwitzer has testified that Case Cash, a Funder run by a disbarred attorney, alleged in separate action to be involved in related misconduct,[1] and which operates as a junior venture partner to Golden Pear funding, is Schwitzer Firm's most consistent lender.

---

[1] *Union Mutual v. Subin Associates, LLP, et al.,* 25-cv-02652, Doc. 110.

> Q.   Is there a specific law lender you use at the Schwitzer firm?
> A.   The majority is Case Cash.

45.     This relationship has been described by former Schwitzer Firm employees as an "exclusive" referral relationship (as to flow from Schwitzer Firm to Case Cash).

> A.   He asked for some funding, he has over $230,000 in funding that have accumulated over the years, principal and interest, at 51 percent interest at this place called Case Cash which Mr. Schwitzer exclusively sends funding cases to, and we got him a very good rate.

46.     "Runners" are persons who participated in the fraudulent scheme described below by recruiting construction workers into staging and/or perpetuating fake construction accidents at various construction sites throughout New York and/or to sign up after accidents with minor or no injury, enticed Claimants to pursue claims and undergo surgeries, coached Claimants on how to efficiently malinger, and otherwise coordinated the logistics of their rote protocol medical care and necessary lawsuit involvement.

47.     By way of example, Schwitzer Firm has been documented to work with, at minimum, Mignolia Pena, who has been recorded both directly instructing prospective clients to malinger, sat in on intake meetings between Schwitzer Firm, Merlino, and said prospective clients, aided in their sales pitches, and to have offered $2,000 to $3,000 to prospective clients to sign up:

**JUAN FLORES:** Yes, but, how can I explain this? Let me think about it a little more, ta... talk with my wife, and we will come to an agreement.

**MIGNOLIA PENA:** You can talk with her, but, I will tell you, if you go to the appointment tomorrow it does not mean you will sign. No. You tell him, if you like it, you sign, and if you do not like it, well, you – but, when you sign, my daughter will give you 2.

**JUAN FLORES:** She will give me 2 what?

**MIGNOLIA PENA:** $2,000 from us, $2,000 dollars.

**JUAN FLORES:** Oh, so you will give me $2,000.

**MIGNOLIA PENA:** Mm-hmm. Yes, tomorrow, when you sign.

**MIGNOLIA PENA:** Uh-huh. So, they are the ones who talk with the doctors and they are the ones that get the permission for surgeries you are going to have, everything.

**JUAN FLORES:** Yes. Okay. So, regarding what you told me, I think the possibility is that yes, that they will go tomorrow.

**MIGNOLIA PENA:** Because I told you, the one that makes your case is you, you always have to tell the doctors about your pain.

**MIGNOLIA PENA:** You say that it hurts and it hurts. Yes, you are the one that makes your case.

BARRY SEMEL: So when was the accident that you were involved in?

INTERPRETER: When was the accident with — what happened?

JUAN FLORES: It was at the beginning of October, like in the first week when —

MIGNOLIA PENA: [INDISCERNIBLE] in Santo Domingo. [Laughter]

---

JOHN MERLINO: Speak with [INDISCERNIBLE]

INTERPRETER: He will call him.

MIGNOLIA PENA: Because you need surgery and you need doctors and without compensation nothing is going to pay [INDISCERNIBLE].

JUAN FLORES: That is why.

MIGNOLIA PENA: Compensation.

INTERPRETER: They're explaining to him workers compensation, he needs it. And he needs to pay his bills.

JOHN MERLINO: Yeah, they're going to cover that for you.

48.    Similar to the scheme set forth in *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024), Runners typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

| | | | | | |
|---|---|---|---|---|---|
| 161017/2015 10/27/2015 | Full Participation Recorded *Disposed* | MIGNOLIA PENA - v. - EMSTAR, INC. | New York County Supreme Court *Tort* | File | Consent |
| 2019-05381 12/10/2019 | Partial Participation Recorded | Ginarte Gallardo Gonzalez & Winograd, LLP v. William Schwitzer et al | Appellate Division - 1st Dept *Tort* | File | Consent |
| 2019-05501 12/12/2019 | Partial Participation Recorded | Ginarte Gallardo Gonzalez & Winograd, LLP v. William Schwitzer et al | Appellate Division - 1st Dept *Tort* | File | Consent |
| 2020-04666 12/01/2020 | Partial Participation Recorded | Ginarte Gallardo Gonzalez & Winograd, LLP v. William Schwitzer et al | Appellate Division - 1st Dept *Civil Action - General* | File | Consent |
| 500194/2018 01/04/2018 | Full Participation Recorded *Pre-RJI* | Luis E. Gomez Pena et al - v. - Michel Herskovic et al | Kings County Supreme Court *Torts - Motor Vehicle* | File | Consent |
| 506492/2016 04/21/2016 | Full Participation Recorded *Disposed* | FRANCISCO A. ENCARNACION et al - v. - MICHEL HERSKOVIC | Kings County Supreme Court *Torts - Motor Vehicle* | File | Consent |
| 517014/2021 07/10/2021 | Full Participation Recorded *Active* | MIGNOLIA PENA v. BOGOPA SERVICE CORP. | Kings County Supreme Court *Torts - Other Negligence* | File | Consent |

49.    Runners have been utilized by law firms, including Schwitzer Firm, medical providers, and Funders alike.

50.    "Non-physician owners" utilize "doc-in-a-box" schemes, wherein a non-physician will unlawfully invest in, open, and subsequently exercise control over a professional corporation or PLLC, through use of an "on-paper" physician or otherwise licensed owner, permitting them to bill otherwise inaccessible channels including no-fault and Workers' Comp. These schemes contain conspicuous hallmarks: background financing agreements wherein the money flow in fact flows to the non-physician owners, pay-to-play arrangements often disguised as "rent," shared patient bases amongst related providers under the same roof, and true-owner managed hiring, firing, marketing, accounting, management, and dominance over securing patient streams and referrals: essentially, the on-paper doctor "owner" just "shows up" – sometimes just on the billing.

51.    Such arrangements are not legal. The owners or members of a professional corporation or PLLC must be professionals who are licensed to practice the profession. BCL § 1503; LLC §§ 1203, 1204. An individual not licensed within the same profession as the professional corporation may not engage in the practice of the profession, or exercise control or ownership of such entity either directly or by proxy. BCL §§ 1504, 1508; LLC §§ 1203, 1207, 1209.

52.    This scheme is not new.[2] The policy concern therein is prioritization of profits over patient care, and the commonplace overbilling and fraud such arrangements engender. These concerns are not misplaced. Such facilities are designed to execute rote protocol schemes.

53.    Here, one family, all non-physicians, is the true owner of both the 410 Ditmas clinic encompassing the 410 Ditmas Defendants and the CMI defendants, as well as business partners

---

[2] https://nypost.com/2000/07/16/clinics-paying-5000-a-year-for-rent-a-docs-med-mills-get-no-show-pros-to-act-as-fronts/

with principals of Total Ortho, the inevitable surgical destination of those who treat at 410 Ditmas. For purposes herein, that context is enough, with that portion of the scheme going beyond the necessary parameters of this pleading (and currently before appropriate channels).

**Fig. 1:**



## III.    FACTUAL BACKGROUND

### a.    *The Fraud Scheme*

54.    From at least 2018 to the present, Defendants, together with others known and unknown, for their financial benefit, have orchestrated, and continue to orchestrate, a widespread fraud scheme to defraud Plaintiffs and others by (i) recruiting construction workers into staging and perpetuating staged construction accidents that occurred in New York and/or transforming legitimate minor or localized injuries into lucrative full-body claims; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) providing, or alleging to have provided, medically unnecessary and excessive healthcare services to such construction workers; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value (the "Fraud Scheme").

55.    A worker injured on a construction site is entitled to prompt indemnity and medical compensation under the New York Workers' Compensation Law. Where the matter in which the worker is injured constitutes a violation of the New York Labor Law, the worker may also be entitled to compensation from the property owner or general contractor through a commercial general liability claim. Both claims are financially backed by insurance policies, which are required in the State of New York.

56.    A worker's compensation claim is initiated by filing documents with the New York State Workers' Compensation Board ("NY WCB"). An attorney typically completes this and other forms to establish injuries to specific body parts, and authorize medical treatment and indemnity payments for the claimant. These determinations are further made through additional forms and

documentation submitted to the New York State WCB by and through the Claimant's attorney, as well as directly by treating doctors and facilities.

57.    Claimants treated by the Medical Provider Defendants and represented by Schwitzer Defendants in workers' compensation claims (as well as affiliated Workers' Comp-specific firms, "WC Firms"), the Medical Provider Defendants and the Schwitzer Defendants and/or WC Firms would have necessarily submitted documents to the NY WCB identifying the alleged workplace accident and injuries, as well as submitted forms, records, and billing regarding the medical services provided to Claimants.

58.    These forms and documentation, when they facially appear to comply with the medical treatment guidelines, are accepted and approved even when the information contained therein is false. Essentially, these Defendants dupe the NY WCB into establishing faked or pre-existing injuries and authorizing medical treatment all stemming from the alleged accidents through rote protocol checking formulaic boxes, which is then used as affirmative proofs in the subsequent litigation. Defendants may submit requests for departures from the guidelines, which are approved if certain criteria are met.

59.    A general liability claim is then initiated through the filing of a lawsuit in one of the Supreme Courts of the State of New York. It requires the filing of a verified Summons and Complaint, with the verification is often done by the claimant's attorney rather than the claimants themselves.

60.    Subsequent to the Summons and Complaint, additional documentation known as original and supplemental Bills of Particulars are prepared, verified by the Claimant or the Claimant's attorney, and served upon all parties to the lawsuit. For Claimants represented by

Schwitzer Defendants in personal injury lawsuits, Schwitzer Defendants have submitted documents attesting to the alleged workplace accident and associated injuries.

61.     The documentation submitted through both the workers' compensation and general liability claims are used as a basis to seek reimbursement for medical expenses, indemnity payments, settlement demands, and - due to the strict nature of New York's workers' compensation and the New York Labor Law - such demands often succeed.

62.     When the documentation submitted is fraudulent or contains fraudulent information, as is the case in the scheme described herein, the settlements become exorbitant when settlements should either be nominal or non-existent. Moreover, it causes increasing claim administration and litigation expenses that would not have been incurred otherwise. Litigation is prolonged, with needless expense incurred, as a result of the scheme, in addition to the falsely inflated indemnity demands and payments.

63.     The Fraud Scheme shares many structural elements similar to those found in *United States v. Rainford*, *supra*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

*United States v. Rainford et al.*, 110 F.4th at 468.

64.     Further evoking the structure and *modus operandi* in *Rainford*, the claimed injuries herein virtually always centered around the shoulders, knees, and most lucrative, the neck and back.

> A.  Because it was part of the money, the money thing.  I guess
> every part was -- every body part was valued, I guess.

Trial testimony of Wandy Diaz, *United States v. Rainford et al*., 18-cr-00289, Doc. 153.

65.    In a Department of Justice press release regarding *Rainford*,[3] the United States Attorney's Office for the Southern District of New York noted "As an incentive to getting surgery, the recruited patients were offered payments after they completed surgery as well as a percentage of any settlement payments from their lawsuits." The source of those funds were not identified in the press release. The source was identified at trial by Wandy Diaz:

> Q.  Did you receive money after having back surgery?
> A.  Yes.
> Q.  How much money did you receive?
> A.  A thousand dollars.
> Q.  Where did you get that money from?
> A.  Case Cash.

*Id*.

66.    As part of the recruitment process, Claimants were told that they would be paid workers' compensation benefits for not working if they had a workplace injury and that they would receive money in addition to workers' compensation benefits in order to cover any theoretical gap

---

[3] https://www.justice.gov/usao-sdny/pr/three-members-trip-and-fall-scheme-sentenced-prison-317-million-scheme-defraud-new-york

in pay, in the form of litigation funding loans arranged by Schwitzer Defendants in conjunction with Funding Defendants.

67.    In furtherance of the recruitment process, Claimants were also told that the amount of their ultimate economic recoveries would increase if they had surgeries or rehabilitation, and that the economic benefits could continue for weeks or more so long as they continued to participate in the treatment protocol predetermined by Defendants.

68.    Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of the Schwitzer Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would provide treatment in furtherance of the scheme.

69.    Claimants usually had medical assessments performed at hospital emergency rooms, which consisted of physical examinations and diagnostic imaging which, in almost all cases, revealed no acute traumatic injuries. In fact, not one of the Claimants in this complaint were admitted to the hospital for the allegedly traumatic injuries sustained, despite later undergoing a variety of surgeries.

70.    Runners then referred and/or transported these Claimants to Schwitzer Firm where attorneys and/or other employees of Schwitzer Firm met with these Claimants.

71.    The Schwitzer Defendants represented the Claimants in personal injury lawsuits and, directly and *via* proxy firms. in workers' compensation claims made to the New York State Workers' Compensation Board ("NY WCB") against various parties involved at the job sites. Despite that several Workers' Comp claims were filed by other law firms, Schwitzer Firm considered and marketed these matters as being handled under their auspices:

> **INTERPRETER:** You have an action for workers compensation.
>
> **JOHN MERLINO:** And potentially for a lawsuit.
>
> **INTERPRETER:** And, a lawsuit.
>
> **[00:57:20]**
>
> **JOHN MERLINO:** Okay. So we handle everything in house.

72.     This point was punctuated to clients as a differentiator:

> **INTERPRETER:** The reason why we get these numbers…
>
> **JOHN MERLINO:** --is because we do everything in house.
>
> **INTERPRETER:** Because we do everything together.
>
> **JOHN MERLINO:** A lot of law firms--
>
> **INTERPRETER:** Many firms –
>
> **JOHN MERLINO:** --they give the workers comp to someone else--
>
> **INTERPRETER:** Give the compensation to another lawyer outside the office.
>
> **JOHN MERLINO:** --and then handle the lawsuit.
>
> **INTERPRETER:** And so, they handle the lawsuit.
>
> **JOHN MERLINO:** We won't do that.
>
> **INTERPRETER:** They do not do that.

73.     **They do in fact do that**. However, the WC firms operate merely as extension of Schwitzer Firm, managed by Defendant Merlino.

74.     The workers' compensation claims were initiated and generally front-run in order to use the manipulated treatment approvals at the WCB level to substantiate the damages claims in the general liability action and maximize profit for the Defendants.

75.    In order to inflate settlement value and workers' compensation benefits and thereby effectuate higher profit for the Defendants, Schwitzer Defendants, directly and/or indirectly through the WC firms and runners, and/or others under their control, directed the Claimants to seek medical treatment from certain associated medical providers with whom the Defendants had an agreement or understanding as to the Fraud Scheme, including the Medical Provider Defendants herein, who would push towards lucrative surgeries in exchange for referral stream volume.

76.    For example, in the matter of <u>Julio Cesar Puac</u>, less than 24 hours from hospital discharge, the WC firm billing records indicate that Schwitzer Firm had a) already met with Plaintiff prior to the WC firm meeting; b) Schwitzer Firm had already determined a course of treatment instead of such treatment path being determined by medical providers, and c) arranged for an initial consult by non-party William King, M.D. ("King") to issue a predetermined statement of injury to match a submitted WC report of injury.



77.     Notable from the above: *Schwitzer Firm and the WC Firm* agreed to client medical treatment. *Schwitzer Firm* confirmed that Mr. Puac would see King that day. *Schwitzer Firm* confirmed that Mr. Puac would start PT on Monday 1/17/22. And given the entry 12 days later on 1/26/22, *Schwitzer Firm* was **able to chart such a course – towards two surgeons and a PT facility – with neither a prescription pad, nor a medical license, nor having even reviewed the hospital record.** In sum and substance, within 24 hours of discharge from the hospital, before any records were reviewed, *Schwitzer Firm* referred Mr. Puac to **two surgeons and PT**, and so relayed these instructions to the WC firm, who followed Schwitzer Firm's direction.

78.     In that matter, King went on to provide a perfectly matching assessment of injury to the Workers' Comp forms submitted in that matter, despite not speaking Spanish, Mr. Puac's only language. **In defaulting on the third-party action in that matter, King admitted as a matter of law to the truth of the following statements**:

> 70)     KING MDPC's initial intake mirrors the verbatim complaints as delineated in the workers compensation submission, despite that 1) the WC submission was prepared by the WCA in English; 2) Plaintiff only speaks Spanish; 3) the entirety of the evaluation is based upon history provided by Plaintiff and **KING does not speak Spanish, nor does the NP Plaintiff consulted with**.

> 71)     KING MDPC reached pre-determined diagnoses in accordance with the referring attorneys' submissions to Workers' Comp – which was submitted **before Plaintiff met with KING MDPC** - and provided a causality statement without having reviewed any hospital records. The records dated January 14, 2022, contain a WCB claim number that was not assigned until 2 weeks after such date – without notation the record has been modified:

> 76)    KING MDPC issues a causality statement without having reviewed hospital records, MRIs, or any other documentation; and as above, for body parts for which there are no objective indications of injury.

> 80)    KING made fraudulent misrepresentations in setting forth that he had personally examined Plaintiff, reached pre-determined diagnoses in accordance with the referring attorneys' wishes, and referred Plaintiff for treatments with precisely zero clinical indication. KING was hand-selected by Plaintiff's attorneys, and KING knew his misrepresentations would be relied upon in the underlying litigation.

**Exhibit 1** (Puac third-party complaint); **Exhibit 1-A** (default judgment).

79.    In this respect, the scheme bears striking similarity not only to *Rainford, supra*, but also to the scheme as set forth in *State Farm v. Tri-Borough*, 120 F.4th 59 (2d Cir. 2024), in which certain "gatekeeper" medical providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions **but rather are predetermined to find various injuries requiring extensive treatment**." *Id.,* at 73 (emphasis added).

80.    Similarly, Defendant herein **PPNY *also* defaulted in that matter**, admitting the truth of the following allegations as a matter of law ("Pain PC" within Ex. 1):

84) PAIN PC first started seeing Plaintiff in March of 2022.

85) PAIN PC did not request or review hospital records, records of KING MDPC, or records from Highline Radiology.

86) Regardless, PAIN PC issued causality statements.

87) Regardless, PAIN PC ordered additional MRIs, *of the same body parts*, and sent Plaintiff to KOLB.

88) As discussed *infra* (under "███████"), PAIN PC falsely presented a lumbar EMG study as presenting "evidence of" radiculopathy, where the study was by definition a clinically negative result. This was a materially false statement, known to be false when it was made, *designed* to be relied upon in order to justify an entirely unwarranted surgery.

89) PAIN PC made knowing and false material misrepresentations as the nature and causality of Plaintiff's purported injuries, which PAIN PC knew and intended would be relied upon to artificially justify unnecessary surgeries (including the surgeries by █████) to inflate the value of the underlying claim, and that those same materially false findings and statements would be relied upon in the underlying litigation.

Ex. 1; Ex. 1-A.

81.     As in *State Farm v. Tri-Borough*, implementation of the fraudulent treatment protocol required, and PPNY as admitted, did "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and **that some of those tests are duplicative of information already obtained….**" 120 F.4th at 74 (emphasis added).

82.     Upon information and belief, Schwitzer Defendants would provide personnel that sometimes consisted of Runners, employees, or outside personnel to accompany the Claimants to all independent medical examinations under the guise of protecting the Claimants' interests, but who in reality were positioned to ensure that Claimants presented their injuries, treatment and even

their residences to comport with the protocol and the narrative crafted by Defendants to justify same. As described below, Schwitzer Defendants (through Runners, employees or outside personnel) also used this opportunity to interact with others undergoing independent medical examinations to lure them away from their existing attorneys.

83.    Specifically, in a New York State action captioned Index No.: *159991/20181; Ginarte Gallardo Gonzalez & Winograd, LLP v. William Schwitzer et al; New York County Supreme Court* ("Ginarte Lawsuit"), the Schwitzer Defendants were sued, *inter alia*, for the use of runners in enticing away injury claimants away from a competitor. Amongst numerous affidavits submitted in support of those claims, one extraordinary affidavit, corroborated by audio recordings of the events, detailed a runner:

    **a.**   Approaching a claimant in a clinic offering $2,000 to sign up with "her" attorney;

    **b.**   Picking the claimant up in an Uber and bringing them to Schwitzer Firm;

    **c.**   Meeting with Defendant Merlino and then-Schwitzer attorney Barry Semel-Weinstein with the runner present;

    **d.**   Following up thereafter and increasing their offer to $3,000.

**Exhibit 2**, March 22, 2019 Affidavit of Juan Flores Hernandez.

84.    A written statement from a former employee of the Schwitzer Firm from the same matter stated:

> I have worked for about 3 years at William Schwitzer & Associates. I along with other staff members of the firm was [sic] encouraged to attend I.M.E. and Doctor [sic] appointments with clients of the law firm... **provide them with transportation to Mr. Schwitzer's office**. The patient would **meet Mr. Schwitzer and an agreement was worked out** between them**.** If the patient, now client, would need cash Mr. Schwitzer would send them to Case Cash...

**Mr. Schwitzer also employs runners that would go to accident scenes and sign up clients as well. One of these runners is [REDACTED] who would sign clients up at either the hospital, accident scenes or doctor appointments…**

**William Schwitzer also uses runners in all 5 boroughs** and I am familiar with [REDACTED] from Staten Island **who brings in labor law cases…**

In the past **Schwitzer has accused me of stealing clients and threatened me with bodily harm.** This was in October of 2015. I have also observed him threaten other employees of his firm…

**"I would also like to add that he keeps a brief case in his office with a large amount of cash and he uses this cash to pay both clients and the runners. By he I mean Mr. Schwitzer uses this cash to bring these cases to his firm."**

**Exhibit 3**, Employee Affidavit

85.    In another matter, with *another* employee, an attorney solely to originate clients from the Korean community and performed no legal work, the employee testified as follows:

> A.    Yes, I was summoned to Mr. Merlino's room one day, Mr. Schwitzer was present, and Mr. Merlino, Mr. Schwitzer confronted me and told me told me that they knew about me sending cases to Chrissy.  They were very angry at me.
>
> Q.    Do you remember what they told you?
>
> A.    They told me they know about it, the conversation got pretty hostile, they were angry with me, they said they were disappointed at me. Mr. Schwitzer raised his voice, he wanted to get

physical with me, he was acting very violent. He said -- I will tell you the exact words because it was so shocking to me it made an imprint on my brain, specifically he said "Italian Mafia they don't hurt women or babies, but Russian Mafia they'll cut a baby right in front of you -- right in front of you." That's what he said and I took that as a threat of physical violence, and then he said he can't control his anger so he has to step out of the office for half an hour to an hour otherwise he may not be able to control himself, and I took that as a serious physical threat and he told me I'm violating some fiduciary duty on Mr. Schwitzer, that he would report me to the disciplinary committee, that he has influence, he knows someone influential at the Appellate Division, that he would report me and I could get disbarred and be out on the street. And I took those words very seriously.

**Exhibit 4**, Transcript Excerpts, Chun Ho Chung v. Schwitzer.

86.     That attorney was promptly given a check for $50,000 to stay and originate more cases:

A.    Yes, right before I left. And I told them in the room, "Mr. Schwitzer, our trust has broken, I don't think I can work here anymore, I

think I need to resign, I need to move on," at which point Mr. Schwitzer summoned Tracy Liu to cut a check for $50,000. After all this, he wanted me to remain with the firm and bring in more business.

*Id.*

87.    W. Schwitzer addressed these allegations as follows:

> Q.  Did you threaten him with violence in any way?
> A.  Could have.  I mean, I -- listen, I could have said you know, John, I should beat
>
> the shit out of you.  But I was sitting -- you're there, I'm here.  I didn't get up.
>        I was pissed.
>
> Q.  Okay.  Did you say anything about some commentary about the Russian Mafia to Mr. Chung?
> A.  It's possible.
> Q.  Did you say anything about the Italian Mafia to Mr. Chung?
> A.  It's possible.

*Id.*

88.    W. Schwitzer further made clear that anything that occurs on the litigation front at Schwitzer Firm is run through and decided by him personally.

> Q.  All right.  Your testimony is anyone who works for you has to clear any sort of lawyer business or work they may do with you; correct?
> MR. LIEBERMAN:  Objection to the form of the question.
> Can you be more specific?
> MR. FARNOLO:  Well, he said closing. I'm just -- I'm not trying to be coy with you, but --
> MR. LIEBERMAN:  Well, we're talking about referrals of rejected cases.
> Are you saying --
> THE WITNESS:  I'm saying anything.
> So if you go to a -- to the court, you can't handle the PC for someone because you happen to be in the park without talking to me.

89.    In another matter, currently pending, a Claimant represented by Schwitzer, who had been on the job only 8 days, purportedly had a fall and went to the hospital. The supervisor on the job attempted to visit him at the ER, when the following transpired:

3. I was informed that Plaintiff was taken to New York Presbyterian Methodist Hospital.

4. I attempted to visit Plaintiff at New York Presbyterian Methodist Hospital roughly one hour from the time the alleged accident took place.

5. At the time of my visit, I was told that Plaintiff was in his hospital room speaking with his attorney.

6. I was refused entry to Plaintiff's hospital room because Plaintiff's attorney was in the room with him. I was not given the name of the attorney or firm who was present.

7. After being refused entry to Plaintiff's room, I left New York Presbyterian Hospital and returned back to work.

8. Having now seen the papers filed in this matter, I recognize the name of the law firm representing Plaintiff.

9. That firm, or people on their behalf, appeared at the job site on several dates prior to the purported accident date, unannounced, and handed out sweaters, shirts, food, and other items to various workers on the job site. The shirts and other items handed out bore the name of the firm now representing Plaintiff. These same individuals were observed on other dates, not in any identifying clothing, just prior to and between shifts and on lunch breaks, having extended conversations with workers on the site.

90.     As part of the Fraud Scheme, Claimants were instructed, coached, and/or pressured by runners, at the direction of, or directly by, the Schwitzer Defendants, to fake an accident, and fake and/or greatly exaggerate their injuries. The Schwitzer Defendants would then refer Claimants to the Defendant Medical Providers, who would provide a myriad of unnecessary, excessive, unwarranted, and costly healthcare services which were not causally related to the alleged workplace accident. The Schwitzer Defendants knew or reasonably should have known that the Claimants were faking their injuries and receiving such unnecessary and unwarranted medical services that were not causally related to the alleged workplace accident.

91.     Upon information and belief, the Schwitzer Defendants employ Spanish-based OSHA training courses through sponsorships, advertising, and attendance as another method of recruiting and grooming immigrant claimants in furtherance of the Fraud Scheme and the aiding in the unlawful immigration and work authorization of Claimants. Schwitzer Defendants advertise themselves at OSHA classes and advertise OSHA classes through their own social media:





92.    Upon information and belief, the Schwitzer Firm, including Defendant John Merlino, attends and provides instructions to said OSHA classes when, upon further information and belief, Merlino is not authorized or credentialed to provide such information. Here, Defendant John Merlino is seen addressing an OSHA training course:




John C. Merlino

93.    The aforementioned courses have advertised, in Spanish, that OSHA cards can be received that same day, regardless of the impossibility of completing the full OSHA 10 hour and 30 hour training sessions with mandatory testing in just a few hours.

94.    In sum, the Fraud Scheme, despite its complexity at the granular, medical level on individual cases, is relatively simple:

- Recruit Claimants.

- Have Claimants stage accidents and/or exaggerate injuries.

- Use confederate medical providers to falsely credit the exaggerations and falsely, facially, justify unnecessary surgeries.

- Manipulate an overburdened Workers Comp system to bootstrap validity.

- File fraudulent lawsuits.

- Keep having Claimants get unnecessary surgeries and filing supplemental Bills of Particulars until threat of economic harm causes capitulation.

- In the interim, nullify any financial consequence of delayed settlements *via* collateralizing your receivables.[4]

### b. *The Fraud Scheme Enterprise*

95.    The Fraud Scheme operated by way of an association-in-fact enterprise (the "Fraud Scheme Enterprise") within the meaning of 18 U.S.C. § 1961(4).

96.    The common purposes of the Fraud Scheme Enterprise was to defraud Plaintiff and those similarly situated into fraudulently-induced Workers' Compensation and general liability indemnity payments, and to coerce such settlements and awards through protracted litigation,

---

[4] Receivables financing opened 2015, continued 2025 into 2030. UCC #: 202503315379392.
Receivables financing opened 2015, continued 2025 into 2030. UCC #: 202504155455520.
Receivables financing opened 2015, continued 2025 into 2030. UCC #: 202504155455532.
Receivables financing opened 2015, continued 2025 into 2030. UCC #: 202506156233121.

falsely escalating treatment, and threat of economic harm. In doing so, Defendants took full advantage of the legal duty to defend an insurer bears on behalf of its insured, as well as good faith duties to protect insureds from excess judgments.

97.     The Fraud Scheme Enterprise was an ongoing organization with a decision-making and operational structure that, while informal, was coordinated and functioning, including: (i) leadership, management, and pursuit of claims necessary to the Fraud Scheme by Schwitzer Firm, W. Schwitzer (as to litigation and overall management of the Fraud Scheme), and Merlino (as to managing the WC firms and the overall Scheme operations through the Workers' Comp system); (ii) operators who executed day-to-day acts, including Schwitzer Firm employees, as well as the Medical Provider Defendants who purportedly treated Claimants, but whose true purpose was to provide falsely substantiated clinical, diagnostic, and surgical treatment; and (iii) facilitators who provided financial and logistical support, including Runners and Funders. The Enterprise used established channels - email, phone, mail, bank wires, and corporate entities - to achieve the common purpose.

98.     The Fraud Scheme Enterprise is distinct from any single Defendant named herein. Each Defendant is a separate legal/real person who conducted or participated in the conduct of the Enterprise's affairs, not merely its own affairs, and indeed without the Fraud Scheme Enterprise machinery operating, could not have profited from the Fraud Scheme in its own right.

99.     The Enterprise engaged in, and its activities affected interstate commerce, including through interstate communications, mailings, and financial transactions across state lines, as well as several instances of Claimant transit to utilize out of state surgical centers.

100.    Each Defendant so charged in Count I, *infra*, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity,

exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise ("Count I Defendants"). Each Defendant so charged in Count II, *infra*, agreed to participate in the Fraud Scheme Enterprise through a pattern of racketeering activity, and while not necessary to establish at the pleadings stage, did in fact engage in overt acts in furtherance of the Fraud Scheme Enterprise and its common purpose ("Count II Defendants").

101.    From approximately 2018 through the present and continuing, Count I Defendants committed at least two predicate acts of racketeering within the past ten years, including but not limited to violations of 18 USC § 1341 (mail fraud), § 1343 (wire fraud), § 1952 (Travel Act violations), and § 1951 (Hobbs Act violations), specifically as pled *infra*. The predicate acts were related (same participants, victims, methods, and purpose) and amounted to, or posed a threat of, continued criminal activity.

102.    The pattern of racketeering activity described above and set forth in detail below reflects continuity in that:

    **a.**  the predicate acts occurred repeatedly over a substantial period of time – at least 7 years and continuing - not a single, isolated scheme (closed-ended); and/or

    **b.**  the Fraud Scheme Enterprise's regular way of doing business relied on the same unlawful methods and remains ongoing or, at minimum, poses a specific threat of repetition at the time of this filing (open-ended).

103.    The Fraud Scheme Enterprise is not a mere "rimless hub and spokes" conspiracy; each element of the Enterprise had substantial interrelation with each other Enterprise element and relied on the conduct of all other participants to play their roles to further the Enterprise's common purpose.

104.    The Fraud Scheme Enterprise is generally depicted in Figure 2, below, with red arrows signifying Fraud Scheme inputs, and the green arrows signifying flow of funds of Fraud Scheme proceeds.

**Fig. 2:**



### i. *Schwitzer Defendants*

105.     As set forth above and in detail below, the Schwitzer Defendants functioned as the core management, supervisory, and logistical clearinghouse of the Fraud Scheme Enterprise.

106.     Schwitzer Defendants employed runners to recruit Claimants to the Fraud Scheme.

107.     Schwitzer Defendants arranged for funding to Claimants to ensure cooperation, and to induce the fraudulent treatment protocols and surgeries by Medical Providers, needed to accomplish the Fraud Scheme Enterprise's common purpose. The preferred funder was Case Cash, which has been documented to make advance installments contingent on undergoing surgeries.

108.     Schwitzer Defendants caused the creation of, subsequently packaged, and presented, the fraudulent, knowingly false medical documentation *via* affiliated WC firms as to Workers' Comp proceedings under Merlino's supervision, and directly packaged and presented this false evidence in litigation proceedings so as to extort, or attempt to extort, Plaintiff and others similarly situated, prolong litigation, and otherwise defraud and attempt to extort Plaintiff and others similarly situated.

### ii. *PPNY: The Gatekeeper Clinic*

109.     As discussed *supra*, similar to *Rainford* and *State Farm v. Tri-Borough* (2d Cir. 2024), PPNY and Brooklyn Med are integral to the Fraud Scheme and the Enterprise operations, as they "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." *Id*. at 73 (emphasis added). These clinics chart and falsely justify the course of unnecessary diagnostics, escalating treatment, false exhaustion of conservative treatment, and justification for high-dollar valuation surgeries.

110.    As also noted *supra*, PPNY defaulted in the Puac v. 37th BG matter, in turn admitting to the truth of the following:

> 88)    As discussed *infra* (under "█████████"), PAIN PC falsely presented a lumbar EMG study as presenting "evidence of" radiculopathy, where the study was by definition a clinically negative result. This was a materially false statement, known to be false when it was made, *designed* to be relied upon in order to justify an entirely unwarranted surgery.
>
> 89)    PAIN PC made knowing and false material misrepresentations as the nature and causality of Plaintiff's purported injuries, which PAIN PC knew and intended would be relied upon to artificially justify unnecessary surgeries (including the surgeries by █████) to inflate the value of the underlying claim, and that those same materially false findings and statements would be relied upon in the underlying litigation.

111.    The above actions are not one-offs; they are central to PPNY's operation; PPNY will simply clone the same appointment record dozens of times, and incorporate clinically negative EMGs that are purported to reveal "evidence of" (but not a clinical diagnosis of) radiculopathy, and same is used as the foundation for fraudulent surgeries. PPNY Defendants will further provide (or purport to provide) injections, either at co-conspirator facilities, or within their own ambulatory surgical centers (Defendants Island ASC and Crotona ASC) and assert liens or receive funding (or both) for these knowingly unnecessary and non-causally related procedures. PPNY provides such falsified documentation to Schwitzer Defendants in their own right, and refer Claimants to MRI providers – here, typically Kolb Defendants – and to Enterprise surgeons in furtherance of the Fraud Scheme and Enterprise.

112.    Notably, in <u>Geico v. Mayzenberg</u>, Geico established that there was no material fact in genuine dispute and was entitled as **a matter of law** to prevail on its fraud and RICO claims originating from (non-party herein) Igor Dovman's use of shell companies purporting to be "marketing" companies to facilitate an illegal patient referral and kickback scheme in which Mayzenberg participated.  Presico Inc. was identified as one such company post-judgment – PPNY Defendant Reyfman directly received several of those checks during the relevant time period:







113.    As part of the Fraud Scheme, PPNY Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged accident.

114.    As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged accident.

115.    As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging inflating the settlement value of such lawsuits.

116.    PPNY Defendants knowingly profited from upfront payment from Funding Defendants and liens for the alleged medical and diagnostic services rendered by PPNY Defendants, which were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

117.    PPNY Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom PPNY Defendants provided medical and diagnostic services and received reimbursement for such services.

118.    PPNY and its individual Defendants were not sought to treat; they were sought to issue causality statements and set the stage for ever-escalating and more invasive treatment to falsely substantiate serious injuries where none exist. Their primary purpose is paper for litigation and subsequent referral for unnecessary MRIs and surgical consults.

### iii.    *Kolb Defendants – Fraudulent MRIs*

119.    The Kolb Defendants have repeatedly been named as Defendants in actions wherein the veracity of Kolb's MRI readings have been called into question.[5] This is of particular note where a) Kolb recently failed to renew his Workers' Comp authorization, removed from the list of authorized providers as of July 1, 2025, and b) Kolb's own former business partner provided sworn allegations of the following:

> e.    When I was not in the office, Dr. Kolb began using my signature stamp to finalize draft reports authored by me even though I had not finalized the reports.
>
> f.    Dr. Kolb modified MRI reports generated more than six (6) months before to include non-substantive modifications in order to enhance their value in personal injury litigation, in order to ingratiate himself with referring attorneys at the expense of my reputation.

**Exhibit 5,** Affidavit of Dr. Lichy.

---

[5] Roosevelt Road/Tradesman v Hajjar, Case 1:24-cv-01549-NG-LB (E.D.N.Y., filed 3/1/24); Roosevelt Road Re, Ltd. et al v. Wingate, Case 1:24-cv-06259 (E.D.N.Y., filed on 9/7/24); Ionian Re, LLC v. Gorayeb, et al., Case 1:24-cv-07098 (E.D.N.Y., filed 10/8/24); Union Mutual Fire Ins Co v Kolb Radiology P.C/Thomas M. Kolb, M.D et al., EDNY 1:24-cv-06082 and Julio Cesar Puac v. BG 37th Avenue Realty LLC v. Kolb et al Queens Co. Index No. 702770/2022 (Ex. 1).

120.    It has been confirmed by Kolb's staff that the Kolb's practice outside of his breast cancer specialty exists solely to service personal injury attorneys:

> Q    The radiology work he does for neck and back and other orthopedic injuries, that's for litigation work; is that right?
>
> A    Correct. That's what he does for the MRI practice. He reviews the body parts, any body part for the facility where I

121.    Kolb has further begun to engage in a disappearing act when called to provide testimony, taking impromptu vacations without informing his staff beforehand where he is going or when he is returning, at the same time as a similarly situated party, and without informing the Court or attorneys on trials scheduled 10 months in advance:

> Additionally, the Court has revisited its earlier determination on the missing witness charge for Dr. Weinstein. The Court found Dr. Kolb's assistant's testimony to be completely incredible, and I suspect that neither Dr. Kolb nor Dr. Weinstein appeared because they didn't want to be subject to cross examination. And for that reason I am going to give a missing witness charge as to both of them. And I wanted to give Counsel for plaintiff notification of that as soon as I changed my mind in the event you can, between now and the end of trial, get either one of them into the courtroom.

122.    Kolb Defendants engage in the simple, yet lynchpin, activity for the Fraud Scheme Enterprise to function - intentional MRI misreads. *Always* over-identifying or overstating non-

existent or minor findings, falsely painting them as traumatic, and omitting indicia of pre-existing or degenerative conditions. These intentional false statements serve to justify continuing and escalating unnecessary treatments, including surgery.

### iv. _Total Ortho Defendants – Spine Surgeries_

123.    Since at least 2018 (and in fact much earlier), Total Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme. Portions of Total Ortho's individual component of the scheme date back as far as 2006.

124.    Defendant Lerman, a principal owner of Total Ortho, was recently denied his continued authorization to treat injured workers in a scathing 19-page decision by the Workers' Comp Board dated April 15, 2025, which found, _inter alia_, Lerman engaged "in wanton disregard and deviation from the standard of care," that Lerman's conduct amounted to professional misconduct in the form of at least negligence, incompetence, and "Willfully making or filing a false report, or failing to file a report required by law or by the department of health or the education department, or willfully impeding or obstructing such filing, or inducing another person to do so" (Education Law §§ 6530[3], [5], [21]), as well as:

The noted treatment to injured workers set forth above, both individually and in the aggregate, does not comport with applicable MTGs and constitutes a violation of your pledge to comply with the provisions of the WCL, Regulations and MTGs. You also consistently fail to provide or maintain adequate medical documentation or record-keeping. You also consistently fail to provide clinical rationales for seeking variance from the MTGs to justify the medical necessity of the variance that you are requesting. You also repeatedly submit PARs for services that have been denied without escalating them for MDO review. You repeatedly resubmit PARs for services that have already been denied, even when there has been no substantial interim change in the claimant's clinical or functional status to warrant such reconsideration. You have performed invasive/risky procedures, without adequately exhausting more conservative (and less risky) treatment modalities. You have repeatedly provided incomplete and/or inconsistent medical documentation. You have failed to follow published Board processes for the submission of medical bills, and you have billed in excess of the Board's MFS, at times for services of questionable necessity. Many of these behaviors in and of themselves, and certainly the constellation of these behaviors taken in aggregate, particularly when there appears to be a clear pattern of these behaviors being repeated, constitutes more than sufficient grounds to deny your authorization to treat injured workers.

Moreover, this same conduct constitutes grounds for the denial of your authorization to render medical care to injured workers and/or perform independent medical examinations pursuant to WCL §§ 13-d(2)(a) and (d). Further, this conduct also amounts to professional misconduct pursuant to Education Law §§6530(3), (5), (21) and (35). Accordingly, the Board declines to grant your application for renewal of your authorization. Finally, it is noted that the Supreme

**Exhibit 6**, WCB April 15, 2025 Denial of Authorization to Lerman.

125.     As part of the Fraud Scheme, Total Ortho Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Merchants and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

126.     As part of the Fraud Scheme, Total Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the

fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

127.    As part of the Fraud Scheme, Total Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

128.    As part of the Fraud Scheme, Total Ortho Defendants engaged in the use of interstate facilities and interstate travel with intent to promote, carry on, and/or facilitate the promotion or carrying on of specified unlawful activity, and did in fact promote, carry on, and/or facilitate same.

129.    Each of Defendants Lerman, Thompson, Long, Drazic, Kumar, and Jeyamohan controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

130.    Total Ortho Defendants knowingly profited from reimbursements and upfront payments from the Funding Defendants for the alleged medical and diagnostic rendered by Defendants Lerman, Kumar, Jeyamohan, Drazic, Thompson, and/or other employees/agents of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

### v.    *All County Defendants – Auxiliary Value Drivers*

131.    All County Defendants are part of a triumvirate of surgeons which have functioned as Schwitzer Firm's go-to surgeons in the past decade. The remaining two, identified herein as "Ortho-1," a spine surgeon, and "Ortho-2," primarily a knee and shoulder surgeon, are referenced herein by those designations and are not named Defendants.

132.    Since at least 2018, All County Defendants have been involved in the medical treatment of numerous Claimants involving purported labor law claims in furtherance of and as a necessary step for the execution of the Fraud Scheme.

133.    Defendant Persich controlled and directed the medical services provided to Claimants by All County, including evaluating, diagnosing, and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

134.    As part of the Fraud Scheme, All County Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Merchants and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

135.    As part of the Fraud Scheme, All County Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

136.    As part of the Fraud Scheme, All County Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

### vi.    *NYCMNR – TBI On Demand*

137.    NYCMNR Defendants are providers that provide TBI diagnoses where none exist.

138.    Since at least 2018, NYCMNR Defendants have been involved in the medical treatment of numerous Claimants involving purported labor law claims in furtherance of and as a necessary step for the execution of the Fraud Scheme.

139.    Defendant Golzad controlled and directed the medical services provided to Claimants by All County, including evaluating, diagnosing, and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

140.    As part of the Fraud Scheme, NYCMNR Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

141.    As part of the Fraud Scheme, NYCMNR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

services that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged accident.

142.    As part of the Fraud Scheme, NYCMNR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

### vii.    410 Ditmas/CMI Defendants – The Total Ortho Express

143.    Following the same playbook of *Rainford* and *State Farm v. Tri-Borough*, following initial evaluation of the Claimants by, in most instances, Brooklyn Med,[6] the Claimants would be immediately referred to CMI for numerous MRIs bearing no semblance to their initial complaints, and would be prescribed physical therapy with Brooklyn Med, chiropractic treatment with NSF Chiro/Lebson, and acupuncture with Unicorn, usually 3x/week each, regardless of complaints.

144.    The MRI referrals to CMI would always include an MRI for the cervical and lumbar spine, and either a knee, a shoulder, or both. Invariably, all reports prepared by CMI would contain purported conditions that were used to justify continued unnecessary treatment and referrals. CMI would omit any degenerative findings.

145.    The 410 Ditmas Clinic used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury, to justify months of physical therapy sessions and injections for Claimants,

---

[6] If Salehin was not there that day, NSF Chiro/Lebson would perform the initial consultation with identical referrals and recommendations.

which were in turn represented as being a course of allegedly failed conservative treatment in order to justify surgeries.

146.    Post-MRIs, the Claimants were invariably referred to Advanced Ortho/Avshalumov for their knee or shoulder, NSF Chiro for one or more EMGs, Big Apple PM for neck or back injections (or both), and shortly thereafter, Total Ortho.

147.    Advanced Ortho/Avshamulov would invariably recommend an arthroscopy.

148.    NSF Chiro's EMG tests, regardless of clinically negative raw result data, would invariably conclude not a diagnosis, but that the tests demonstrated "evidence of" radiculopathy.

149.    Big Apple PM/Apple would provide between 1-3 injections, which invariably failed to provide relief. The diagnoses offered by Apple would be identical for every patient. The only difference between the vast majority of Big Apple PM/Apple's reports are the date and patient name.

150.    As part of the Fraud Scheme, 410 Ditmas Clinic Defendants employed dual- and multi-purpose employees whose job duties included steering Claimants to Schwitzer Firm and other affiliate firms (essentially, Runners), including Margarita Sarkisyan (who has in fact notarized dozens of filed legal documents including documents wholly unrelated to 410 Ditmas, is the "Office Manager" for Brooklyn Medical Practice, the hiring manager for the non-physician owners, the Biling Manager for Big Apple Pain, and the records custodian for most if not all of the 410 Ditmas Defendants), Steven Roque (a former Claimant, who has provided translation affidavits for other Enterprise law firms), and Vyacheslav Koval (who nominally works for Brooklyn Med, lives with the non-physician owners, and was listed as an additional insured on their personal vehicles).





Insured Name: A█████████████
Owner's Vehicle: 2019 OTHER|LEXUS 500
Additional Driver: KOVAL, VYACHESLAV

151.    The 410 Ditmas Clinic Defendants further directly employed several Claimants, including Willie Wactor (508260/2020), Sherlon Roberts (529975/2021), Akmal Fazilov (516926/2017), Roxanna Cordero and Crissia Andino (513213/2016), and Crissia Andino again (510062/2019). Fazilov's job, for 30-36 hours a week - his *full-time job* - was to deliver papers between and amongst lawyer firms and the clinic.







152. Fazilov underwent an arthroscopy by Avshalumov/Advanced. Andino had a C3-4 fusion (at 26 years old) by Karen Avanesov (Lerman's partner and a principal of Total Ortho).

153.    410 Ditmas further purportedly "employed" Aylin Vidals (523467/2019) *via* W-2, issuing her ~$3,600, who received an arthroscopy by Avshalumov/Advanced (and did not disclose employment with 410 Ditmas Clinic during her case). 410 Ditmas similarly "employed" and issued ~$3,200 *via* W-2 to Halyna Moduliak (501026/2022), who received an unknown surgery by Avshalumov.

154.    In addition, the daughter of the non-physician owner family, who had been "employed" by non-Party Subin law firm (another injury firm facing pending Rico suits) since shortly after graduating high school, has since passed the bar in March 2025. At last check in August 2025, she had appeared as attorney of record in twenty-nine (29) cases. In five (5) of those cases, discovery has not been performed or responses have been improperly filed under seal. In two (2) of those cases, Claimants treated with unrelated providers. In each of the remaining twenty-two (22) cases,  out of 29, Claimants treated with 410 Ditmas Defendants, CMI, and/or Total Ortho:

| | | | | |
|---|---|---|---|---|
| 502995/2023 | 152722/2022 | 154119/2024 | 501296/2022 | 503265/2023 |
| 506500/2023 | 511230/2024 | 514134/2022 | 518999/2024 | 522563/2023 |
| 526160/2023 | 529876/2024 | 532840/2023 | 534091/2023 | 800010/2022E |
| 802434/2024E | 806911/2021E | 812708/2023E | 814329/2023E | 816681/2022E |
| 816695/2024E | 817819/2022E | | | |

As of this writing, that number is up to 67 cases, with the presence of 410 Ditmas, CMI, and/or Total Ortho on virtually every additional case where information is available.

155.    Notably, pursuant to prior testimony from Defendant Lerman, Defendant Salehin is an undisclosed owner in Total Ortho. This renders every referral from Brooklyn Med to Total Ortho at best self-interested, and at worst, in the case of Medicaid/Medicare patients, a violation of the Stark Law, 42 USC § 1395nn.

Q        How many partners are there?

A        There is three partners.

Q        Who are they?

A        Dr. Avanesov, Dr. Saleehin, Dr. Ruotolo and me.

156.    As part of the Fraud Scheme, 410 Ditmas and CMI Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

157.    As part of the Fraud Scheme, 410 Ditmas and CMI Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

158.    As part of the Fraud Scheme, 410 Ditmas and CMI Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging inflating the settlement value of such lawsuits.

159.    410 Ditmas and CMI Defendants knowingly profited from upfront payment from Funding Defendants and liens for the alleged medical and diagnostic services purportedly rendered, that were unnecessary, excessive, unwarranted and/or costly, and were not causally

related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

160.    410 Ditmas and CMI Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom 410 Ditmas and CMI Defendants provided medical and diagnostic services and received reimbursement for such services.

161.    410 Ditmas and CMI Defendants, and its related individual Defendants, were not sought to treat; they were sought to issue causality statements and set the stage for ever-escalating and more invasive treatment to falsely substantiate serious injuries where none exist. Their primary purpose is paper for litigation and subsequent referral for unnecessary surgery.

## IV.    Defendants' Pattern of Racketeering Activity

162.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud from Plaintiff and others, began on or before 2018, and continues to the present day.

163.    This pattern includes, among others, the following predicate acts exemplified by the below Claimants, wherein the Fraud Scheme Enterprise and the listed predicate acts caused Plaintiff direct harm:

### i.    Claimant A

163.    Claimant A's relevant, redacted records are attached as **Exhibit 7-A.**

164.    Claimant A is a Queens resident, who has used multiple names and at least 4 different social security numbers, who claimed a slip and fall on tile flooring while carrying a ladder at construction site on October 3, 2019. He testified that he had been working at the accident location for only 3 days when the accident occurred. Claimant A was taken to the Emergency

Department of NYU Langone Hospital, where he made various complaints of right lower back pain after either slipping while carrying a ladder, or straining his back setting down a ladder.

Assessment/Plan:
47 y/o male, no pmhx
Spanish speaking
P/w right lower back x 1 hour. States pain occurred when slipping with a ladder on this shoulder. Reported pt strained his lower back, and lowered himself down to the floor. No falls or head injuries. Pt was able to ambulate afterward but reports pain localized to lower back. Nonradiating.
Denies h/o back pain.

In addition to the history, physical, assessment and plan of care outlined in the physician assistant's documentation, when I obtained the patient's history of present illness, the patient noted that: 47 yo M with no sig pmhx with R lower back pain x 1 hour after slipping while carrying a ladder. Did not fall off the ladder. Fell and had pain noted on his right side. Denies weakness, numbness, midline pain. Denies incontinence or retention of the bowel or bladder. Sensation and motor intact. C/o significant pain to the R side. Ambulatory bu with pain. On exam, no obvious bruising, erythema. No midline pain. R sided lower back pain palpable. Strength and motor intact 5/5 lower ext. Sensation intact lower ext. Imp: muscle sprain. No neuro deficits. No indication for imaging at this time. Will give nsaids and lidocaine patch and reassess. Upon my examination, I found that the patient was well appearing in no acute distress. My assessment and plan of care for this patient is: see above. Please also see physician assistant's note.

165.    The latter is in fact consistent with a witness statement given at the scene:



166.    In any event, Claimant A's complaint **was exclusive to low back pain**. He presented **zero** objective indication of injury, and had full range of motion throughout. **No bruising, swelling, tenderness, or neurological deficits.** Diagnostic films were not deemed necessary and Claimant A was discharged same day**.**

167.    **Turning to the present, in a Claimant who perhaps had a back strain, had no objective signs of injury, and was discharged the same day, Claimant A was ultimately the recipient of <u>five surgeries by Total Ortho</u>:**

- Right knee arthroscopy by Defendant Drazic (Total Ortho)

- L5-S1 Posterolateral Lumber Fusion by Defendant Lerman (Total Ortho);

- C4/5 Anterior cervical discectomy and fusion with autograft and allograft bone on by Defendants Kumar and Jeyamohan;

- Right shoulder arthroscopy by Defendant Drazic (Total Ortho);

- *Second* right knee arthroscopy by non-party employee surgeon of Total Ortho.

168.    On October 8, 2019, 5 days later, Plaintiff filled out and signed a Workers' Comp C-3 claim form. That form is blank as to representative and contained no signature or name, just a pre-printed identification number and title "Attorney." The identification number is that of Bangel, Cohen & Falconetti, LLP, a firm which frequently appears as the WC Firm where Schwitzer Firm is attorney on the liability action.



169.    The notice of appearance is not signed by the WC Firm attorney until nearly a month later.



170.    Within the C-3, the mechanism of injury had changed yet again.

6. How did the injury/illness happen? (e.g., I tripped over a pipe and fell on the floor)
I tripped and fell on debris that was on the floor.

171.    Within the C-3, dated October 8, 2019, Claimant A claimed to be under the care of a transient chiropractor, **who would not actually have their initial evaluation of Claimant A or begin treatment until October 22, 2019.**

172.    The chiropractor later affirmed under penalty of perjury that he in fact performed the services detailed in the initial report and for which bills were submitted. However, several entries are signed by initials "ALS," who is not identified.

*This form is signed under penalty of perjury.*
Board Authorized Health Care Provider - Check one:
[X] I provide the services listed above.
[ ] I actively supervised the health-care provider named below who provided these services.
Provider name    JANAN SAYYED, DC          Specialty    chiropractic
Board Authorized Health Care Provider signature:
JANAN SAYYED, DC                                  chiropractic                12/10/2019
Name                                                        Specialty                   Date
C-4.0 (1-11) Page 4 of 4

173.    Plaintiff would continue to treat with the above chiropractor, as well as numerous other transient providers at 97-30 63rd Dr. and 96-14 63rd Dr. in Rego Park, which are across the street from each other and host dozens of transient providers (as well as a PPNY office and the office of the WC Firm referenced *supra*, ¶ 60-61.)

174.    Throughout the unnecessarily large number of purported chiropractic visits, Claimant A was prescribed voluminous amounts of DME from a company called EZ Ortho Supply Inc., which, along with its owner, have recently been sued by Geico in this District for racketeering claims in the no-fault context (1:24-cv-07330-NGG-RML). Claimant A was also prescribed DME from Allure Recovery Inc., which shares a registered address with several Funders, including Axe Funding, which has been utilized by Schwitzer Firm Claimants.

175.    On November 19, 2019, Claimant A was referred by the chiropractor for MRIs at a non-defendant facility for his cervical and lumbar spine. **Both demonstrated degenerative conditions without indicia of trauma.**

176.    On December 4, 2019, Claimant A returned to the non-defendant provider for MRIs of both knees. The left knee demonstrated a mild joint effusion; the right knee demonstrated a medial meniscus posterior horn tear. Claimant A was sent separately for MRIs of his shoulders to Defendant CMI.

177.    Claimant A presented to Defendant PPNY and was seen by physician's assistants on behalf of Defendant Kosharskyy on December 13, 2019, and January 27, February 4, and February 24, 2020, now with complaints of pain to his neck, back, bilateral shoulders, and bilateral knees. Plaintiff – who was in no acute distress at the hospital on date of accident with solely low back soreness and no objective sign of any injury – was deemed by PPNY to be **100% disabled**. On February 4, 2020, Kosharskyy performed a cervical epidural.

178.    On March 2, 2020, another PPNY employee performed an epidurography at Island ASC, a facility which Kosharskyy and Reyfman have an ownership interest. Claimant A's primary physician is listed as Reyfman, who had never seen Claimant A.

179.    Defendant Shulkin saw Claimant A on behalf of Kosharskyy on March 26, 2020, for a copy-pasted visit, and this process would repeat itself using different PAs for the remainder of Claimant A's treatment.

180.    On January 6, 2020, Claimant A presented to Defendant Lerman, who recited the prior MRI reports, purportedly performed a physical exam, and told Claimant A to follow up in 4-6 weeks. Claimant A saw Defendant Lerman again 6 *months* later on July 20, 2020, with complaints of lumbar and cervical spine pain. Defendant Lerman erroneously noted that no

epidurals had been done, but regardless of that error, recommended an L5/S1 decompression and fusion. Lerman sent Prior Authorization Requests ("PARs") to perform same on July 21, 2020 and September 11, 2020.

181.    On July 30, 2020, Claimant A saw Defendant Lerman at Defendant Total Orthopedics and Sports Medicine for a "second opinion" regarding his right knee pain (the first opinion being from Defendant Drazic, also of Total Ortho). For purposes of that visit, Claimant A's story changed from "the patient trip and fell over debris," to "the plaintiff trip and fall over debris, landing on his right knee."

182.    On September 8, 2020, Claimant A underwent right knee arthroscopic surgery, performed by Defendant Drazic at All City Family Healthcare Center. The sole diagnosis noted by anesthesiology was "right knee pain." The claimed surgical findings were not consistent with the imaging studies performed:

| Structure | MRI report | Operative report | Consistent? | Notes |
|---|---|---|---|---|
| **Lateral meniscus** | **Intact.** | Peripheral fraying noted; lateral meniscus debridement performed. | **No** | Imaging says intact; surgery documents pathology + treatment. |
| ACL | Intact. | "Fraying but overall intact." | Partial | Surgery downgrades "intact" to "frayed" |
| Synovitis & medial plica | Nonexistent. | Synovectomy and plicectomy performed; "synovitis and medial plica" listed in postop Dx. | **No** | Added disease & procedures not supported by the MRI. |
| Loose bodies | "No masses or fluid collections." | "Several loose free floating small loose bodies" noted and removed. | **No** | MRI says none; op note says several. |

183.    The operative report **noted that the tear was "removed"** using an arthroscopic shaver and fraying of the lateral meniscus was removed using the same shaver. No actual repairs were performed, simply purported debridement. **The same tear purportedly removed shows up on a later MRI**.

184.    Claimant A returned to Total Ortho and Dr. Lerman on December 14, 2020, regarding his cervical and lumbar pain. A lumbar discectomy and fusion was recommended and **subsequently performed** on January 26, 2021, by Dr. Lerman and Dr. Leven at Nassau University Medical Center ("NUMC").

185.    The operative report from this procedure by Dr. Lerman is one out of at least 21 verbatim identical such reports, 9 of which were for Schwitzer Firm clientele, and not one of which submitted a specimen of purportedly removed disc material to pathology, standard practice, and the only physical evidence of a performed surgery. This takes on particular relevance where, as in one of the listed cases below, marked ****, post-op imaging *revealed no post-surgical change*.

NYSCEF

| Index # | Doc #: | Claimant | Attorney |
|---|---|---|---|
| 703320/2020 | | **Claimant A** | William Schwitzer & Associates |
| 21764/2018E | 48 | Aisha Barrett/Parker | William Schwitzer & Associates |
| 707461/2018 | 113 | Jose Jimenez | William Schwitzer & Associates |
| 153145/2016 | 61 | Dorge Batista | William Schwitzer & Associates |
| 507950/2019 | 66 | Damian Aguayza | William Schwitzer & Associates |
| 521342/2016 | 98 | Ramon Rijo | William Schwitzer & Associates |
| 26347/2016E | 75 | Adriana Galarza | William Schwitzer & Associates |
| 707527/2020 | 52 | Carlos Parra** | William Schwitzer & Associates |
| 720236/2019 | 54 | Marin Esteban | William Schwitzer & Associates |
| 503861/2022 | 25 | Norma Rosario | Elefterakis, Elefterakis & Panek |
| 32478/2020E | 132 | Freddys Tejeda Soto*** | Elefterakis, Elefterakis & Panek |
| 515311/2016 | 636 | Lazaro Hernandez Dominguez | Elefterakis, Elefterakis & Panek |
| 524810/2018 | 47 | Yeison Moncion Gomez | Elefterakis, Elefterakis & Panek |
| 525331/2020 | 160 | Maria Rojas | Liakas Law PC |
| 504588/2020 | 201 | Christopher Lopez**** | Liakas Law PC/Cherny |
| 508758/2020 | 69 | Juan Ortiz | Khavinson & Mandronico PC |

| 150406/2021 | 38 | Francisco Martinelli | Khavinson & Mandronico PC |
| 151479/2020 | 39 | Halmar Reyes Guevera | Subin/Whorley |
| 511602/2019 |  | Faycal Feth Allah* | Subin/Cherny |
| 715629/2017 | 49 | Brett Semenetz | Grigoropoulos Law Group PLLC |
| 30525/2020E | 68 | Banister Mendez | Block O'Toole |

* Both on the same day.

** Leven listed as attending.

***Leven listed as attending but Lerman authored report.

**** **Radiology review found post-op imaging showed no post-operative change (NYSCEF Index #: 504588/2020, Doc. 159, p. 4).**

> A second significant problem that I encountered during my review of Mr. Lopez' imaging examinations is the lack of imaging findings to justify a surgical instrumented fusion at L5-S1 performed by Dr. Lerman. Dr. Lerman is a spine surgeon and therefore should be capable of reviewing MR images of the lumbar spine; the pre- and post- operative diagnoses provided by Dr. Lerman for the operation are "L5-S1 disc herniation" which is not present on the imaging. Even if a herniation were present, it is unclear why Mr. Lopez, a relatively young patient, would require instrumented fusion rather than a single level microdiscectomy. Dr. Lerman reports having performed "bilateral hemilaminectomy, facetectomy, foraminotomy" which are not evident on the post-operative radiographs.

186.    By way of example:

Aisha Barrett/Parker                                        Claimant A

44 year old female with history of disabling lower back pain and lumbar radiculitis, patient failed prolonged conservative care including Physical therapy.

NSAIDs, activity modification and pain management including lumbar epidural injections. Patient elected surgery since prolonged conservative care failed to alleviate her symptoms and disabling pain.

Risk and benefits was discussed with patient prior to surgery including but not limited to: the risk of death following complications of surgery or anesthesia, infection, non union, implant failure, intraoperative or postoperative neurological deficits, bleeding, infections like HIV or hepatitis, or other complications like myocardial infarction, pneumonia, DVT, pulmonary embolism and stroke, and remote possibility of post operative blindness. Patient understood and agreed to proceed with surgery. Positioning:

   After administration of general anesthesia the patient was placed prone onto the Wilson Frame. Care was taken to position Gel padding under potential pressure points at the knees and elbows. A grounding pad was carefully positioned on the thigh and a strap around the thigh was positioned to hold the legs firmly in position.

48 year old male with history of disabling lower back pain and lumbar radiculitis, patient failed prolonged conservative care including Physical therapy.

NSAIDs, activity modification and pain management including lumbar epidural injections. Patient elected surgery since prolonged conservative care failed to alleviate his symptoms and disabling pain.

Risk and benefits was discussed with patient prior to surgery including but not limited to: the risk of death following complications of surgery or anesthesia, infection, non union, implant failure, intraoperative or postoperative neurological deficits, bleeding, infections like HIV or hepatitis, or other complications like myocardial infarction, pneumonia, DVT, pulmonary embolism and stroke, and remote possibility of post operative blindness. Patient understood and agreed to proceed with surgery. Positioning:

   After administration of general anesthesia the patient was placed prone onto the Wilson Frame. Care was taken to position Gel padding under potential pressure points at the knees and elbows. A grounding pad was carefully positioned on the thigh and a strap around the thigh was positioned to hold the legs firmly in position.

Prepping and Draping:
The back was prepped with a Duraprep solution. Standard draping of the lumbosacral area was performed leaving access to the posterior superior iliac crests

An approximately 1.5 inch parasagital incision was made bilaterally at L5-S1 levels. Electrocautery was utilized to control all bleeding. We went through the subcutaneous layer exposing the lumbosacral fascia. The subcutaneous layer was stripped on the both side to gain exposure to the posterior elements of the lumbar spine. The lumbosacral fascia was then opened. Newport MIS retractors were used to hold the soft tissues out of the way. Care was taken to avoid damage to the facet capsules of the levels not to be fused. The MIS retractor was then positioned for further lateral exposure. The posterolateral gutters were then exposed out to the tips of the transverse processes bilaterally. Care was taken not to violate the inter-transverse membrane. The gutters were then packed off.

HEMILAMINECTOMY, FACETECTOMY, FORAMINOTOMY L5-S1

Under microscopic control the interlaminar space was further cleared of any soft tissue debris. Using a Midas Rex 3mm burr a small sliver of the lower edge of the lamina was removed to enlarge the interlaminar opening. The ligamentum flavum was then incised. Epidural fat and the epidural space were appreciated. Small angled rongeurs were utilized to remove the lamina as far lateral as the medial wall of the pedicle.
Care was taken to protect the nerve roots and cauda equina throughout the entire procedure. Next each of the individual nerve roots of L5 and S1 were decompressed while decompressing neuroforaminas. Using gentle traction and blunt dissection adhesions around the bilateral nerve root were mobilized allowing medial retraction of the nerve roots over the ventrally located disc herniation in neuroforamina B/L. Small epidural veins were controlled using the micro-cautery. After coagulation the veins and adhesions were cut using a micro-scissors.

Inspection of Nerve Root and Foramen:
The nerve root retractor was removed from the spinal canal and nerve allowed to fall back into its normal position. With the aid of a microdissector and a nerve hook the nerve root and foramen were inspected for any signs of residual free fragments or neural compression
It was noticed that neuroforamen are wide open.
Insertion of Pedicle Screws: L5-S1
Due to resection of 70% of the facet B/L we now paid attention to PSF/Instrumentation. The MIS retractors were repositioned to visualize TPs perfectly. A small burr was used to make a small pilot hole in the base of the superior facet perpendicular to a line drawn from the mid-portion of the base of the transverse process.

Prepping and Draping:
The back was prepped with a Duraprep solution. Standard draping of the lumbosacral area was performed leaving access to the posterior superior iliac crests.

Incision and Exposure:
An approximately 1.5 inch parasagital incision was made bilaterally at L5-S1 levels. Electrocautery was utilized to control all bleeding. We went through the subcutaneous layer exposing the lumbosacral fascia. The subcutaneous layer was stripped on the both side to gain exposure to the posterior elements of the lumbar spine. The lumbosacral fascia was then opened. Newport MIS retractors were used to hold the soft tissues out of the way. Care was taken to avoid damage to the facet capsules of the levels not to be fused. The MIS retractor was then positioned for further lateral exposure. The posterolateral gutters were then exposed out to the tips of the transverse processes bilaterally. Care was taken not to violate the inter-transverse membrane. The gutters were then packed off.

HEMILAMINECTOMY, FACETECTOMY, FORAMINOTOMY L5-S1

Under microscopic control the interlaminar space was further cleared of any soft tissue debris. Using a Midas Rex 3mm burr a small sliver of the lower edge of the lamina was removed to enlarge the interlaminar opening. The ligamentum flavum was then incised. Epidural fat and the epidural space were appreciated. Small angled rongeurs were utilized to remove the lamina as far lateral as the medial wall of the pedicle.
Care was taken to protect the nerve roots and cauda equina throughout the entire procedure. Next each of the individual nerve roots of L5 and S1 were decompressed while decompressing neuroforaminas. Using gentle traction and blunt dissection adhesions around the bilateral nerve root were mobilized allowing medial retraction of the nerve roots over the ventrally located disc herniation in neuroforamina B/L. Small epidural veins were controlled using the micro-cautery. After coagulation the veins and adhesions were cut using a micro-scissors.

Inspection of Nerve Root and Foramen:
The nerve root retractor was removed from the spinal canal and nerve allowed to fall back into its normal position. With the aid of a microdissector and a nerve hook the nerve root and foramen were inspected for any signs of residual free fragments or neural compression.
It was noticed that neuroforamen are wide open.

Insertion of Pedicle Screws: L5-S1

Due to resection of 70% of the facet B/L we now paid attention to PSF/Instrumentation. The MIS retractors were repositioned to visualize TPs perfectly. A small burr was used to make a small pilot hole in the base of the superior facet perpendicular to a line drawn from the mid-portion of the base of the transverse process.

Following the saggital plane as depicted on the FLOUROSCOPY (also approximately perpendicular to the plane of the transverse process) a K-wire was inserted angling medially into the pedicle. This was repeated on the opposite side. Similarly at the base of the facet a small burr hole was made and a K-wire inserted in the pedicle. This was repeated on the opposite side. FLOUROSCOPY was obtained to verify the location of the pedicle. The same was performed at the next level.

After the Flouro Shot we withdrew each K-wire sequentially and placed a pedicle finder down into the tract of the K-wire with modifications made as necessary according to FLOUROSCOPY. The pedicle finder was replaced with a pedicle probe to examine the tract and verify the lack of perforation of the walls of the pedicle. The appropriate length pedicle screws (6.5mm X 40mm) from the Spinal Elements set were inserted into the pedicles bilaterally. In a similar fashion screws were placed in the remaining pedicles. All screws demonstrated acceptable parameters on stimulation. A second AP and lateral X-ray was obtained to verify good positioning of the screws.

POSTEROLATERAL FUSION L5-S1:
There was evidence of motion at the L5-S1 level. With careful retraction the posterolateral gutters were decorticated around the base of the pedicle screws and transverse processes, remaining of the facet joints, laminas, pars. The graft with BMP was carefully pushed laterally into the area of the transverse processes. The facet joint and pars were carefully packed as well.

Rod insertion and Fixation:
The gap between the L5-S1 pedicle screws was measured with a caliper. A rod was selected and contoured for connection to the screws. The rod was inserted and set screws were placed. The rod was inserted on the opposite side in a similar fashion. Gentle compression was performed and a setscrew was retightened. The remaining bone graft was positioned underneath and lateral to the rod in lateral gutters.
Final AP and lateral x-rays where taken showed hardware in excellent position.

Following the saggital plane as depicted on the FLOUROSCOPY (also approximately perpendicular to the plane of the transverse process) a K-wire was inserted angling medially into the pedicle. This was repeated on the opposite side. Similarly at the base of the facet a small burr hole was made and a K-wire inserted in the pedicle. This was repeated on the opposite side. FLOUROSCOPY was obtained to verify the location of the pedicle. The same was performed at the next level.

After the Flouro Shot we withdrew each K-wire sequentially and placed a pedicle finder down into the tract of the K-wire with modifications made as necessary according to FLOUROSCOPY. The pedicle finder was replaced with a pedicle probe to examine the tract and verify the lack of perforation of the walls of the pedicle. The appropriate length pedicle screws (6.5mm X 40mm) from the Spinal Elements set were inserted into the pedicles bilaterally. In a similar fashion screws were placed in the remaining pedicles. All screws demonstrated acceptable parameters on stimulation. A second AP and lateral X-ray was obtained to verify good positioning of the screws.

POSTEROLATERAL FUSION L5-S1:
There was evidence of motion at the L5-S1 level. With careful retraction the posterolateral gutters were decorticated around the base of the pedicle screws and transverse processes, remaining of the facet joints, laminas, pars. The graft with BMP was carefully pushed laterally into the area of the transverse processes. The facet joint and pars were carefully packed as well.

Rod insertion and Fixation:
The gap between the L5-S1 pedicle screws was measured with a caliper. A rod was selected and contoured for connection to the screws. The rod was inserted and set screws were placed. The rod was inserted on the opposite side in a similar fashion. Gentle compression was performed and a setscrew was retightened. The remaining bone graft was positioned underneath and lateral to the rod in lateral gutters.
Final AP and lateral x-rays where taken showed hardware in excellent position.

187.    Claimant A had a follow up with Dr. Lerman[7] on April 12, 2021, when he also purportedly complained about his neck pain.

---

[7] Dr. Lerman had his authorization to treat injured workers denied on April 15, 2025.

188.    He was sent to Kolb[8] radiology for an MRI on May 3, 2021, found the following in comparison to the closer in time November 2019 MRI:

Nov. 2019                                           May 2021

| | |
|---|---|
| C2-3: Central disc herniation impinging thecal sac. | C2-3: Nothing |
| C3-4: Posterior bulge impinging thecal sac | C3-4: broad posterior disc herniation impinging upon thecal sac and narrowing the neural foramina bilaterally, abuts spinal cord |
| C4–5: broad-based central herniation + severe **left** foraminal stenosis with C5 root impingement and uncinate hypertrophy (**left** worse). | C4-5: central posterior disc herniation impinging upon the thecal sac directly upon the spinal cord with **bilateral** foraminal stenosis. |
| C5-6: herniation, bilateral foraminal impingement, bilateral uncinate hypertrophy | C5-6: broad posterior disc herniation impinging upon thecal sac and narrowing the neural foramina bilaterally, abuts spinal cord |
| C6–7: posterior bulge, severe **left** foraminal stenosis, mild right; **central canal stenosis**. | C6-7: posterior disc herniation impinging upon the thecal sac abutting the spinal cord with bilateral foraminal narrowing. |
| "There is normal height of the vertebral bodies," all disc spaces "normal height" | Loss of height C5-6 and C6-7 discs. |
| Thoracic herniations and bulges noted. | None noted |
| Retrolisthesis | No Listhesis |
| Canal stenosis at C6-7. | "Normal cord signal," while "C4-5 and C6-7 displaces the cord posteriorly" |
| C4-5, C5-6, C6-7 all identified as "productive changes" (degenerative growths) | "Status post trauma" |

189.    Both MRIs evidenced significant issues involving multiple levels of the cervical spine – regardless of color or editorialized etiology – and both were in accord as to spinal canal concerns at C6-7, and Kolb identified loss of disc space height at C5-6 and C6-7.

190.    Regardless, on May 10, 2021, Claimant A met with Defendant Kumar of Total Ortho, who recommended and submitted a prior authorization request ("PAR") for an anterior

---

[8] Dr. Kolb removed from list of authorized providers for WC on July 1, 2025 for failure to renew.

cervical discectomy and fusion ("ACDF") as to C4-5 only. Kumar himself noted the MRI demonstrated **left** impingement at C4-5.

191.    The PAR was approved on May 19, 2021. On May 26, 2021 (two days before surgery), Claimant A purportedly was seen at Complete Care NY, the practice of Dr. Aric Hausknecht,[9] wherein he complained of neck pain and made no mention of a pending surgery. MRI review performed that day noted underlying cervical degenerative joint disease and diffuse hypertrophic changes.

192.    On May 28, 2021, the ACDF was performed by Defendants Jeyamohan and Kumar at a facility in New Jersey, Bayonne Medical Center ("BMC"). **Importantly, an ACDF procedure includes _removal_ of the disc from the space to be fused.**

193.    The op note detailed removal of a "significant disc fragment… from the spinal canal freeing the dural sac and shoulder of the nerve root," but fails to detail a completed foraminotomy or decompression. Laterality is not described for any part of the operation. A purported full discectomy was performed (consistent with ACDF). There is no identification of steps taken to decompress the **left paracentral/foraminal narrowing** which purportedly prompted the surgery.

194.    Worse still, the operative report is incompatible with either version of the purported implant list.

195.    On the day of surgery, the following implant list (unsigned) was prepared using the Unique Device Identified ("UDI," FDA-required tracking number) stickers:

---

[9] Dr. Hausknecht resigned his authorization to treat injured workers on November 1, 2023.



196. **There is no hardware detailed in the initial implant list.**

197. The op report itself is devoid of any description of the hardware used (and is even inconsistent with the biologics that were identified – separate units of 2.5cc and 5 cc allograft, despite less than 1cc actually utilized):

With the disc space prepped and with good punctate bleeding present, we proceeded to size the space. Appropriately sized cage was filled with 1cc bone graft and local autograft then inserted into the disc space, depth confirmed with fluoro. Two screws paths were created and appropriately sized screws were placed in cranial and caudal holes. After fluoro confirmation, the stopper was turned into place to lock screw position

198.     Defendants Kumar and Jeyamohan both electronically signed an operative report on May 29, 2021, and these reports were sent with billing to Workers' Comp.



199.     A separate implant list, verified and run on ***June 11, 2021***, is part of the facility's surgical case record, under Defendant Kumar's name, which consistently listed and matched the biologics and their UDI, **but added the claimed hardware – *without any identifying UDI tracking* (i.e., no traceable proof of the item was actually utilized) -**



```
                              Surgical Case Record                          Page: 5
    Patient:
Account Num:
  Physician:   KUMAA4-Kumar MD, Abhishek                      Sex:   M
  Specialty:   ORTHO-ORTHOPEDICS                    Room-Bed/T.Loc:  SDAINF-01
       O.R.:   OR08- Operating Room 8                  Oper Date:   05/28/21
   Facility:   Bayonne Medical Center
   Verified                                             Run Date:   06/11/21
   Date        06/11/21 1309  HXSC01  Herman Soobryan   Run Time:   1310
```

Implants

| Inventory | Type | Implant/Manufacturer | | Qty/Surgeon | Device ID |
|---|---|---|---|---|---|
| OR | IMPLANT | PUTTY DBM STAGRAFT 5CC<br>BIOMET INC | | 1<br>Kumar MD, Abhishek | |
| OR | IMPLANT | PUTTY NEVOS BONE 5CC<br>AMENDIA SPINE | | 1<br>Kumar MD, Abhishek | |
| | Lot #/Serial #/DIN<br>PTT-20-0633-0012 | Manuf Dt/Exp Dt/Site<br><br>04/20/23<br>Spine | Cat #/Batch #/Size<br>BNEPP0005<br><br>5CC | Qty/Culture<br>1 | |
| OR | IMPLANT | PLATES CERES C<br>UNKNOWN MANUFACTURER | | 1<br>Kumar MD, Abhishek | |
| | Lot #/Serial #/DIN | Manuf Dt/Exp Dt/Site<br><br>Spine | Cat #/Batch #/Size<br>08-170-06<br><br>6MM | Qty/Culture<br>1 | |
| OR | IMPLANT | BONE MATRIX 2.5 MM<br>AMENDIA SPINE | | 1<br>Kumar MD, Abhishek | |
| | Lot #/Serial #/DIN<br>0298420271 | Manuf Dt/Exp Dt/Site<br><br>02/12/24<br>Spine | Cat #/Batch #/Size<br>BORMP025<br><br>2.5CC | Qty/Culture<br>1 | |
| OR | IMPLANT | SPACER CERES 12 X 15 X6 DEG<br>AMENDIA SPINE | | 1<br>Kumar MD, Abhishek | |
| | Lot #/Serial #/DIN | Manuf Dt/Exp Dt/Site<br><br>Spine | Cat #/Batch #/Size<br>08-170-0606<br><br>6MM | Qty/Culture<br>1 | |
| OR | IMPLANT | SCREW 4.0 X14MM CERES-C SLF/TA<br>AMENDIA SPINE | | 2<br>Kumar MD, Abhishek | |
| | Lot #/Serial #/DIN | Manuf Dt/Exp Dt/Site<br><br>Spine | Cat #/Batch #/Size<br>12-33-4014<br><br>4.0 X14MM | Qty/Culture<br>2 | |

- and calls into question, generously crediting the above as approaching accurate, why 7.5cc of graft would be claimed needed for a spacer with accommodation for only 0.3cc-0.8cc:



200.    It further directly contradicts the submission of this surgery to WC as a causally related surgery *where the sole indication for use of this device is for degenerative conditions*, and in a patient with ***multi***-*level degenerative conditions well-documented over several years*:

**INDICATION**
The Ceres-C Stand-Alone Cervical System is a stand- alone anterior cervical interbody fusion device indicated for use in skeletally mature patients with degenerative disc disease (DDD) with accompanying radicular symptoms at one level from C2-T1. DDD is defined as discogenic pain with degeneration of the disc confirmed by history and radiographic studies. These patients should have had six weeks of non- operative treatment. The Ceres-C Stand-Alone Cervical implant should be packed with autograft or allogenic bone graft comprised of cancellous and/or corticocancellous bone graft and implanted with an anterior approach.

3.    This device is not intended for use except as indicated.

201.     After this new list was run, Defendant Kumar signed a new operative report, which is the one maintained in the facility's file:

> Hemostasis was achieved and the wound was irrigated with NS.
> The wound was then closed with 3-0 vicryl and 4-0 monocryl for the skin. Steri strips and a tegaderm dressing were applied.
> There were no significant changes in neuromonitoring during the case. The microscope was used during the approach, discectomy and cage placement.
> There were no complications
> The patient was lightened from anesthesia and taken to the recovery room in stable condition.
>
> **Electronically Signed by Kumar MD,Abhishek on 06/12/21 at 1542**

202.     Claimant A later had a subsequent MRI done by Kolb of the cervical spine on May 18, 2022. Incredibly, a) the purported herniation Kolb observed previously at C3-4 ("C3-4: broad posterior disc herniation impinging upon thecal sac and narrowing the neural foramina bilaterally, abuts spinal cord") **simply disappeared**, b) the previously identified "Loss of height C5-6 and C6-7 discs **simply disappeared, yet noted "no interval change"**; and c) most importantly:

> **At C4-C5**, there is focal left paracentral recurrent or residual disc herniation/marginal osteophyte formation, impinging upon the left lateral recess and narrowing the left-sided neural foramen.
>
> **IMPRESSION: Status post anterior discectomy and fusion at C4-5 with focal, left paracentral recurrent or residual disc herniation/marginal osteophyte formation, impinging upon the left lateral recess and narrowing the left-sided neural foramen**

203.     **After an ACDF, <u>there should not be any disc existing at that level at all</u>, let alone to "recurrent[ly] or residual[ly]" herniate. The conditions purportedly prompting the May 28, 2021 surgery <u>appear post-surgically as they did in the initial 2019 MRI</u>.**

204.    **It is directly alleged the foregoing lumbar and cervical surgeries were performed in furtherance of a kickback scheme.**

205.    While it is noted that neither Travel Act violations, nor underlying kickback/bribery schemes, are subject to any heightened particularity pleading standards, it is also noted that in 2016 and 2017, Avanesov and Defendant Lerman (primary Total Ortho principals), through grant, purchase, or otherwise, obtained significant equity stakes in Amendia, a spinal implants manufacturer. Individually, they tied for the 5th largest such physician-owned stake; when combined, it constituted the largest such stake in the country.



206.    Also in 2017, Amendia merged with Spinal Elements (April 2017), and adopted the corporate name of the latter (July 2017). Avanesov and Lerman have never updated their disclosures to reflect the change in corporate name.

207.    It is further noted that in 2017, at least as to surgeries performed at NUMC, only approximately **34%** of surgeries by Total Ortho involved the use of Amendia/Spinal Elements products. By 2021, that number was **93%. In 2021, Lerman and Jeyamohan used Amendia/Spinal Elements in 95.7% and 94.1% of surgeries at NUMC, respectively.**

208.    The "Nevos" and "Orios" brand graft that Kumar/Jeyamohan wildly overutilized (*supra*, ¶ 154) are also Spinal Elements products.



Spinal Elements
https://spinalelements.com › ... › Robust Biologics    ⋮
**Nevos® DBM Putty**
**Moldable, Flowable, and Irrigation Resistant** · Demineralized bone matrix putty derived from 100% human allograft bone · Offers an osteoconductive matrix with a ...



Spinal Elements
https://spinalelements.com › ... › Robust Biologics    ⋮
**Orios® Moldable**
A viable autograft alternative. **Formulated to enhance bone fusion**. DMSO-Free without compromise. Evidenced-Based Application: Fusion.



209.    Notably, MRIs were performed at the end of 2024 (at yet another new MRI facility). The cervical surgery simply **did not do what the op report stated or what the surgery was indicated for in the first place**. The C4-5 foramina was never decompressed (the whole stated point of the cervical surgery), and it appears **all that was done was insertion of hardware**.

210.    The pre-op imaging plainly detailed foraminal/uncinate osteophyte causing left C5 root impingement. **A midline discectomy/fusion doesn't remove a lateral bony spur**. In failing to unroof the foramen (take down the uncinate/osteophyte, a *degenerative* issue in the first instance), the nerve stays crushed. <u>**That's exactly what the 2022 and 2024 MRIs show. They fused the level but never decompressed the foramen. Years later the nerve is still crushed at the same spot.**</u>

C4-C5: Status post ACDF. Interbody metal device with bone graft. Bulging endplate osteophyte resulting in mild central stenosis. Severe left foraminal stenosis with compression of the exiting left C5 nerve root. Patent right neural foramen.

C5-C6: Bulging disc resulting in mild central stenosis. Mild to moderate bilateral foraminal stenosis.

C6-C7: Central annular tear and disc protrusion resulting in mild to moderate central stenosis. Bulging disc component results in mild to moderate bilateral foraminal stenosis

211.    Similarly, as to the lumbar, 2019 MRI already showed an isthmic L5–S1 Grade-1 slip with bilateral L5 foraminal stenosis - **a foraminal height and compression problem**. In January 2021, Lerman did a posterolateral fusion at L5–S1 with screws/BMP - but no interbody and no slip reduction, a construct that **cannot restore foraminal height**. Predictably, the 2022 MRI still shows the L5 foramina narrowed, abutting the exiting L5 roots, *i.e.*, the **decompression failed**; and by 2024 the level above (L4–5) has progressed to moderate-to-severe left foraminal stenosis (adjacent-segment blowback) while L5–S1 remains stenotic with persistent anterolisthesis - and there is no significant canal stenosis anywhere across the studies.

212.    Put more clearly: Lerman bolted Claimant A's spine together without opening the very nerve compression purportedly indicating the surgery, didn't fix the pathology, and helped create new and additional pathology.

213.    <u>**The only apparent purpose of the surgeries was to jam in their own brand of implants and create scary demonstrative X-rays for trial.**</u>

L4-L5: Moderate to severe left and mild to moderate right foraminal stenosis from disc bulge and facet arthrosis. No significant spinal canal stenosis. Mild retrolisthesis.
L5-S1: Mild anterolisthesis. Mild to moderate bilateral foraminal stenosis from disc bulge and facet arthrosis. No significant spinal canal stenosis. Posterior instrumented fusion.

214.    Claimant A continued to be shuffled around at Total Ortho, and on July 26, 2021, he saw Defendant Drazic again for purported bilateral shoulder and right knee complaints.

215.    Toward end of 2021 there were attempts to get treatment for the *left* knee approved, which were denied.

216.    Claimant A, while continuing to be bounced around transient clinic providers for a variety of overlapping and redundant PT, chiro, and acupuncture regimens, ultimately makes his way to an orthopedist who is not named in this action and has been previously affiliated with allegations as against Schwitzer Firm (Ortho-2) in January of 2022 for right shoulder pain. On that first visit, right shoulder surgery was promptly recommended, consistent with Ortho-2's previous practice involving Schwitzer Firm Claimants.

217.    Ortho-2 *also* sent Claimant A to the Kolb, who performed bilateral shoulder MRIs on February 24, 2022. Ortho-2 submitted a PAR to perform right shoulder surgery, which was denied. Claimant A then went back to Drazic.

218.    Defendant Drazic ultimately performed right shoulder arthroscopy without a PAR on June 30, 2022. Claimant A would subsequently receive another right shoulder MRI in February 2023 from a non-defendant provider, referred by yet another Total Ortho surgeon, Jarrett Baroniec.

219.    In the context of the pre- and post- operative MRIs, the operative report notes are incompatible with any diagnostic findings.

| Anatomical area | 2019 MRI | 2022 MRI | Op report (6/30/2022) | 2023 MRI |
|---|---|---|---|---|
| **Rotator cuff** | Mild tendinitis; *bursal*-surface "tear" at infraspinatus | Low-grade *articular*-side partial tear at posterior distal infraspinatus; low-grade subscapularis fray | **First says cuff intact; later says partial-thickness cuff tear debrided (site/side not specified)** | No rotator cuff tear; only mild tendinosis |
| **Acromion** | No finding | **Report explicitly notes no acromion issues** | Claims curved acromion, subacromial spur, "kissing lesion," and performs acromioplasty/subacromial decompression | No subacromial bursitis; normal cuff interval |
| **Labrum (location & treatment)** | Small superior/anterior labral tear (~3×3 mm); biceps/anchor normal | Labral tear with mild periosteal avulsion; biceps normal | Unspecified "peripheral labral tears… labrum was debrided" | **SLAP type II is still there** |
| **AC joint / distal clavicle** | Not called | No significant impingement (hypertrophic ACJ without effect) | Acromioplasty performed; no distal clavicle work documented | Minimal AC joint arthrosis |
| **Glenohumeral cartilage** | Not discussed | Normal marrow; no osteochondral defect | Describes Grade I chondromalacia | No acute defect |

220.    Arthroscopic photographs were taken during the procedure; however, the images are unlabeled and low quality; no "before/after" views proving acromial spur or acromioplasty plane, and no clear shots of a cuff defect or labral flap.

221.    Records indicate further intention to have performed a left shoulder arthroscopy in or around July 2022, but this did not seem to have occurred.

222.    On January 17, 2023, Claimant A underwent a *second* right knee arthroscopy, through another Total Ortho surgeon. The intra-op pictures taken once again are not labeled, identify no "before/after" images, and again provide no substantiation of worked allegedly

performed. The surgery once again treats things never diagnostically observed, and is incredible in the context of the MRIs and prior arthroscopy. *E.g.*:

| Anatomical Area | 2019 MRI | 2020 Op Report (9/8/20) | 2022 MRI (2/25/22) | 2023 Op Report (1/17/23) |
|---|---|---|---|---|
| **Lateral meniscus** | Intact | "Peripheral fraying;" lateral meniscus debridement performed | Intact; no evidence of tear | Documents lateral meniscus tear and debridement |
| **Loose bodies** | None ("No masses or fluid collections") | "Several loose free-floating small loose bodies" in medial compartment | Not reported | None noted |
| **ACL** | Intact | "Fraying but overall intact" | Cruciates (ACL/LCL) unremarkable | Intact |
| **Synovium / Plica** | Not mentioned | Synovectomy / plicectomy performed | No synovitis/plica reported | Synovitis noted; synovectomy again |
| **Cartilage – Medial femoral condyle (MFC)** | Not called | Not addressed | Focal chondral defect at anterior MFC | Mentions grade 2–3 chondromalacia; chondroplasty performed (location variably described) |
| **Patellofemoral cartilage** | Not called | Not addressed | Not called | Describes grade 2–3 chondromalacia; patellar chondroplasty performed |
| **Medial meniscus** | Posterior horn/body tear | Partial meniscectomy of medial meniscus; stable rim | Multiple medial meniscus tears (posterior horn flap; body free-margin; anterior horn intrasubstance) | Medial meniscus debrided; consistent with chronic medial pathology |

223.    In creating the multitude of falsified reports purporting to support that Claimant A, with no objective sign of injury on date of accident - who alternately either strained his back or fell on his right knee (or slipped and fell backward) depending on the day and purpose – needed two spinal fusions, two right knee surgeries, and right shoulder surgery, Defendants Total Ortho, Lerman, Kumar, Drazic, and Jeyahoman knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

224.    In travelling to New Jersey on May 28, 2021, and performing the knowingly unjustified cervical spine surgery on Claimant A, and in preparing the false documentation thereto, Defendants Kumar, Jeyamohan, and Total Ortho "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 USC § 1961(1).

225.    In creating the multitude of falsified reports regarding Claimant A purporting to support that, with no objective sign of injury on date of accident, such unnecessary surgeries were plausibly justified, Defendants Kolb and Kolb Radiology knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

226.    In creating the multitude of falsified reports regarding Claimant A purporting to support that, with no objective sign of injury on date of accident, continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, PPNY Defendants knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

227.    On February 24, 2020, at the direction of W. Schwitzer, an attorney of Schwitzer Firm verified and filed a Verified Complaint on behalf of Claimant A, alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant A was "severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled" by the events of October 3, 2019, wherein Claimant A had no objective sign of any injury.

228.    On May 26, 2020, at the direction of W. Schwitzer, another attorney of Schwitzer Firm verified and filed an Amended Verified Complaint on behalf of Claimant A, alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant A was "severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled" by the events of October 3, 2019, wherein Claimant A had no objective sign of any injury.

229.    On September 8, 2022, at the direction of W. Schwitzer, yet another attorney of Schwitzer Firm verified and mailed Verified Bill of Particulars on behalf of Claimant A, alleging under penalty of perjury that Claimant A suffered injuries to his cervical spine, lumbar spine,

thoracic spine, right knee, right shoulder, left knee, and left shoulder as a result of the events of October 3, 2019, wherein Claimant A had no objective sign of any injury.

230.    The Schwitzer Firm would go on to serve 5 supplemental Verified Bills of Particulars in similar fashion, alleging new surgeries as having been related to the events of October 3, 2019, wherein Claimant A had no objective sign of any injury.

231.    As the Schwitzer Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme.

232.    In performing five utterly unjustified and/or unrelated surgeries Total Ortho, in agreement and with the assistance of Schwitzer Firm, PPNY, and Kolb, engaged in force or violence in an attempt to extort money from Plaintiff,  through fear of economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations of the Hobbs Act, 18 USC § 1951.

233.    In performing five utterly unjustified and/or unrelated surgeries, Total Ortho and Defendants Kumar, Jeyamohan, Lerman, and Drazic, in agreement and with the assistance of Schwitzer Firm, PPNY, and Kolb, engaged in force or violence in an attempt to extort money from Plaintiff through fear of economic loss. These actions amounted to five discrete violations of the Hobbs Act, 18 USC § 1951.

234.    Claimant A's claim remains open. Plaintiff has incurred unnecessary investigative, expert, and attorneys' fees as a direct and proximate result of the conduct alleged herein.

ii. **Claimant B**

235.    Claimant A's relevant, redacted records are attached as **Exhibit** 7-**B**.

236.    Claimant B, a Queens resident, claimed to have been working on a stepladder, touched a hanging light bulb, was electrocuted, and fell, ultimately claiming injuries to his foot, ankle, knee, lumbar, and cervical spine on June 30, 2023.

237.    Claimant B does not have an SSN. The address Claimant B has provided throughout his WC proceedings and litigation has **43 listed current residents** and an addition 31 prior residents. But Claimant B is not one of them, and public records reveal no such name anywhere in the country, in any permutation.



238.    On the date of accident, Claimant B claimed he **walked** directly to the hospital after the claimed fall – **4 miles away**. Notably, Claimant B would later claim he fell at approximately 1 pm. **He arrived at the hospital just after 6 pm.**



239.    At the ER on June 30, 2023, at approximately 6:10 pm, Claimant B made complaints of back and right leg pain from a fall while changing a light bulb. Claimant B **denied hitting his head, loss of consciousness, neck pain, extremity numbness, and tingling**.

240.    Physical examination revealed that he was in **no acute distress** and was ambulatory with a steady gait. Cervical examination revealed **normal range of motion with no bony tenderness.** Thoracic spine examination revealed a normal exam with no tenderness, and his **lumbar spine exam revealed tenderness with no swelling, edema, no signs of trauma, spasms, bony tenderness, negative right and left straight leg raising test, and had normal range of motion.** It was also noted that Claimant B was **ambulatory without any difficulty. His lower extremity exam revealed no bony tenderness, swelling, bruising, or deformity and had full range of motion.** The attending physician made special note that there was "no bruising, redness noted on his body… Patient can be seen in fast track."

241.    X-rays taken of Claimant B's lumbar spine demonstrated an "**intact lumbar spine,**" with possible spina bifida – a birth defect.

DX Lumbar Spine 2 Views (H+H High Value Care Council does NOT recommend imaging for low back pain in the first 6 weeks unless red flags are present) [503857723]     Resulted: 06/30/23 2059, Result status: Final result

Ordering provider: Choekyi, Tenzin, FNP  06/30/23 1950     Order status: Completed
Resulted by: Morse, Elliott, MD                              Filed by: Interface, Rad Results In  06/30/23 2101
Performed: 06/30/23 2037 - 06/30/23 2037                    Accession number: ELDX11146687
Resulting lab: HHC PS360
Narrative:
Lumbar spine

Study consists of anterior lateral and coned lateral views the lumbar spine. Lumbar vertebra are normally aligned with preservation joint spaces and no evidence of vertebral body slippage neurocompression. Is maintenance of the normal lumbar lordosis.
There is suggestion of a spina bifida involving L5.

Impression:
IMPRESSION: Intact lumbar spine.

Report dictated and signed by Elliot Morse, MD 6/30/2023 8:59 PM

Acknowledged by: Voloshina, Irina, RN on 07/01/23 1635

242.    **Put simply, Claimant B also had no objective indication of injury, whatsoever, of any body part, and full range of motion throughout.**

243.    No matter. Since the date of "accident," Claimant B has undergone a right knee arthroscopy by the aforementioned Ortho-2 on March 22, 2024; a cervical discectomy with fusion and implants on August 7, 2024 by the aforementioned Ortho-1; and a right ankle arthroscopy and ligament repair by Persich and All County Defendants on January 21, 2025.

244.    On July 3, 2023, Claimant B signed WC forms with Schwitzer Firm, which are signed and mailed by Merlino on July 6, 2023. The forms now indicate complaints of neck, back, both hips, right ankle, right knee, right foot, with injury from "electrocuted and fell from height."

245.    Claimant B was routed to PPNY Defendants, with a first appointment on July 5, 2023, where he sees an NP on behalf of Defendant Kosharskyy. The complaints match perfectly: neck, back, both hips, right ankle, right knee, right foot. No notation is made as to how translation was made from Claimant B, who speaks only Spanish.

246.    Mechanism of injury was now "fell off a ladder." The exam findings are incompatible with the hospital records. Radiating low back pain, 10/10 pain. Bilateral hip pain, 10/10 pain. Radiating neck pain, 5-6/10 pain. Right knee 5/10; right ankle 7/10. Limited range of motion across the board. Difficulty getting on the exam table. Claimant B, with no objective indication of injury, whatsoever, of any body part, and full range of motion throughout just 5 days prior, is marked 100% disabled, recommended for trigger point injections, a TENS unit, and PT for all claimed body parts.

247.    Claimant B was seen the next day, July 6, 2023, at PPNY and purportedly filled out pain questionnaires. He is subsequently sent to Island ASC and Crotona ASC to receive epidural injections in August and September 2023. Claimant B received an EMG test in January 11, 2024, by Defendant Cohen of PPNY, which (consistent with virtually every EMG performed by PPNY) came back with "evidence of," but not a clinical finding of, cervical radiculopathy.

248.    Claimant B was sent to Kolb for MRIs, first for MRI of the right foot on 8/17/23, then MRI of the lumbar and cervical spine 8/22/23, then right hip and right shoulder on 9/14/23, and subsequently the right knee and right ankle on 9/17/23.

249.    Claimant B continued to appear for appointments at PPNY, where the majority are merely repeated notes that he is "adhering to physical therapy."

250.    Claimant B no-showed for an IME in November 2023.

251.    On December 4, 2023, Claimant B met with Persich at All County for the first time, purportedly referred over by Ortho-2. There is no notation in Ortho-2's records regarding having made this referral, and there is single page attachment in the All County records with Claimant B's information with a notation of "new patient" (with no referral source) on September 14, 2023 referencing an adverse reaction by Claimant B to a medication. In Ortho-2's records, the first date

of treatment on August 1, 2023 indicated a referral to a spine specialist only, and the second visit, from 2 days prior to the first visit with Persich, September 12, 2023, it was noted that Claimant B was already under the care of a podiatrist.

252. On the first documented visit with Persich (December 4, 2023) Persich immediately recommended surgery. Claimant B ultimately underwent the procedure on January 21, 2025. Despite seeing Persich several times in the interim, no updated MRI is ever obtained, and the basis of the surgery is Kolb's 1 year and 5 month old MRI.

253. **Claimant B had a WC IME on January 8, 2024, which found zero range of motion limitations or any disability whatsoever**, however, Claimant B complained of pain "all the time" in various body parts.

254. On March 15, 2024, a level 2 PAR review rejected Ortho-1's request to perform a cervical fusion, noting that "non-op management, physical therapy, oral medications, cervical epidural steroid injection (CESi's) are not documented, **objective exam is not consistent with EMG result**, and the level to be decompressed and fused is not clearly identified. Therefore, this request is not certified."

255. On March 22, 2024, on the basis of a Kolb MRI purportedly demonstrating a <u>low-grade</u>, free-edge meniscal tear and a purported <u>partial</u> ACL tear, Ortho-2, alleged to be acting on the direct instruction and/or explicit/implicit agreement with Schwitzer Firm, further misrepresented Claimant B's condition, and performed a full ACL reconstruction and purported "bucket-handle tear" repair.

| Anatomical Area | Sept. 2023 MRI | March 2024 Surgery |
|---|---|---|
| **ACL** | Partial tear. PCL/MCL/LCL intact. | Full ACL reconstruction with patellar-tendon autograft; intra-op laxity tests "grossly positive;" ACL remnant described as dysfunctional/attenuated. |
| **Medial Meniscus** | Small/free-edge body tear of the medial meniscus; low-grade peripheral/posterior-horn changes. | Unstable bucket-handle tear described; repaired (anatomic repair + meniscal work). |

256.    On August 7, 2024, Claimant B underwent a C5-6 ACDF with Ortho-1, at the direction of Schwitzer Firm. It similarly utilized the Kolb MRIs to open the door to a surgery that makes zero medical sense:

| Item | MRI (8/22/2023) | Op note (C5–6 ACDF) |
|---|---|---|
| **Number of pathologic levels** | Four levels with broad posterior disc herniations: C3–4, C4–5, C5–6, C6–7; central/foraminal narrowing. | Single level surgery only at C5–6 (discectomy, cage, plate, fusion). No explanation. |
| **Cord/root decompression** | Cord/thecal sac impingement noted at multiple levels (C3–4, C4–5, C5–6, C6–7). | States "decompressed the spinal cord and nerve roots" at C5–6. |
| **Level selection rationale** | MRI doesn't single out C5–6 as uniquely worse than C3–4 or C4–5. | Chooses C5–6; no documented clinical correlation (dermatomal deficits, EMG) justifying that choice. |
| **Imaging recency** | Study is 6 months pre-op. | No updated MRI/CT myelogram cited before fusion. |
| **Foraminal stenosis at other levels** | Bilateral foraminal narrowing at C3–4, C4–5, C6–7 (left > right in places). | No decompression or fusion at those levels. |

257.    On November 6, 2024, Claimant B claimed he fell of a ladder while installing sheetrock, from the 7th step (previously, this was a stepladder, no reference to sheetrock).

258.    On November 20, 2024, Ortho-2, at the direction of the Schwitzer Firm, attempted to obtain PAR for a right shoulder surgery, despite there never being any diagnostic or clinical support for same, or even any indication of injury.

259.    Despite no change in condition from initial visit and recommendation for surgery (at that first visit) in December 2023, Persich moved ahead with surgery, with no updated diagnostics, on January 21, 2025.

260.    Consistent with the other surgeries from the Schwitzer Firm-adjacent triumvirate, the surgery by Persich uses the Kolb MRI as the basis to go in, then uses the opportunity to perform (or at least claim to perform) far more than any objective indication.

| Area / Structure | Pre-op MRI finding | Surgery performed | Issue |
|---|---|---|---|
| Peroneal tendons (longus/brevis) | Partial tears at lateral malleolus | Teno-synovectomy of longus & brevis; repair of peroneus brevis | MRI shows partial tears; surgery treats more extensively than MRI suggests. |
| Tibial plafond cartilage | Marrow normal; no osteochondral defect reported | Micro-abrasion chondroplasty of the anterior tibial plafond | Not supported even by Kolb MRI. |
| Synovium | No synovitis or effusion described beyond "sizeable joint effusion" linked to tendon tears | Extensive debridement synovectomy | Not supported even by Kolb MRI. |
| Flexor digitorum longus (FDL) / Flexor hallucis longus (FHL) | Tears at musculotendinous junction with sizeable joint effusion | No surgical treatment documented | Claimed tears simply not mentioned |
| Posterior tibial tendon (PTT) | Tear of distal posterior tibial tendon | No procedure on PTT | Another medial-side pathology not addressed |

261.    In creating the multitude of falsified reports regarding Claimant B purporting to support that, with no objective sign of injury on date of accident, such unnecessary surgeries were plausibly justified, Defendants Kolb and Kolb Radiology knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

262.    In creating the multitude of falsified reports regarding Claimant B purporting to support that, with no objective sign of injury on date of accident, continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, PPNY Defendants knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

263.    In creating the multitude of falsified reports purporting to support that Claimant B, with no objective sign of injury on date of accident – nor any ankle complaint on date of accident – needed extensive ankle surgery beyond anything diagnostically or clinically corroborated, Persich and All County knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

264.     On July 19, 2023, at the direction of W. Schwitzer, an attorney of Schwitzer Firm verified and filed a Verified Complaint on behalf of Claimant B, alleging directly and under penalty of perjury, that Claimant B was "severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled" by the events of June 30, 2023, wherein Claimant B had no objective sign of any injury.

265.     On June 7, 2024, at the direction of W. Schwitzer, another Schwitzer Firm attorney verified and mailed a Verified Bill of Particulars on behalf of Claimant B, verified under penalty of perjury that Claimant B suffered injuries to his cervical spine, lumbar spine, right knee, right ankle, and right foot as a result of the events of June 30, 2023, wherein Claimant B had no objective sign of any injury, and demanded $1.59m in medical special damages.

266.     On August 12, 2024, at the direction of W. Schwitzer, another Schwitzer Firm attorney verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant B, verified under penalty of perjury that Claimant B further underwent the aforementioned spinal surgery by Ortho-1 as a result of the events of June 30, 2023, wherein Claimant B had no objective sign of any injury, and then demanded $3.6m in medical special damages.

267.     Two weeks after the aforementioned ankle surgery, on February 5, 2025, Schwitzer Firm demanded $6.5 million.

268.     As the Schwitzer Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false and mailed in furtherance and as a necessary step in the Fraud Scheme.

269.    In performing three unjustified, inconsistent, and/or unrelated surgeries Persich, All

County, Ortho-1, and Ortho-2, in agreement and with the assistance of Schwitzer Firm, PPNY, and

Kolb, engaged in force or violence in an attempt to extort money from Plaintiff,  through fear of

economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations

of the Hobbs Act, 18 USC § 1951.

270.    Claimant B's claim remains open. Plaintiff has incurred unnecessary investigative,

expert, and attorneys' fees as a direct and proximate result of the conduct alleged herein.

### iii.  Claimant C

271.    Claimant C's relevant, redacted records are attached as **Exhibit 7-C**.

272.    Claimant C claimed an injury at work on May 4, 2018, and was taken to Bellevue

Hospital that day. It was his second week on the job.

273.    Claimant C's chief complaint was exclusively ***mild*** low back pain after falling 2 to

3 steps of off a ladder with a tool belt on, and ***landing on his feet***. Claimant C was neurologically

intact, alert, and oriented.

```
HPI: The patient is a 42y/o M p/w c/o back        Ext: no edema, cyanosis, or clubbing
pain s/p fall from two steps up ladder, p/w       MSK: Mild back pain, 5/5 strength, normal
c/o lumbar pain however denies any lower          range of motion, no swollen or erythematous
extremity weakness or associated                  joints
numbness/tingling or associated bowel/bladder     Neuro: Alert and oriented x3, CN 2-12 grossly
incontinence. The patient also denies any         intact
associated f/c/n/v/d/c.
```

274.    X-rays of his back revealed normal alignment, normal mediastinal contours, no

acute fracture or dislocation, no significant degenerative change, and sacroiliac joints and sacral

arcuate lines were normal – an intact spine. He was discharged home and into self-care. He left

ambulating steadily with gait and normal vision.

275.    On the next day, May 5, 2018, Claimant C, with the help of Defendant Merlino and

Schwitzer Firm, filed a workers compensation claim. This claim included injuries to the neck,

head, back, left shoulder and left knee **despite zero claims of head, left shoulder, and left knee** injuries at Bellevue Hospital on the date of the accident (the day prior). The workers' compensation claim was mailed as well as e-mailed to the WCB on May 11, 2018.

276.    Also that day, May 5, 2018, Claimant C presented to a different hospital, *gave a different name, provided a different story, and made different complaints*, now comporting with the paperwork Claimant C filled out with Merlino. Given Claimant C was at the hospital from at least 3 pm through at least 7 pm, it would appear Claimant C *went directly to another hospital following his meeting with Schwitzer Firm*. Claimant C now claimed he fell from the 6th step off a ladder, was unconscious for 3 minutes, and started vomiting the morning of May 5, 2018.

277.    A brain CT was completely negative. A cervical CT revealed zero acute findings, and noted the following:

> Multilevel degenerative osteoarthritis is present. Findings include marginal endplate osteophytes. There is calcification along the anterior longitudinal ligament of the C2-C3 level. Intervertebral disc space heights are preserved.

278.    Claimant C began treatment with Dr. S.J. Pahng on May 9, 2018, who W. Schwitzer has previously identified in testimony as a "business relationship" whom he "did not want to lose."

Q. I'm sorry, Dr. Pahng. Did he suggest you come here to be a PI lawyer?

A. Yes.

Q. And he suggested you come here to become a PI lawyer and he would recommend you hook up with an American law firm to do that?

MR. NAPOLI: Objection to the form.

A. Yes.

Q. Did he say which American law firm?

A. Dinkes & Schwitzer.

Q. Did he tell you how he knew Dinkes & Schwitzer?

A. Yes.

Q. What did he tell you?

A. They had a business relationship together.

---

Q. How do you know Dr. Pang?

A. He would refer patients to my office. We had a business relationship, and I would refer clients for treatment to him.

Q. Understood.

So he referred cases to you, and you would send clients to him occasionally?

A. Yeah.

Q. And he, Dr. Pang runs a pain clinic, as I understand?

A. He has a medical office. Specifically -- you know, I'm not sure.

Q. Is that medical office in Flushing, Queens?

A. Yes.

Q. All right. How long have you known Mr. -- Dr. Pang?

A. 2012.

---

Q. All right. What did you think of the idea of advertising in the Korean marketplace?

A. I had no idea. Here's what I thought: For what it would cost and I'm doing a favor, if he brings in -- if something comes in through the ad, God bless, and I knew if I didn't, I ran the risk of losing Dr. Pang, and I didn't want to lose Dr. Pang. That's my real reason.

Q. So this was to do Dr. Pang a favor?

William Schwitzer

That's your testimony; correct?

A. To keep my business relationship.

Q. Understood.

---

John C. Merlino

What was your understanding of what interested Mr. Schwitzer about hiring Mr. Chung?

A. It was evident to me that he wanted to make Dr. Pang happy.

Q. And why would he want to make Dr. Pang happy?

A. Because Dr. Pang would refer us cases.

---

279.    Dr. Pahng has testified previously that "Schwitzer is a businessman first and then an attorney."

280.    On May 9, 2018, Claimant C was now using a cane, claiming 9/10 pain in his neck, 9/10 pain in his back, 9/10 pain in bilateral knees, and 8/10 pain in his bilateral shoulders. Despite

the apparent 180 degree turn in entire physical well-being, Claimant C at least maintained the following:

| Neurological | Denies headaches, fainting/blackouts, loss of sensation in any part of body, dizziness. |
| --- | --- |

281.    On May 23, 2018, Claimant C presented to Kolb for an MRI of the thoracic spine. The impression was purportedly disc herniation at T6-7 impinging upon the thecal sac, and disc bulges at T5-6, T7-8, T8-9 and T9-10.

282.    Claimant C was seen by Defendant Kosharskyy of PPNY on June 11, 2018, for his neck, low back, left shoulder, left knee and headaches. Kosharskyy performed a left shoulder ultrasound which revealed mild to moderate glenohumeral joint effusion and degenerative changes of the AC joint. Continued physical therapy was recommended.

283.    On June 14, 2018, Kolb performed a lumbar, purportedly finding a L5-S1 predominately left sided herniation with impingement of the foramen, thecal sac, and left S1 nerve root, and a posterior L4-5 disc bulge. Discs were of normal height, with no listhesis noted. Kolb also performed a cervical MRI, which purportedly found a central to right herniation at C3-4 impinging the thecal sac and narrowing the right foramen.

284.    On August 1, 2018, Claimant C had a consultation with non-party Dr. Joseph Weinstein,[10] who was recommended was an L5/S1 decompression and fusion.

---

[10] Who has also had his authorization to treat injured workers denied, with the WCB finding his treatment included "invasive and potentially life altering (for the worse) spinal fusion, which appears to have been insufficiently justified, and indeed medically unnecessary."

285.    At a follow up on October 22, 2018, Kosharskyy arranged for Claimant C to proceed with an epidural steroid injection, following the same demonstrated rote protocol and setting up the pathway to the pre-determined endpoint of spinal fusion. Claimant C also underwent a left knee joint aspiration/injection for "**knee osteoarthritis pain.**"

286.    On September 18, 2018, Claimant C saw Defendant Golzad[11] of NYCMNR, now with purported complaints of headaches, dizziness, memory, and cognitive difficulties. Defendant Golzad recommended a brain MRI, a formal neuropsychological evaluation, and cognitive remediation therapy.

287.    The brain MRI, which was obtained on **October 18, <u>2018</u>**, was **<u>normal</u>**. However, the provider added in a "DTI" test which purportedly revealed "significant FA reduction most compatible with traumatic white matter tract injury," and "predisposition to post-traumatic intracranial hypertension."

288.    **<u>DTI tests aren't validated to diagnose TBI in an individual patient</u>**. Even supportive reviews say clinical use is limited by inconsistency and lack of standardization – DTI tests are only *starting* to be useful, in large scale studies, in conjunction with large language model AI systems[12] – <u>which didn't exist in 2018</u>. Calling an individual DTI finding "most compatible with traumatic white-matter injury" is flat clinical fiction.

289.    Claimant C did return to Golzad until **November 11, <u>2019</u>**. On that date, Defendant Golzad diagnosed Claimant C with Traumatic Brain Injury with post-concussion syndrome – based

---

[11] Who has resigned his authorization to treat injured workers.

[12] <u>Application of Machine Learning in the Diagnosis and Prognosis of Mild Traumatic Brain Injury Using Diffusion Tensor Imaging: A Systematic Review</u>; Journal of Magnetic Resonance Imaging, peer reviewed and accepted August 19, 2025. <u>Open Access Link</u>.

on a clinically useless diagnostic, for a trauma that simple review of the patient's records would review never happened. Defendant Golzad recommended Claimant C to see a neuropsychologist.

290.    Reyfman of PPNY referred Claimant C to Kolb for a left knee MRI on September 24, 2018, which purportedly revealed a tear of the ACL and a thin linear tear of the MCL. Defendant.

291.    Non-party Kenneth McCulloch recommended an arthroscopic partial meniscectomy on October 24, 2018, for Claimant C's left knee, a purported injury absent on the date of incident, based nominally on the Kolb MRI.

292.    Claimant C returned to McCulloch 4 months later on February 18, 2019, wherein it was recorded that Claimant C reported "he had an immediate onset of pain and swelling in the left knee" following the accident, which is incompatible with the medical record. Further, Claimant C denied undergoing physical therapy up to this point. A left knee arthroscopy was scheduled for April 15, 2019.

293.    Claimant C's left knee surgery was performed McCulloch at Fifth Avenue Surgery Center, LLC. Consistent with the pattern of Kolb MRIs, which are used to open the door for unnecessary surgeries, Claimant C's knee surgery in incompatible with the door-opening MRI itself:

| Structure / Issue | MRI – Sept 2018 | Surgery – 4/15/2019 | Problem |
| --- | --- | --- | --- |
| **Medial meniscus (posterior horn/root)** | **Thin linear tear to the posterior horn root** | Root **"found to be intact."** Tear treated was **body/anterior horn** | Incompatible. |
| **Lateral meniscus (posterior horn/root)** | **Unremarkable** | **Posterior horn root debrided; partial lateral meniscectomy** | Incompatible. |

| Structure / Issue | MRI – Sept 2018 | Surgery – 4/15/2019 | Problem |
|---|---|---|---|
| ACL | Low-grade partial tear at tibial insertion | Intact | Incompatible. |
| MCL | Partial tear | Not mentioned | Incompatible. |
| Loose bodies / synovitis | Not noted | Multiple loose bodies removed; hypertrophic synovitis debrided | Incompatible. |

294.    Claimant C's MRI and op report of the left knee **cannot co-exist with both being accurate or truthful**.

295.    Claimant C had a follow-up visit with Defendant McCulloch on September 18, 2019, for a post-operative visit regarding his left knee surgery and to follow-up on his "left shoulder pain" and for which **he has not had any treatment**, and once again, wasn't injured day of accident**.**

296.    Approximately three (3) weeks later, on October 7, 2019, Claimant C had an initial evaluation with Ortho-1 regarding his neck, which was not injured date of accident. Ortho-1 referred Claimant C to Ortho-1 for updated MRIs, which were obtained and reviewed on November 18, 2019. Ortho-1, at the direction of or in implicit or explicit agreement with Schwitzer Firm, recommended an ACDF at C3-4, which was in fact performed on March 20, 2020.

297.    As with the others, Kolb opens the door, and the surgeon blasts through it:

| Item | MRI 6/14/2018 | MRI 10/28/2019 | March-2020 op report |
|---|---|---|---|
| Level | C3–4 | C3–4 | C3–4 ACDF with partial resection of C3 & C4 bodies, cage + plate |
| Herniation pattern | Central to right foraminal disc herniation narrowing the right foramen | Same as before, right sided pathology | "Herniation in the canal producing cord and nerve root compression; removed the herniation; decompressed cord and roots" |
| Cord signal | Normal | Normal | |

| Item | MRI 6/14/2018 | MRI 10/28/2019 | March-2020 op report |
|------|---------------|----------------|----------------------|
| **Laterality vs approach** | Right-sided foraminal disease | Right-sided foraminal disease | Diagnosis lists **myelopathy**; narrative says **cord compression**<br><br>Left-sided anterior approach; no explicit right foraminotomy described |

298. The MRIs documented, even taking them as accurate, a 16 month stable condition. Ortho-1 claims urgent decompression and fusion is needed due to cord compression and myelopathy demanding decompression and fusion – **neither of these are documented conditions.**

299. The MRIs documented, even taking them as accurate, **right-sided pathology**. Ortho-1 used a **left-sided** approach, purportedly located a torn annulus never before identified, and purportedly removed a herniation causing cord compression from the canal (never before identified), and there is no specific documentation of decompressing the **right** neural foramen. *I.e.,* another surgery for surgery's sake.

300. Non-party McCulloch, at Schwitzer Firm's direction or in implicit or explicit agreement with Schwitzer Firm, later performed a left shoulder arthroscopy on Claimant C on June 23, 2020 – having nothing to do with, at best, "mild low back pain" on date of accident. Once again, Kolb's MRI and the op report **are incompatible** (likely the most egregious non-spine surgery detailed herein):

| Structure Issue | MRI 8/12/2019 | Surgery – June 2020 | Problems |
|-----------------|---------------|---------------------|----------|
| **Labrum location** | **Posterior-inferior labral tear** extending inferiorly with a **1.2 cm interosseous <u>paralabral cyst</u>** in the **posterior-inferior glenoid**. Remainder of labrum unremarkable. | Dictates "Type II SLAP" (**<u>superior</u>**) tear; debrides <u>anterior labrum and SLAP</u>. **No posterior-inferior labral repair or cyst** | **Laterality/region mismatch.** MRI localizes the problem <u>**posterior-inferior**</u>; op treats <u>**superior/anterior**</u>. The **paralabral cyst** is ignored. If the pain generator was posterior, this op didn't address it. |

| Structure Issue | MRI 8/12/2019 | Surgery – June 2020 decompression described. | Problems |
|---|---|---|---|
| Biceps long head | ***Normally located and intact (extra-articular). No biceps pathology*** | **Open biceps tenodesis** after cutting the tendon from the superior labrum. | Doing a **tenodesis** when MRI shows normal biceps needs a clear clinical rationale. Op report gives none. |
| Rotator cuff | **Partial-thickness tear at the anterior distal supraspinatus** insertion; **remainder of cuff intact** | Describes **"extensive partial-thickness tearing diffusely;"** | The scope narrative exaggerates vs MRI ("diffuse" vs focal anterior). |
| Subacromial CA ligament | AC joint unremarkable; MRI doesn't call impingement changes. | **Extensive bursectomy**, **lysis of adhesions**, and **lysis of the coracoacromial (CA) ligament**. | Lots of **impingement-style work** without imaging support. If you cut the **CA ligament**, you'd better justify it; otherwise you risk **anterosuperior escape** in cuff disease. |
| Glenohumeral synovitis adhesions | Not mentioned. | **"Significant morbid synovitis"** and **extensive adhesions** | No substantiation. |

301.    Notably, the June 23, 2020 surgery was performed at Surgicore Surgical Center LLC – in Saddle Brook, New Jersey, thus availing, and exposing, the relevant Defendants of New Jersey's laws as set forth in Count X.

302.    At Schwitzer Firm's direction or in implicit or explicit agreement with Schwitzer Firm, Ortho-1 returned on January 12, 2023, over 4 years post "accident," to perform "lumbar laminectomies, medial facetectomies, neural foraminotomies, and a decompression of the neurological elements and nerve roots" of L4 and L5. Once again, this surgery makes no sense in the context of the *several* films done on Claimant C, all Kolb MRIs – all internally inconsistent, and **not one matching this surgery**.

| Aspect | MRI 6/14/2018 | X-ray 7/2/2018 | MRI 1/24/2019 | MRI 10/28/2019 | Op report (Jan 2023) | Problem |
|---|---|---|---|---|---|---|
| Primary level | **L5–S1:** central-**left foraminal** herniation; impinges **left S1**; | "**Normal** plain films," no listhesis/ instability. | **L5–S1:** central-**right paracentral/ right lateral recess** herniation | **L5–S1:** central-**left foraminal** herniation; impinges **left S1. "no interval change"** | 3-level decompression: laminectomies + medial facetectomies + foraminotomies decompress all roots | Imaging shows single-level L5–S1 problem, **left-sided** and **stable**. Op does **3 levels** without evidence. |
| L4–5 | "Posterior disc bulge" inferior foraminal narrowing. | Normal alignment. | "Disc bulge at L4–5 with central and foraminal narrowing." | **No disc bulge or herniation; foramina unremarkable.** | Included in decompression (laminectomy, facetectomy, foraminotomy). | Operated on normal disc. |
| Canal stenosis | Not described. | — | Not described. | Not described. | Implies broad "decompression of neurological elements" across three levels. | **No documented multilevel canal stenosis** to justify wide laminectomies. |
| Lateral | **Left** S1 root compression. | — | **Right**-sided at L5–S1. | Back to **left** S1 root; **stable.** | **No side specified** | Complete inconsistency. |
| Instability | — | **None** on flex/ext. | — | — | Removes lamina/facets at 3 levels while says "avoiding instability." | Aggressive bone removal **without any pre-op instability** |

303.    In sum, after an "accident" wherein Claimant C fell from a 2nd or 3rd step and landed on his feet, complained solely of _mild_ low back pain, and had **zero objective indication of any injury on date of accident** – then **one day later**, **signed up with Schwitzer Firm** _via_ Merlino, then **immediately went to a different hospital** and gave a different name, with a different story and different complaints – **Claimant C winds up with cervical and lumbar surgeries, a knee surgery, a shoulder surgery, and a TBI diagnosis. This is the Fraud Scheme.**

304.    Claimant C's matter demonstrates the integral nature of PPNY and Kolb in the Fraud Scheme and Fraud Scheme Enterprise. In falsely substantiating justification for unnecessary surgeries, should one doctor fail to receive a PAR, or choose not to move forward, the Fraud Scheme is not foiled, it just swaps out for a more willing Enterprise Member or conspirator for that particular rendition - here, Weinstein for Ortho-1.

305.    In creating the multitude of falsified reports regarding Claimant C purporting to support that, with no objective sign of injury on date of accident, such unnecessary surgeries were plausibly justified, Defendants Kolb, Kolb Radiology, PPNY, NYCMNR, and Golzad knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

306.    On June 18, 2018, at the direction of W. Schwitzer, an attorney of Schwitzer Firm verified and filed a Verified Complaint on behalf of Claimant C, alleging directly and under penalty of perjury, that Claimant C was "severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled" by the events of May 4, 2018, wherein Claimant C in fact had no objective sign of any injury.

307.    On November 5, 2018, at the direction of W. Schwitzer, another Schwitzer Firm attorney verified and mailed a Verified Bill of Particulars on behalf of Claimant C, verified under penalty of perjury that Claimant C suffered injuries to his cervical spine, lumbar spine, left knee, left shoulder, and head as a result of the events of June 30, 2023, wherein Claimant C had no objective sign of any injury, and demanded $3.5m in medical special damages.

308.    On March 24, 2020 (4 days after the ACDF), W. Schwitzer personally verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant C, verified under penalty of perjury that Claimant C further underwent the aforementioned spinal surgery by Ortho-1 as a result of the events of May 4, 2018, wherein Claimant C had no objective sign of any injury, and demanded $3.6m in medical special damages.

309.    On January 16, 2023 (4 days after the lumbar surgery), at the direction of W. Schwitzer, another Schwitzer attorney verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant C, verified under penalty of perjury that Claimant C further underwent the aforementioned 3-level lumbar spinal surgery by Ortho-1 as a result of the events of May 4, 2018, wherein Claimant C had no objective sign of any injury, and now demanded $6m in medical special damages.

310.    As the Schwitzer Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme.

311.    In performing four unjustified, inconsistent, and/or unrelated surgeries, non-party McCulloch and Ortho-1, in agreement and with the assistance of Schwitzer Firm, PPNY, and Kolb, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations of the Hobbs Act, 18 USC § 1951.

312.    In falsely substantiating a knowingly false diagnosis of TBI, NYCMNR and Golzad agreed to and did provide substantial assistance to Schwitzer Firm in an attempt to obtain

Plaintiff's property (money),  through fear of economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations of the Hobbs Act, 18 USC § 1951.

313.    Claimant C's claim remains open. Plaintiff has incurred unnecessary investigative, expert, and attorneys' fees as a direct and proximate result of the conduct alleged herein.

### iv.  <u>Claimant D</u>

314.    Claimant D was purportedly injured on July 13, 2021, on his second or third week on the job, when he suffered a cut on his finger. Claimant D was 21 years old at the time of the purported accident – and his *left shoulder arthroscopy*; 22 years old at the time of  his *cervical fusions*; and 23 years old at the time of his *lumbar fusion* - and represents a case study in the previously referenced rote treatment protocol for Claimants (*supra*, Fig. 1). **Exhibit 7-D**, records.



315.    On July 13, 2021, Claimant D was performing work with two other employees. Claimant D's assignment at the date and time of the accident was to prepare "hangers" during an air conditioning related job, which consisted of placing a 1" by 16" piece of sheet metal into a vice, and then drilling holes in it to permit the metal to be hung. At around 11 am, Claimant D approached his co-worker and stated that he had injured his left thumb when one of the metal pieces he was drilling slipped and came in contact with his thumb. The co-worker observed a minor

scrape to Claimant D's thumb, cleaned it off for him, and wrapped it in gauze. Claimant D was permitted to rest for the rest of the day. As they were leaving the site for the day, Claimant D asked this co-worker to drop him off at Jamaica Hospital, which he did.

316.    The second co-worker independently confirmed that hanger preparation was the task assigned to Claimant D at that date and time, as well as confirmed he observed Claimant D complaining of exclusively a cut on his thumb during that workday.

317.    Claimant D in fact took pictures of his injuries and sent them to his supervisor, which consisted of exclusively 2 pictures of his thumb.

318.    Once the first co-worker dropped Claimant D off at Jamaica Hospital several hours later as requested, Claimant D claimed to the ER that he was "working as an air conditioner helper when his finger got caught on a drill causing him to fall on his lower back." X-rays revealed no evidence of acute injury. He was promptly discharged.

319.    Similar to Claimant C, the next day, Claimant D signed Workers' Comp paperwork with Schwitzer Firm.

320.    Claimant D treated once with a non-defendant provider, providing the same explanation of "working as an air conditioner helper when his finger got caught on a drill causing him to fall on his lower back."

321.    Claimant D's story would subsequently change virtually every time it was given.

322.    On July 27, 2021, Claimant D presented anew, alleged to be at the instruction of Schwitzer Firm, to a different hospital, now with the story that he fell from 3 steps up a ladder, for a fall of 3-5 feet. He now complained of neck, right shoulder, right hip, and left wrist pain. All imaging was negative for any indicia of acute injury, and the lumbar X-ray found solely "some

disc space narrowing and endplate sclerosis at L4-5." He was prescribed ibuprofen and again discharged.

323.    On July 28, 2021, at Claimant D's first appointment with Defendant Brooklyn Med, Claimant D now asserted he "fell off an unstable 6 foot ladder."

324.    On August 2, 2021, at Claimant D's visit with Avshamulov/Advanced, he claimed he fell from a ladder while working.

325.    On October 27, 2021, at Claimant D's visit with Jeyamohan/Total Ortho, he claimed he was on a ladder and fell backwards onto his back.

326.    On November 4, 2021, at Claimant D's visit with Golzad/NYCMRN, he claimed he lost his footing on a ladder and fell **on his head.**

327.    On November 15, 2021, at Claimant D's visit with a Golzad-referred neuropsychologist, Claimant D claimed he fell from a ladder while carrying heavy metal equipment.

328.    At deposition, once questions were asked about the work being done, Plaintiff didn't feel well and Schwitzer Firm busted the deposition after roughly an hour of testimony.

```
      Q.    You don't know what the hanger
looks like that you were installing?
          MS. GABLEHOUSE:  Note my
      objection.  He can answer.
      A.    Specify the question well
because I'm not understanding it.
      Q.    What does a hanger look like?
      A.    It is a flexible --
          THE INTERPRETER:  The
      interpreter needs to clarify.
      A.    It is a flexible support.  I
don't know how to say it.
          MS. GABLEHOUSE:  Could I have
      five minutes guys?
```

> MR. DUNN: I spoke with Plaintiff counsel off the record briefly. She's let me know that the

> Plaintiff himself is not feeling well. He's having a little bit of a hard time today. We have agreed to stop here. It's 11:36 a.m. here on

329.    Back at Brooklyn Med on July 28, 2021, Claimant D was prescribed the rote protocol treatment of physical therapy (at Brooklyn Med), chiropractic (at NSF Chiro), and acupuncture treatments (at Unicorn), for orthopedic consultation (with Advanced), and subsequently the standard injections (at BAPM), all of course under the same 410 Ditmas roof, to the shared benefit of its non-physician owners and the Fraud Scheme Enterprise. Claimant D was referred for MRIs to CMI, and then spinal surgery with Total Ortho, consistent with the rote protocol.

330.    Claimant D purportedly underwent 70 PT appointments, 70 chiropractic appointments, and 55 acupuncture appointments, virtually all of which occurred on identical days. Brooklyn Med and NSF Chiro each billed for claimed therapeutic massages, which occurred on identical days. Claimant D, assuming accuracy of records, received 140 massages for a thumb scratch.

331.    Claimant D presented to Avshalumov of Advanced on August 2, 2021, wherein *his only complaint was regarding his left wrist.* Avshalumov marked this concern to constitute a 100% disability.

332. The CMI MRI of Claimant D's left shoulder on August 12, 2021 purportedly found a bursal side surface tear of the supraspinatus tendon, and tendinitis/bursitis at the supraspinatus and infraspinatus tendon; *i.e.*, identical findings purportedly read in Claimant A's CMI MRI.

333. Claimant D returned to Avshalumov with the left shoulder MRI in hand on August 18, 2021, and lo and behold, complaining now of left shoulder pain. Untroubled by this sudden change, Avshalumov promptly recommended and scheduled a left shoulder arthroscopy, which was performed at a facility in New Jersey on September 9, 2021.

334. The September 9, 2021 surgery was performed at Surgicore Surgical Center LLC – in Saddle Brook, New Jersey, thus availing, and exposing, the relevant Defendants of New Jersey's laws as set forth in Count X. This surgery, occurring approximately 6 weeks after the purported accident, was justified by the failure of "physical therapy, activity modification, and anti-inflammatory medications **for several months**." Avshalumov purportedly debrided a supraspinatus tear ("surface tear" on MRI), a labrum tear (not on MRI), and extensive synovitis (not on MRI).

335. In travelling to New Jersey on September 9, 2021, and performing the knowingly unjustified surgery on Claimant D, and in preparing the false documentation thereto, Defendants Avshalumov and Advanced "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 USC § 1961(1).

336. Apple and BAPM provided 3 cervical on September 23, October 7, and October 21, 2021; and, 3 lumbar injections on February 8, February 15, and March 3, 2022. Incredibly, they don't work.

337.    On November 4, 2021 Claimant D presented to Golzad at NYCMNR. Claimant D, who very much did not hit his head or even claim to until this exact date, claimed now he landed on his head. Golzad, who reviews no records, accepted this, and immediately deemed Claimant D 100% disabled from post-concussive syndrome and later issued a diagnosis of TBI.

338.    The CMI MRI of Claimant D's cervical spine purportedly revealed herniations of Claimant D's C3-4 (left-sided), C5-6 (right-sided), and C6-7 (right-sided) levels. Notably, the cervical MRI demonstrated no loss of disc space height, no cord compression ("cord is unremarkable"), normal facet joints, and "unremarkable" posterior elements. No listhesis or instability was noted.

339.    EMGs at NSF Chiro (September 28, 2021 for cervical; January 25, 2022 for lumbar), consistent with the Fraud Scheme, had no clinical indication or diagnosis, but "evidence of" radiculopathy at C5 and L5 which are thereafter treated as diagnoses.

340.    On January 17, 2022, Claimant D had a lumbar MRI at a non-defendant facility. The results contained no indication for an L4-5 fusion, and are discussed *infra*, wherein Total Ortho performed precisely an L4-5 fusion.

341.    On April 13, 2022, Jeyamohan and Kumar of Total Ortho once again crossed state lines to BMC in New Jersey to perform a purported ACDF of C5-6, which was utterly unjustifiable, particularly in a *22-year-old*, and impossible to square even within the already-skewed diagnostic context.

| Item | 8/18/2021 MRI | 4/13/22 Op Report | Problem |
|---|---|---|---|
| **Pathology /severity** | Focal protrusion (C5-6 right) and diffuse bulge. Cord, marrow, facets normal. | C5-6 ACDF (cage + hardware) claims "cervical disc herniation, **annulus tear**, **cord and neural compression.**" | **75% inconsistent with imaging - and <u>the consistent 25% doesn't warrant a fusion.</u>** |

| Item | 8/18/2021 MRI | 4/13/22 Op Report | Problem |
|---|---|---|---|
| Level selection | Multilevel, asymmetric and mostly right-sided (except C3-4 left). | Operates only at C5-6. | 2 other levels with virtually identical pathology. No stated explanation. |
| Central/ foraminal compromise | **Report explicitly stated "cord unremarkable and identified no foraminal compression at C5-6 (or anywhere)** | Claims to have decompressed the bilateral neuroforamen and cord | **"Fixed" issues not documented to exist** |

342.   In travelling to New Jersey on April 13, 2022, and performing the knowingly unjustified cervical spine surgery on Claimant A, and in preparing the false documentation thereto, Defendants Kumar, Jeyamohan, and Total Ortho "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 USC § 1961(1).

343.   On February 28, 2023, Claimant D returned to visit Jeyamohan, who recommended an L4-5 fusion based on MRI findings, noting that "MRI demonstrates significant disc herniation at L4-5 causing significant bilateral lateral recess and foraminal impingement with presence of annular tear. This is of particular import where the MRI report referenced had found, *unequivocally*:

There is no evidence of neural foraminal stenosis

344.   On August 10, 2023, Defendants Long and Thompson of Total Ortho performed an L4-5 posterolateral fusion with bilateral hemilaminectomy, facetectomy, foraminotomies. This procedure lacked any legitimate clinical justification and the operative report is flatly incompatible with the MRI.

| Item | 1/7/22 MRI | 8/10/23 Op report | Problem |
|---|---|---|---|
| **Severity at L4-5** | **Disc herniation** deforming the thecal sac; **explicitly states: "no evidence of neural foraminal stenosis."** | "**Severe neural compression**… **extruded disc fragment**… **segmental instability at L4-5**"; performs **bilateral hemilaminectomy, facetectomy, foraminotomies** and **posterolateral fusion L4-5.** | MRI doesn't show severe compression, or foraminal stenosis, or an extruded disc. Nothing about pre-op instability. This is fiction. |
| **Dynamic views** | **Decreased conspicuity** of the L4-5 finding on flexion (i.e., looks **better** when moving). | Treats the level as unstable and severely compressive. | If flexion improves the appearance, that cuts against fixed severe compression and against fusion. |
| **Level actually unstable** | **Grade I retrolisthesis at L5-S1**, not at L4-5. | Fuses **L4-5**. | They fused a level **with no listhesis** |
| **Extruded fragment** | MRI does **not** describe a free/extruded fragment; just a herniation. | Op note says "**extruded disk fragment.**" **No specimen submitted.** | If you actually removed an extruded fragment, you bag it and send it to pathology. |
| **Reason for fusion** | No pre-op instability shown. | Surgeon admits: after **>50% bilateral facetectomies** there was "**intersegmental motion… instability at L4-5,**" then fuses. | *They caused it,* purportedly to reach a nerve *that wasn't compressed*. |
| **Foraminal disease** | Report literally says **no foraminal stenosis** | Does **bilateral foraminotomies** at L4 and L5. | Without any clinical indication whatsoever |
| **Internal Timeline** | N/a | August 10, 2023 5 pm – 7:28 pm. | Initial authoring note: Aug. 15, 2023, without author name. End of note ID's author as Long on Aug. 17, 2023. |

345.    To be clear as to what that medical jargon actually means, the following is what

Long and Thompson did, to a *23-year-old with no clinical indication for it*:

> i. **Nerve-tunnel drilling** (foraminotomies) – Drill/enlarge both foramina to purportedly free the exiting L4 and L5 nerve roots – **here, where the MRI expressly stated "no evidence of neural foraminal stenosis**."

ii.  **Bone removal** (lamina) - Remove the back "roof" of the spinal canal on left and right (bilateral hemilaminectomies) to get down to the nerves. **This permanently alters the bony canal. Here, as above, *there was no reason to reach the nerves in the first place.***

iii.  **Joint removal** (facets) – Resect major portions of the paired facet joints- the level's natural hinges. Taking this much joint **in itself** makes the segment inherently unstable without hardware – ***i.e., the surgery performed <u>itself</u> bootstrapped the need for fusion.*** Here, Claimant D had only **grade 1 listhesis - <u>at L5-S1, not L4-5</u> - which <u>does not warrant surgical intervention in the first place.</u>** That's on good authority.[13]





iv.  Hardware placement – Drill into the pedicles of L4 and L5 on both sides and insert large metal screws close to the spinal canal and nerve roots. Connect the screws with rods and tighten. The L4–5 motion segment is now mechanically locked.

346.  In performing utterly unjustified, inconsistent and/or unrelated surgeries, Defendants Kumar, Jeyamohan, Long, Thompson, Total Ortho, Avshalumov, and Advanced, in agreement and with the assistance of Schwitzer Firm, 410 Ditmas Defendants, and CMI Defendants, engaged in force or violence in an attempt to obtain Plaintiff's property (money), through fear of economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations of the Hobbs Act, 18 USC § 1951.

---

[13] Total Ortho Website, accessed October 11, 2025.

347.    In falsely substantiating a knowingly false diagnosis of TBI, NYCMNR and Golzad agreed to and did provide substantial assistance to Schwitzer Firm in an attempt to obtain Plaintiff's property (money), through fear of economic loss imposed by and furthered by Schwitzer Firm. These actions amounted to violations of the Hobbs Act, 18 USC § 1951.

348.    In creating the multitude of falsified reports regarding Claimant D purporting to support, with no objective sign of injury on date of accident outside of a minor finger abrasion, that such unnecessary surgeries were plausibly justified, Total Ortho Defendants, 410 Ditmas Defendants, CMI Defendants, and NYCMRN Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 USC §§ 1341 & 1343, predicate acts pursuant to 18 USC § 1961(1).

349.    On October 26, 2021, at the direction of W. Schwitzer, an attorney of Schwitzer Firm verified and filed a Verified Complaint on behalf of Claimant D, alleging directly and under penalty of perjury, that Claimant D was "severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled" by the events of July 13, 2021, wherein Claimant D in fact had no objective sign of any injury. Aside from a scratched thumb.

350.    On February 4, 2022, an attorney for Schwitzer Firm, at the direction of W. Schwitzer, verified and mailed a Verified Bill of Particulars on behalf of Claimant D, verified under penalty of perjury that Claimant D suffered injuries including traumatic brain injury, cervical spine, lumbar spine, left shoulder, left wrist, and left thumb as a result of the events of July 13, 2021,

wherein Claimant D had no objective sign of any injury (less a scraped thumb), and demanded $1.5m in medical special damages.

351.    Claimant D's claim remains open. Plaintiff has incurred unnecessary investigative, expert, and attorneys' fees as a direct and proximate result of the conduct alleged herein.

## V.    PLAINTIFF'S JUSTIFIABLE RELIANCE

352.    As the predicate acts sounding in mail and wire fraud as set forth against the Count I RICO Defendants herein are alleged to have been foreseeable, in furtherance of, and as a necessary step in the Fraud Scheme, reliance is not required element to be established or pled as to each individual such document mailed or transmitted.

353.    Similarly, the NJ IFPA imposes no obligation to plead or prove reliance as a separate element.

354.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct. The Fraud Scheme was specifically designed and implemented in order to thwart due diligence and court process.

355.    The mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Plaintiff was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiff would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants, and they were the proximate and intended result of Defendants, the harm to Plaintiff itself being a necessary element to the Fraud Scheme through protracted litigation and unnecessarily incurred and inflated costs.

356.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to not just circumvent but exploit these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

## VI.    DAMAGES

357.    Plaintiff is an insurance carrier which underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and the Legal Defendants as part of the Fraud Scheme, with the necessary and substantial assistance of the Medical Defendants, and other members known and unknown of the Fraud Scheme Enterprise,.

358.    As a result of the Fraud Scheme, Plaintiff has incurred substantial damages. Such damages include the payments that Plaintiff made to Legal Defendants in the form of settlements due to Defendant's pattern of fraudulent conduct. Damages also include payments Plaintiff made as legal and investigative costs for defending fraudulent lawsuits and/or for reimbursement for payments made as part of settlement which were diverted to Defendant Medical Providers through liens for treatment predicated upon, in whole or in part, the fraudulent reports generated by Defendants.

359.    Litigation costs, investigative costs, attorneys' fees, and other damages are expressly and statutorily proper damages under the NJ IFPA. Same have been identified as viable and proper damages under RICO by precedent within this Circuit.

360.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

361.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit, even if the allegations are false or groundless – or patently fraudulent - the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses by Plaintiff in discharging its duty to defend its insured.

362.    Each transmission of records of fraudulent medical treatment rendered (or falsely recorded) had the direct and immediate effect of causing additional damages through Plaintiff's further incurred fees and costs in discharging its legal obligation to provide a defense to its insured, causing Plaintiff to incur further and additional investigative and legal fees both in direct response to the individual document transmissions and through prolonged litigation, the need for experts, required additional reserves, and were relied upon – to the degree they *must* be in the context of litigation, good faith requirements, and the duty to defend - in valuing the claim as to exposure and/or settlement in figures that were fraudulently inflated.

363.    Further, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent

scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

VII.   **CAUSES OF ACTION**

**COUNT I**
**RICO Violation (§ 1962[c])**
*Fraud Scheme Enterprise*

**As Against ("Count I Defendants"):**

**WILLIAM SCHWITZER & ASSOCIATES, P.C.**
**KOLB RADIOLOGY P.C.**
**PAIN PHYSICIANS NY, P.L.L.C.**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC d/b/a/ TOTAL ORTHOPEDICS**
**NYC MEDICAL & NEUROLOGICAL OFFICES, P.C.**

364.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

365.   Each of Schwitzer Firm, Kolb Practice, PPNY, and Total Ortho is a "person" as that term is defined by statute under 18 U.S.C. § 1961, et. seq.

366.   Count I Defendants constituted an association-in-fact enterprise as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.* (the "Fraud Enterprise").

367.   The Count I Defendants maintained a common purpose: to generate and monetize personal-injury and Workers' Comp claims through falsified testimony, medical necessity, and unnecessary surgeries. The relationships among Count I Defendants and others enabled the enterprise's functions (referrals, imaging, surgeries, liens, funding, and litigation coordination); and, the Fraud Scheme Enterprise has maintained sufficient longevity to pursue its purpose, as well as continues through the present.

368.   From at least 2018 through the present, each Count I Defendant conducted and/or participated in the conduct of the affairs of the Fraud Enterprise, by engaging in transactions and

conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

369.    This conduct included predicate acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, and Hobbs Act violations under 18 USC § 1951, directly and proximately causing Plaintiff's compensable damages, as well as numerous other 18 USC §§ 1341 and 1343, and Travel Act violations under 18 USC § 1952, as set forth regarding substantially similar related predicate acts extending from at least 2018 through to the present, and likely to continue into the future. These acts included, but are not limited to, the following:

**Schwitzer Firm**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Schwitzer Firm to Plaintiff's Defense Counsel | May 26, 2021 | Amended Verified Complaint | Upload/email. 18 USC § 1343. |
| A | Schwitzer Firm to Plaintiff's Defense Counsel | September 8, 2022 | Verified Bill of Particulars | Mail. 18 USC § 1341 |
| A | Schwitzer Firm | September 8, 2022, to present | Attempted extortion Conspiracy to commit extortion | Fear of economic loss *via* sham surgery/litigation 18 USC § 1951 |
| B | Schwitzer Firm to Plaintiff's Defense Counsel | June 7, 2024 | Verified Bill of Particulars | Mail. 18 USC § 1341 |
| B | Schwitzer Firm to Plaintiff's Defense Counsel | August 12, 2024 | Supplemental Verified Bill of Particulars | Mail. 18 USC § 1341 |
| B | Schwitzer Firm | September 8, 2022, to present | Attempted extortion Conspiracy to commit extortion | Fear of economic loss *via* sham surgery/litigation 18 USC § 1951 |
| | | | | |

| C | Schwitzer Firm (W. Schwitzer) To Plaintiff's Defense Counsel | March 20, 2020 | Supplemental Verified Bill of Particulars | Mail. 18 USC § 1341 |
|---|---|---|---|---|
| C | Schwitzer Firm To Plaintiff's Defense Counsel | January 16, 2023 | Supplemental Verified Bill of Particulars | Mail. 18 USC § 1341 |
| C | Schwitzer Firm | May 5, 2018, to present | Attempted extortion Conspiracy to commit extortion | Fear of economic loss *via* sham surgery/TBI diagnosis/litigation 18 USC § 1951 |
| D | Schwitzer Firm to Plaintiff's Defense Counsel | February 4, 2022 | Verified Bill of Particulars | Mail. 18 USC § 1341 |
| D | Schwitzer Firm | July 23, 2021 to present | Attempted extortion Conspiracy to commit extortion | Fear of economic loss *via* sham surgery/TBI diagnosis/litigation 18 USC § 1951 |

**Kolb Practice**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Kolb to Zurich re WC | May 14, 2021 | Billing and records from 5/3/21 visit | Mail. 18 USC § 1341 |
| A | Kolb to WCB | May 27, 2021 | Billing and records from 5/3/21 visit | Mail. 18 USC § 1341 |
| A | Kolb to Zurich re WC | March 2, 2022 | Billing and records from 2/25/22 visit | Mail. 18 USC § 1341 |
| A | Kolb to Zurich re WC | May 23, 2022 | Billing and records from 5/18/22 visit | Mail. 18 USC § 1341 |
| A | Kolb to Zurich re WC | May 30, 2022 | Billing and records from 5/23/22 visit | Mail. 18 USC § 1341 |
| A | Kolb to Plaintiff's medical records agent | April 24, 2024 | All records | Email. 18 USC § 1343 |
| A | Kolb | May 3, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted |

| | | | | surgery in furtherance of economic fear of loss 18 USC § 1951 |
|---|---|---|---|---|
| B | Kolb *Via* WCB to Plaintiff's Medical records agent | November 26, 2024 | All billing and records in WCB file | WCB File Transfer 18 USC § 1343. |
| B | Kolb | August 17, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 USC § 1951 |
| C | Kolb to Plaintiff's Defense Counsel | July 30,2020 | All records | Mail. 18 USC § 1341 |
| C | Kolb | May 23, 2018 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 USC § 1951 |

**PPNY**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | PPNY to Plaintiff's medical records agent | December 20, 2024 | All records | Upload/Email. 18 USC § 1343 |
| A | PPNY | May 3, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss. 18 USC § 1951 |

| B | PPNY (Kosharskyy) to WCB | September 6, 2023 | Billing and records from 7/5/23 visit | Mail. 18 USC § 1341. |
|---|---|---|---|---|
| B | PPNY (Cohen) to WCB | February 6, 2024 | Billing and records from 1/15/24 visit | WCB File Transfer Upload. 18 USC § 1343. |
| B | PPNY *Via* WCB to Plaintiff's Medical records agent | November 26, 2024 | All billing and records in WCB file | WCB File Transfer 18 USC § 1343. |
| B | PPNY | July 5, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss. 18 USC § 1951 |
| C | PPNY *via* WCB to Plaintiff's Medical records agent | January 15, 2020 | All billing and records in WCB file | WCB File Transfer 18 USC § 1343. |
| C | PPNY to Plaintiff's Defense Counsel | December 16, 2019 | Records | Fax. 18 USC § 1343. |
| C | PPNY | June 11, 2018 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss. 18 USC § 1951 |

### Total Ortho

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Total Ortho (Drazic) To WCB | September 18, 2020 | Billing and Surgical Records from 9/8/2020 Surgery) | WCB File Transfer Upload. 18 USC § 1343 |
|  |  |  |  |  |

| A | Total Ortho (Lerman) To WCB | December 20, 2020 | Billing and Records (12/14/2020 visit) | WCB File Transfer Upload. 18 USC § 1343 |
|---|---|---|---|---|
| A | Total Ortho (Drazic) To WCB | February 15, 2021 | Billing and Records (2/8/21 visit) | WCB File Transfer Upload. 18 USC § 1343 |
| A | Total Ortho (Lerman) *Via* NUMC to WCB | February 26, 2021 | NUMC Billing from 1/26/21 surgery | Fax. 18 USC § 1343 |
| A | Total Ortho (Lerman) *Via* NUMC to WCB | March 3, 2021 | Billing and surgical records from 1/26/21 surgery | WCB File Transfer Upload. 18 USC § 1343 |
| A | Total Ortho (Kumar) To WCB | May 26, 2021 | Billing and Records (2/8/21 visit) | WCB File Transfer Upload. 18 USC § 1343 |
| A | Total Ortho (Kumar) To WCB | June 23, 2021 | Billing and Records (5/28/21 surgery) | WCB File Transfer Upload. 18 USC § 1343 |
| A | Total Ortho (Jeyamohan) To WCB | June 23, 2021 | Billing and Records (5/28/21 surgery) | WCB File Transfer Upload. 18 USC § 1343 |
| A | Total Ortho (Jeyamohan) | May 28, 2021 | Made use of interstate facilities and travel with intent to act, and then acting, in furtherance of kickback scheme | Travel Act Violation 18 USC § 1952 |
| A | Total Ortho (Kumar) | May 28, 2021 | Made use of interstate facilities and travel with intent to act, and then acting, in furtherance of kickback scheme | Travel Act Violation 18 USC § 1952 |
| A | Total Ortho To Plaintiff's Medical Records Agent | April 24, 2024 | All Records | Mail. 18 USC § 1341 |
| A | Total Ortho (Kumar) To Plaintiff's Medical Records Agent | January 24, 2025 | BMC Hospital and surgical records | Mail. 18 USC § 1341 |

| A | Total Ortho (Drazic, Kumar, Lerman, Jeyamohan) | September 8, 2020 to present | Conspiracy to commit extortion | Knowingly unjustified surgeries. Violence to buttress fear of economic harm. 18 USC § 1951. |
|---|---|---|---|---|
| D | Total Ortho (Jeyamohan) | April 13, 2022 | Made use of interstate facilities and travel with intent to act, and then acting, in furtherance of kickback scheme | Travel Act Violation 18 USC § 1952 |
| D | Total Ortho (Kumar) | April 13, 2022 | Made use of interstate facilities and travel with intent to act, and then acting, in furtherance of kickback scheme | Travel Act Violation 18 USC § 1952 |
| D | Total Ortho | October 27, 2023 | Records | Fax. 18 USC § 1343 |
| D | Total Ortho (Kumar, Jeyamohan, Thompson, Long) | April 13, 2022 to present | Conspiracy to commit extortion | Knowingly unjustified surgeries. Violence to buttress fear of economic harm. 18 USC § 1951. |

**NYCMNR**

| C | NYCMNR (Golzad) *via* WCB to Plaintiff's medical records agent | January 15, 2020 | All records | Upload/Email. 18 USC § 1343 |
|---|---|---|---|---|
| C | NYCMNR (Golzad) to WCB | December 3, 2019 | Billing and Medical records | Upload/Email. 18 USC § 1343 |
| C | NYCMNR | September 18, 2018 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely substantiating TBI in furtherance of economic fear of loss 18 USC § 1951 |

| D | NYCMNR (Golzad) *via* WCB to Plaintiff's medical records agent | January 15, 2020 | All records | Upload/Email. 18 USC § 1343 |
|---|---|---|---|---|
| D | NYCMNR | November 4, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely substantiating TBI in furtherance of economic fear of loss 18 USC § 1951 |

370. Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiff cannot readily ascertain without discovery.

371. The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff's damage have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent or were otherwise in furtherance of the Fraud Scheme. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that the Count I Defendants knew, intended, and/or could reasonably foresee the use of such mails and wires, same being a necessary step in furtherance of the larger scheme or artifice to defraud; while in fact pled, reliance need not be pled in this context.

372. The Travel Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to use of interstate facilities, intent to facilitate, carry on, and/or promote specified unlawful conduct, and that same was in fact carried out, and the underlying unlawful conduct as alleged plausibly permits inference of unlawful bribery *via* kickback scheme and Hobbs Act violations/extortion.

373.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced by wrongful use of actual force and violence (upon claimants), and/or fear of economic harm (upon Plaintiff).

374.    The knowingly unjustified surgeries performed by the Total Ortho Defendants, Persich Defendants, and Advanced Defendants (actual force and violence), substantially assisted by way of false facial justification knowingly prepared by PPNY Defendants, Kolb Defendants, CMI Defendants, and 410 Ditmas Defendants, were weaponized by Schwitzer Firm in causing or attempting to cause such fear of economic harm so as to induce Plaintiff to having its property wrongfully obtained by consent.

375.    The knowingly unjustified surgeries, performed at the ultimate request and direction of Schwitzer Firm, further constituted acts of actual force or violence in attempting to induce Plaintiff's consent. Total Ortho Defendants, Persich Defendants, Advanced Defendants, and W. Schwitzer and/or Schwitzer Firm agreed to, and in fact engaged, in such conduct as alleged.

376.    In falsely substantiating a knowingly false diagnosis of TBI, NYCMNR and Golzad agreed to and did provide substantial assistance to Schwitzer Firm in a further and distinct attempt to obtain Plaintiff's property (money), through fear of economic loss imposed by and furthered by Schwitzer Firm.

377.    The transmissions pled were made to support monetary demands backed by such wrongful use of actual violence or force, and fear of economic harm, were made by wire and mail, involves several instances of violence and force in other states, and thus constituted acts of extortion or attempted extortion affecting interstate commerce.

378.    Each surgery identified in the predicate table constituted an act of actual force or violence used to bolster the extortionate demands for payment from Plaintiff and other insurers, and to induce consent to part with money under fear of economic harm.

379.    Schwitzer Firm's lawsuits, proxy WC filings, pre-suit demands, and lien/assignment claims (collectively, the "Sham Claims") lacked any probable cause and were/are objectively baseless. Across even, and at least, the 5 exemplars herein, Schwitzer Firm:

- knowingly pursued injury claims contradicted by contemporaneous medical records, IME findings, even their own diagnostic reviews;

- knowingly relied on templated reports cut-and-paste across patients with identical "findings" and billing codes (*supra*, ¶¶ 144-145);

- knowingly relied on inflated or fabricated treatment records;

- utilized escalating and unjustified medical treatments and surgeries on non-English speaking, often undocumented, immigrants with limited education and understanding, not to obtain legitimate redress on any merits, but to impose escalating litigation and discovery costs and exposure risk so as to coerce payments unrelated to claim validity - *i.e.*, to use the governmental process, as opposed to the valid outcome of that process, as a weapon.

380.    As evidenced herein and elsewhere, Schwitzer Firm wages a repeated and identifiable campaign in Courts and WC proceedings to block, burden, and penalize Plaintiff's right and ability to contest claims, flooding calendars with copy-paste actions and repeated allegation supplements so as to prevent any sustained scrutiny on any individual treatment, surgery, or provider, to multiply the expense of defense, and to continuously raise exposure risk so as to

impose the false construct of settling at or near policy or risk bad faith exposure for failing to so *via* potential bad faith claims.

381.    Schwitzer Firm abused process through knowing and material falsehoods to Courts and administrative bodies, as well as Plaintiff and similarly situated ultimate payors *via* fabricated medical findings, false statements of treatment rendered, and intentionally utilizing a network of concealed kickbacks and self-referral arrangements. The lawsuits and claims were (a) objectively baseless and (b) subjectively intended to burden and coerce rather than to win on legitimate merits.

382.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants not yet so identified as part of the Fraud Scheme.

383.    As a result of the pattern of racketeering activity, Plaintiff has suffered damages to their business and property.

384.    As the ultimate goal of the Fraud Scheme Enterprise was to extort and/or defraud Plaintiff out of settlements and awards, Plaintiff is the intended victim of the Fraud Scheme Enterprise and the pattern of racketeering activity. Put simply, should the Fraud Scheme succeed, the success is marked by a settlement check. Plaintiff's account would be, or has been, drawn upon for purposes of such check, and in the interim, such accounts are drawn upon to pay investigative fees, expert fees, legal fees, and litigation costs as required under the duty to defend. There is no break in the causal chain between Defendants' conduct and Plaintiff's damages.

**WHEREFORE**, Plaintiff demands judgment against the Count I Defendants, and each of them, jointly and severally, for

      a)     An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

      b)     Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

      c)     Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

      d)     Such other relief as the Court deems just and proper.

## COUNT II

### RICO Conspiracy (§ 1962[d])
### *Fraud Scheme Enterprise*

### Against All Defendants

385.    Plaintiff repeats and reallege each and every allegation set forth above as if fully set forth at length herein.

386.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 USC § 1962(d).

387.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 USC § 1341), wire fraud (18 USC § 1343), Travel Act violations (18 USC § 1952), and Hobbs Act violations (18 USC § 1951) – all of which is "racketeering activity" as defined in 18 USC § 1961(1)(A).

388.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

389.    These predicate acts were necessary steps in and in furtherance of the Fraud Scheme Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Defendants, including:

- Recruiting Claimants and staging accidents;

- Securing retainer of the attorneys within the Fraud Scheme Enterprise, including Schwitzer Firm;

- Managing Claimants through pre-determined protocol treatment *via, inter alia,* the Medical Provider Defendants;

- Performing pre-determined and unnecessary surgeries by, *inter alia,* the Medical Provider Defendants;

- Utilizing unnecessary surgical implants to the benefit of surgeons;

- Filing and prosecuting the fraudulent suits;

- Laundering and concealing the nature of the Fraud Scheme proceeds; and,

- Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

390.    Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of the Fraud Scheme Enterprise.

391.    W. Schwitzer agreed to, and did, provide substantial assistance through the management of the Fraud Scheme Enterprise, supervision and management of the litigation

proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, B, C, and D, as well as in fact personally verifying false information.

392.    Merlino agreed to, and did, provide substantial assistance through the management of the related WC firms, supervision and management of the WC proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, B, C, and D, as well as in fact preparing and submitting knowingly false WC submissions.

393.    The Kolb Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants A, B, and C.

394.    The PPNY Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of PPNY, PPNY employees, Island ASC, and Crotona ASC, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimant A, B, and C.

395.    The All County Defendants agreed to, and did, provide substantial assistance in performing and providing falsified records of unnecessary and unjustified surgeries, so as to prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matter of Claimant B.

396.    The NYCMNR Defendants agreed to, and did, provide substantial assistance in providing falsified records of knowingly false TBI diagnoses, so as to prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants C and D.

397.    The Total Ortho Defendants, and each of Kumar, Jeyamohan, Thompson, Long, and Lerman agreed to, and did, provide substantial assistance both individually and through supervision and management of Total Ortho employees, in performing and providing falsified records of unnecessary and unjustified surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matters of Claimants A and D.

398.    The 410 Ditmas Defendants, and each of Salehin, Avshalumov, Apple, Wang, and Lebson agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant D.

399.    The CMI Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants A and D.

400.    At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I.

401.    Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiffs and those similarly situated.

402.    As a direct and proximate result of the § 1962(c) violations that Count II Defendants conspired to commit, and the § 1962(d) conspiracy, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert fees, and litigation costs.

403.    Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Count II Defendants' agreement and the predicate acts committed in furtherance thereof; Plaintiff would not have suffered the losses described.

404.    As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

e)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

f)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

g)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

h)    Such other relief as the Court deems just and proper.

<u>**COUNT III**</u>
**RICO Violation (§ 1962[c])**
*Schwitzer Firm Enterprise*

<u>**As Against:**</u>

**WILLIAM D. SCHWITZER**
**GIOVANNI "JOHN" C. MERLINO**

405.    Plaintiff repeats and reallege each and every allegation set forth above as if fully set forth at length herein.

406.    W. Schwitzer is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.* Merlino is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.* Schwitzer Firm is an expressly defined "enterprise" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

407.    From at least 2018 through the present, W. Schwitzer and Merlino have conducted and/or participated in the conduct of the affairs of Schwitzer Firm, and continue to so conduct and participate, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

408.    This conduct included predicate acts of mail and wire fraud under 18 USC §§ 1341 and 1343, and Hobbs Act violations under 18 USC § 1951, directly and proximately causing Plaintiff's compensable damages, as well as numerous other 18 USC §§ 1341 and 1343, and Hobbs Act violations under 18 USC § 1951, as set forth regarding substantially similar related predicate acts extending from 2018 through the present, and likely to continue into the future. These acts included but are not limited to the acts as set forth at length in Count I, including a violation of 18 USC § 1341 on March 20, 2020, and 18 USC § 1951 Hobbs Act violations as to Claimants A, B, C, and D.

409.    Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of W. Schwitzer and Merlino which Plaintiff cannot readily ascertain without discovery.

410.    The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff's damage have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that W. Schwitzer knew, intended, and/or could reasonably foresee the use of such mails and wires, same being a necessary step in furtherance of the larger scheme or artifice to defraud; reliance need not be pled in this context.

411.    In addition to the acts detailed in Count I, which are incorporated as if set forth fully herein, Merlino further prepared knowingly false Workers' Comp opening documents regarding Claimant B on July 6, 2023, and Claimant C on May 5, 2018, knowing same would be transmitted *via* wire in furtherance of and as a necessary step in the fraud scheme, and which were then so transmitted at Merlino's instruction on those same days *via* Schwitzer Firm employees to the WCB; together constituting two separate and discrete violations of 18 USC § 1343.

412.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (upon Plaintiff), as set forth at length in Count I. W. Schwitzer agreed, conspired to, and in fact did, attempt to impose such fear of economic harm upon Plaintiff so as to induce consent for Plaintiff's property to be obtained.

413.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants yet to be identified who have been drawn into the Fraud Scheme.

414.    As a result of the pattern of racketeering activity, Plaintiff has directly and proximately suffered damages to their business and property.

415.    As the ultimate goal of the scheme to defraud for W. Schwitzer and Merlino is monetary compensation of settlements and awards paid by Plaintiff and other similarly situated, Plaintiff is the intended victim of the Schwitzer Firm Enterprise and related pattern of racketeering activity.

**WHEREFORE**, Plaintiff demands judgment against Defendant W. Schwitzer and Merlino for:

a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d)    Such other relief as the Court deems just and proper.

## COUNT IV
### RICO Conspiracy (§ 1962[d])
*Schwitzer Firm Enterprise*

### As Against ("Count IV Defendants"):

**WILLIAM D. SCHWITZER**
**GIOVANNI "JOHN" C. MERLINO**
**ALL COUNTY FOOT AND ANKLE, L.L.P.**
**GIANNI PERSICH, M.D.**
**KOLB RADIOLOGY P.C.**
**THOMAS M. KOLB, M.D.**
**NYC MEDICAL & NEUROLOGICAL OFFICES, P.C.**
**MEHRDAD GOLZAD, M.D.**
**PAIN PHYSICIANS NY, P.L.L.C**
**LEON REYFMAN, M.D.**
**BOLESLAV KOSHARSKYY, M.D.**
**MARK COHEN, M.D.**
**CROTONA PARKWAY ASC, LLC D/B/A CROTONA SURGERY CENTER**
**ISLAND AMBULATORY SURGERY CENTER, LLC**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC d/b/a/ TOTAL ORTHOPEDICS**
**JEFFERY THOMPSON, D.O.**
**MITCHELL LONG, D.O.**
**ABHISHEK KUMAR, M.D.**
**SHIVEINDRA JEYAMOHAN, M.D.**
**ROBERT DRAZIC, D.O.**
**VADIM LERMAN, D.O.**
**BROOKLYN MEDICAL PRACTICE, P.C.**
**SAYEEDUS SALEHIN, M.D.**
**ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C.**
**STANISLAV AVSHALUMOV, D.O.**
**BIG APPLE PAIN MANAGEMENT PLLC**
**RICHARD J. APPLE, M.D.**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C.**
**TODD LEBSON, DC**
**UNICORN ACUPUNCTURE, P.C.**
**DEKUN WANG, L.AC**
**COMMUNITY MEDICAL IMAGING, P.C.**
**ANDREW MCDONNELL, M.D.**

416.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

417.    From at least 2018 to the present, Count IV Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Schwitzer Firm Enterprise through a pattern of racketeering activity set forth in Count III herein in violation of 18 U.S.C. § 1962(d).

418.    The pattern of racketeering activity in which the Count IV Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific predicate acts as described in detail in this Complaint and specifically Count III above, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) Travel Act violations (18 USC § 1952), and Hobbs Act violations (18 USC § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

419.    The substantive 18 USC § 1962(c) violations are set forth in Count III above (and by reference, Count I). The predicate acts of mail fraud, wire fraud, travel act violations, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Count IV Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

420.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

421.    These predicate acts were necessary steps in and in furtherance of the Schwitzer Firm Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Count IV Defendants, including:

- Recruiting Claimants and staging accidents or fraudulently obtaining Claimants;

- Securing retainer of Schwitzer Firm;

- Managing Schwitzer Firm Claimants through pre-determined protocol treatment;

- Performing pre-determined and unnecessary surgeries;

- Filing and prosecuting the fraudulent suits;

- Laundering and concealing the nature of the Fraud Scheme proceeds; and,

- Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

422.    Each Count IV Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, such acts to the benefit of the Schwitzer Firm Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Counts I & III. Each Count IV Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiff and those similarly situated.

423.    W. Schwitzer agreed to, and did, provide substantial assistance through the management of the Fraud Scheme, supervision and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, B, C, and D, as well as in fact personally verifying false information.

424.    Merlino agreed to, and did, provide substantial assistance through the management of the related WC firms, supervision, and management of the WC proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, B, C, and D.

425.    The Kolb Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants A, B, and C.

426.    The PPNY Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of PPNY, PPNY employees, Island ASC, and Crotona ASC, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimant A, B, and C.

427.    The All County Defendants agreed to, and did, provide substantial assistance in performing and providing falsified records of unnecessary and unjustified surgeries, so as to prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matter of Claimant B.

428.    The NYCMNR Defendants agreed to, and did, provide substantial assistance in providing falsified records of knowingly false TBI diagnoses, so as to prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants C and D.

429.    The Total Ortho Defendants, and each of Kumar, Jeyamohan, Thompson, Long, Drazic, and Lerman agreed to, and did, provide substantial assistance both individually and through supervision and management of Total Ortho employees, in performing and providing falsified records of unnecessary and unjustified surgeries, so as to prolong litigation, inflate

medical billings and falsely inflate case and settlement values, including the matters of Claimants A and D.

430.    The 410 Ditmas Defendants, and each of Salehin, Avshalumov, Apple, Wang, and Lebson agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant D.

431.    The CMI Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants A and D.

432.    At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I.

433.    Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiffs and those similarly situated.

162.    As a direct and proximate result of the § 1962(c) violations that Count IV Defendants conspired to commit, and the § 1962(d) conspiracy, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert fees, and litigation costs.

163.     Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Count IV Defendants' agreement and the predicate acts committed in furtherance thereof; Plaintiff would not have suffered the losses described.

164.     As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Count IV Defendants, and each of them, jointly and severally, for:

i)       An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

j)       Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

k)       Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

l)       Such other relief as the Court deems just and proper.

### COUNT V
**RICO Violation (§ 1962[c])**
*Kolb Radiology Enterprise*

### As Against THOMAS M. KOLB, M.D.

165.     Plaintiff repeats and reallege each and every allegation set forth above as if fully set forth at length herein.

166.     Kolb is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

167.     Kolb Practice, a professional corporation, is an expressly defined "enterprise" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

168.     From at least 2018 through the present, Kolb has conducted and/or participated in the conduct of the affairs of Kolb Practice, and continues to so conduct and participate, by engaging

in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

169.    This conduct included predicate acts of mail and wire fraud under 18 USC §§ 1341 and 1343, and Hobbs Act violations under 18 USC § 1951, directly and proximately causing Plaintiff's compensable damages, as well as numerous other 18 USC §§ 1341 and 1343, and Hobbs Act violations under 18 USC § 1951, as set forth regarding substantially similar related predicate acts extending from 2018 through the present, and likely to continue into the future. These acts included but are not limited to the acts as set forth at length in Count I.

170.    Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Kolb which Plaintiff cannot readily ascertain without discovery.

171.    The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff's damage have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that Kolb knew, intended, and/or could reasonably foresee the use of such mails and wires, same being a necessary step in furtherance of the larger scheme or artifice to defraud; reliance need not be pled in this context.

172.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon

Claimants), as well as fear of economic harm (upon Plaintiff), as set forth at length in Count I. Kolb agreed, conspired to, and in fact did, provide substantial assistance in attempts to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm.

173.    Kolb obtained, attempted to obtain, and/or conspired to obtain Plaintiff's property by attempting to induce Plaintiff's consent through wrongful use of fear of economic harm - including the threatened risk of inflated and/or excess verdicts and settlements premised on knowingly falsified operative, medical, and diagnostic reports and sworn statements - and by the wrongful use of actual force and violence upon Claimants in the form of medically unnecessary surgeries.

174.    The transmissions pled herein were made in support of claims and monetary demands backed by such wrongful use of fear and violence and/or economic harm and thus constituted acts of extortion or attempted extortion affecting interstate commerce.

175.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants yet to be identified who have been drawn into the Fraud Scheme.

176.    As a result of the pattern of racketeering activity, Plaintiff has suffered damages to their business and property.

177.    As the ultimate goal of the scheme to defraud for Kolb is monetary compensation either directly or through lien, paid by Plaintiff and other similarly situated, Plaintiff is the intended victim of the Kolb Radiology Enterprise and related pattern of racketeering activity.

**WHEREFORE**, Plaintiff demands judgment against Kolb for:

a)   An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b)   Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c)   Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d)   Such other relief as the Court deems just and proper.

**COUNT VI**
**RICO Conspiracy (§ 1962[d])**
*Kolb Radiology Enterprise*

**As Against ("Count VI Defendants"):**

**THOMAS M. KOLB, M.D.**
**WILLIAM SCHWITZER & ASSOCIATES, P.C.,**
**WILLIAM D. SCHWITZER,**
**GIOVANNI "JOHN" C. MERLINO**
**PAIN PHYSICIANS NY, P.L.L.C,**
**LEON REYFMAN, M.D.,**
**BOLESLAV KOSHARSKYY, M.D.**
**ALL COUNTY FOOT AND ANKLE, L.L.P.,**
**GIANNI PERSICH, M.D.,**

178.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

179.   From at least 2018 to the present, Count VI Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Kolb Radiology Enterprise through a pattern of racketeering activity set forth in Count V herein in violation of 18 U.S.C. § 1962(d).

180.    The pattern of racketeering activity in which the Count VI Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific predicate acts as described in detail in this Complaint and specifically Count I above, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and Hobbs Act violations (18 USC § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

181.    The substantive 18 USC § 1962(c) violations are set forth in Count V (and by reference, Count I) above.

182.    The predicate acts of mail fraud, wire fraud, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Count VI Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

183.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

184.    These predicate acts were necessary steps in and in furtherance of the Kolb Radiology Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Count VI Defendants, including:

- Recruiting Claimants and staging accidents or fraudulently obtaining Claimants;

- Securing retainer of Schwitzer Firm and/or other confederate firms;

- Managing Claimants through pre-determined protocol treatment;

- Steering Claimants to Kolb Practice for over-called MRIs;

- Performing pre-determined and unnecessary surgeries;

- Filing and prosecuting the fraudulent suits;

- Laundering and concealing the nature of the Fraud Scheme proceeds; and,

- Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

185.    Each Count VI Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the such acts to the benefit of the Kolb Radiology Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Counts I & V. Each Count VI Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiff and those similarly situated.

186.    W. Schwitzer agreed to, and did, provide substantial assistance through the management of the overarching Fraud Scheme, supervision, and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme.

187.    Merlino agreed to, and did, provide substantial assistance through the management of the related WC firms, supervision, and management of the WC proceedings, managing Claimants and Medical Providers, managing Schwitzer Firm attorneys and employees, and steering Claimants to Kolb in furtherance of the scheme.

188.    PPNY, Reyfman, Kosharskyy, All County, and Persich agreed to, and did, provide substantial assistance in referring Claimants and maintaining referral streams in exchange of Kolb Practice MRI reads falsely justifying surgeries and escalating/continued treatments.

189.    As a direct and proximate result of the § 1962(c) violations that Count VI Defendants conspired to commit, and the § 1962(d) conspiracy, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert fees, and litigation costs.

190.    Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Count VI Defendants' agreement and the predicate acts committed in furtherance thereof; Plaintiff would not have suffered the losses described.

**WHEREFORE**, Plaintiff demands judgment against the Count VI Defendants, and each of them, jointly and severally, for:

a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d)    Such other relief as the Court deems just and proper.

### COUNT VII
### RICO Violation (§ 1962[c])
### *Total Ortho Enterprise*

### As Against ("Count VII Defendants"):

**VADIM LERMAN, D.O.**
**ABHISHEK KUMAR, M.D.**
**SHIVEINDRA JEYAMOHAN, M.D.**

191.    Plaintiff repeats and reallege each and every allegation set forth above as if fully set forth at length herein.

192.    Lerman, Kumar, and Jeyamohan are each "persons" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

193.    Total Ortho, a limited liability company, is an expressly defined "enterprise" as that term is defined within statute under 18 U.S.C. § 1961, *et. seq.*

194.    From at least 2018 through the present, Lerman, Kumar, and Jeyamohan have conducted and/or participated in the conduct of the affairs of Total Ortho, and continues to so conduct and participate, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

195.    This conduct included predicate acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, and Hobbs Act violations under 18 USC § 1951, directly and proximately causing Plaintiff's compensable damages, as well as numerous other 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, and Hobbs Act violations under 18 USC § 1951, as set forth regarding substantially similar related predicate acts extending from 2018 through the present, and likely to continue into the future. These acts included but are not limited to the acts as set forth at length in Count I.

196.    Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Kolb which Plaintiff cannot readily ascertain without discovery.

197.    The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff's damage have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that Kolb knew, intended, and/or could reasonably foresee the use of such mails and wires, same being a necessary step in furtherance of the larger scheme or artifice to defraud; reliance need not be pled in this context.

198.    The Travel Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to use of interstate facilities, intent to facilitate, carry on, and/or promote specified unlawful conduct, and that same was in fact carried out, and the underlying unlawful conduct as alleged plausibly permits inference of unlawful bribery *via* kickback scheme and Hobbs Act violations/extortion, including the matters of Claimants A and D, and as set forth at length in Count I.

199.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (upon Plaintiff), as set forth at length in Count I. Each of Lerman, Kumar, and Jeyamohan agreed, conspired to, and in fact did, provide substantial assistance in attempts to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm. Notably, in New York, *pro forma* consent is not a defense to violence where there is risk of serious injury or death.[14]

200.    Lerman, Kumar, and Jeyamohan attempted to obtain, and/or conspired to obtain money from Plaintiff by inducing Plaintiff's consent through wrongful use of fear of economic harm - including the threatened risk of inflated and/or excess verdicts and settlements premised on

---

[14] *See*, *e.g.*, New York Penal Law § 120.05(2) ("With intent to cause physical injury to another person, he causes such injury... by means of a... dangerous instrument") (Assault in the Second Degree); New York Penal Law §§ 120.00(1)("With intent to cause physical injury to another person, he causes such injury..."), 120.00(2)("He recklessly causes physical injury to another person"), 120.00(3) ("With criminal negligence, he causes physical injury to another person by means of a... a dangerous instrument") (all Assault in the Third Degree).

knowingly falsified operative reports and by the wrongful use of actual force and violence upon Claimants in the form of medically unnecessary surgeries, including the matters of Claimants A and D, and as set forth in Count I.

201.    The transmissions pled herein were made in support of claims and monetary demands backed by such wrongful use of fear and violence and/or economic harm and thus constituted acts of attempted extortion affecting interstate commerce.

202.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants yet to be identified who have been drawn into the Fraud Scheme.

203.    As a result of the pattern of racketeering activity, Plaintiff has suffered damages to their business and property.

204.    As the ultimate goal of the scheme to defraud for Lerman is monetary compensation either directly or through lien, paid by Plaintiff and other similarly situated (or funded on the premise Plaintiff will ultimately pay), Plaintiff is the intended victim of the Kolb Radiology Enterprise and related pattern of racketeering activity.

**WHEREFORE**, Plaintiff demands judgment against Lerman for:

a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d)    Such other relief as the Court deems just and proper.

## COUNT VIII
### RICO Conspiracy (§ 1962[d])
### *Total Ortho Enterprise*

### As Against ("Count VIII Defendants"):

**VADIM LERMAN, D.O.**
**ABHISHEK KUMAR, M.D.**
**JEFFERY THOMPSON, M.D.**
**SHIVEINDRA JEYAMOHAN, M.D.**
**ROBERT DRAZIC, M.D.**
**WILLIAM SCHWITZER & ASSOCIATES, P.C.**
**WILLIAM D. SCHWITZER**
**GIOVANNI "JOHN" C. MERLINO**
**KOLB RADIOLOGY P.C.**
**THOMAS M. KOLB, M.D.**
**PAIN PHYSICIANS NY, P.L.L.C**
**LEON REYFMAN, M.D.**
**BOLESLAV KOSHARSKYY, M.D.**
**BROOKLYN MEDICAL PRACTICE, P.C.**
**BIG APPLE PAIN MANAGEMENT PLLC**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C.**
**UNICORN ACUPUNCTURE, P.C.**
**SAYEEDUS SALEHIN, M.D.**
**RICHARD J. APPLE, M.D.**
**TODD LEBSON, DC**
**DEKUN WANG, L.AC**
**COMMUNITY MEDICAL IMAGING, P.C.**
**ANDREW MCDONNELL, M.D.**

205.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

206.    From at least 2018 to the present, Count VIII Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Total Ortho Enterprise through a pattern of racketeering activity set forth in Count III herein in violation of 18 U.S.C. § 1962(d).

207.    The pattern of racketeering activity in which the Count VIII Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific predicate acts as described in detail in this Complaint and specifically Count I above, constituting mail fraud (18 USC § 1341), wire fraud (18 USC § 1343), Travel Act violations (18 USC § 1952) and Hobbs Act violations (18 USC § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

208.    The substantive 18 USC § 1962(c) violations are set forth in Count VII (and by reference, Count I) above.

209.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Count VIII Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

210.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

211.    These predicate acts were necessary steps in and in furtherance of the Total Ortho Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Count VIII Defendants, including:

- Recruiting Claimants and staging accidents or fraudulently obtaining Claimants;

- Securing retainer of Schwitzer Firm and/or other confederate firms;

- Managing Claimants through pre-determined protocol treatment;

- Steering Claimants to Kolb Practice (or similar) for over-called MRIs;

- Performing pre-determined and unnecessary surgeries;

- Filing and prosecuting the fraudulent suits;

- Laundering and concealing the nature of the Fraud Scheme proceeds; and,

- Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

212.    Each Count VIII Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, such acts to the benefit of the Total Ortho Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Counts I & VII. Each Count VIII Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiff and those similarly situated.

213.    Total Ortho Defendants and Lerman agreed to, and did, provide substantial assistance both individually and through supervision and management of Total Ortho employees, in performing and providing falsified records of unnecessary and unjustified surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matters of Claimants A and D.

214.    Kumar, Thompson, Jeyamohan, and Drazic all explicitly and or implicitly agreed to perform such needless surgeries as part and parcel of employment, and took actions in furtherance thereof.

215.    W. Schwitzer and Schwitzer Firm agreed to, and did, provide substantial assistance through the management of the Fraud Scheme, supervision, and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Schwitzer Firm attorneys and employees in furtherance of the scheme.

216.    Merlino and Schwitzer Firm agreed to, and did, provide substantial assistance through the management of the related WC firms, supervision, and management of the WC

proceedings, managing Claimants and Medical Providers, managing Schwitzer Firm attorneys and employees, and steering Claimants to Kolb in furtherance of the scheme.

217.    Kolb and Kolb Practice agreed to, and did, provide substantial in providing falsified MRI reads so as to falsely support unnecessary surgeries, and continued, escalating, and unnecessary treatments, and knowingly unnecessary but lucrative referrals.

218.    PPNY, Reyfman, and Kosharskyy agreed to, and did, provide substantial assistance both individually and through supervision and management of PPNY, PPNY employees, Island ASC, and Crotona ASC, in providing falsified records of conservative, as well as escalated, treatments so as to falsely support unnecessary surgeries, and continued, escalating, and unnecessary treatments, and knowingly unnecessary but lucrative referrals.

219.    Salehin, Apple, Lebson, and Wang agreed to, and did, provide substantial assistance both individually and through supervision and management of Brooklyn Med, BAPM, NSF Chiro, and Unicorn and their employees, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, and referrals.

220.    McDonnell and CMI agreed to, and did, provide substantial in providing falsified MRI reads so as to falsely support unnecessary surgeries, and continued, escalating, and unnecessary treatments, and knowingly unnecessary but lucrative referrals.

221.    As a direct and proximate result of the § 1962(c) violations that Count VIII Defendants conspired to commit, and the § 1962(d) conspiracy, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert fees, and litigation costs.

222.    Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Count VIII Defendants' agreement and the predicate acts committed in furtherance thereof; Plaintiff would not have suffered the losses described.

**WHEREFORE**, Plaintiff demands judgment against the Count VIII Defendants, and each of them, jointly and severally, for:

    a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

    b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

    c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

    d)    Such other relief as the Court deems just and proper.

<u>**COUNT IX**</u>
**New Jersey Insurance Fraud Prevention Act (N.J.S.A. § 17:33A-1, *et seq.*)**

<u>**As Against ("Count IX Defendants"):**</u>

**VADIM LERMAN, D.O.**
**ABHISHEK KUMAR, M.D.**
**SHIVEINDRA JEYAMOHAN, M.D.**
**WILLIAM SCHWITZER & ASSOCIATES, P.C.**
**KOLB RADIOLOGY P.C.**
**THOMAS M. KOLB, M.D.**
**PAIN PHYSICIANS NY, P.L.L.C**
**LEON REYFMAN, M.D.**
**BOLESLAV KOSHARSKYY, M.D**
**BROOKLYN MEDICAL PRACTICE, P.C.**
**ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C.,**
**BIG APPLE PAIN MANAGEMENT PLLC,**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C.,**
**UNICORN ACUPUNCTURE, P.C.,**
**SAYEEDUS SALEHIN, M.D.,**
**STANISLAV AVSHALUMOV, D.O.,**
**RICHARD J. APPLE, M.D.,**
**TODD LEBSON, DC,**

**DEKUN WANG, L.AC**
**COMMUNITY MEDICAL IMAGING, P.C.**
**ANDREW MCDONNELL, M.D.**

223.     The New Jersey Insurance Fraud Prevention Act  ("NJ IFPA") allows  insurance companies to bring an action relating to fraudulent claims in any court of competent jurisdiction pursuant to § 17:33A-7(a).

224.     Plaintiff is an insurance carrier authorized to business in New Jersey, and thereby an "insurance company" pursuant to § 17:33A-1.

225.     Plaintiff has mailed a copy of this Complaint to the New Jersey Commissioner  of Banking and Insurance contemporaneous with the filing of this Complaint, and shall report to the commissioner, on a form prescribed by the commissioner, the amount ultimately recovered and such other information as is required by the commissioner.

### i.   Claimant A

226.     In travelling to New Jersey on May 28, 2021, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Defendants Kumar, Jeyamohan, and Total Ortho each violated the NJ IFPA, § 17:33A-4(a)(2).

227.     In creating additional facility records on June 12, 2021 related to the  above surgery, which Defendants Kumar and Total Ortho knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Defendants Kumar and Total Ortho committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

228.    In presenting or causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on June 23, 2021, Defendants Kumar, Jeyamohan, and Total Ortho further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1) through submission of billing and records to the WCB.

229.    In presenting (Total Ortho) and causing to be presented (Kumar and Jeyamohan) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on April 24, 2024, Defendants Kumar, Jeyamohan, and Total Ortho further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such records from Total Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

230.    In causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on January 24, 2025, Defendants Kumar, Jeyamohan, and Total Ortho further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such records from BMC to Plaintiff's medical records agent in support of the underlying claim for payment.

231.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Defendants Jeyamohan, Kumar, and Total Ortho's violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

232.    As the conduct described above constituted a "pattern" as defined in § 17:33A-1, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

233.    It is further alleged that each of Defendants Kumar, Jeyamohan, Lerman, Total Ortho, Kolb, PPNY, and Schwitzer Firm further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

234.    It is further alleged that each of Defendants Kumar, Jeyamohan, Lerman, Total Ortho, Kolb, PPNY, and Schwitzer Firm further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

235.    As a result, Count IX Defendants are jointly and severally liable to Plaintiff for their damages herein.

### i.  Claimant C

236.    It is alleged that Kolb, PPNY, and Schwitzer Firm knowingly conspired with and assisted non-party Kenneth McCulloch to violate § 17:33A-4(a)(2), to create records June 23, 2020 known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Defendants Kumar, Jeyamohan, and Total Ortho each violated the NJ IFPA, all in violation of § 17:33A-4(b).

237.    It is further alleged that each of Defendants Kolb, PPNY, and Schwitzer Firm further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds

derived from the above creation of knowingly false records on June 23, 2020 in violation of § 17:33A-4(a)(2), due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

238.    As a result, Count IX Defendants are jointly and severally liable to Plaintiff for their damages herein.

- **Claimant D**

239.    In creating records known to be false on August 12, 2021, wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Avshalumov and Advanced travelling to New Jersey on April 13, 2022 to perform unjustified surgery, CMI and McDonnell violated the NJ IFPA, § 17:33A-4(a)(2).

240.    In creating records known to be false on August 18, 2021, wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan, Kumar, and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, CMI and McDonnell violated the NJ IFPA, § 17:33A-4(a)(2).

241.    In creating records known to be false on August 18, 2021, wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify travelling to New Jersey on September 9, 2021 to perform unjustified surgery, Defendants Avshalumov and Advanced violated the NJ IFPA, § 17:33A-4(a)(2).

242.    In creating records known to be false on September 23, 2021, October 7, 2021, and October 21, 2021, wherein such knowingly false records were knowingly intended to be presented

to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, BAPM and Apple committed 3 distinct violations of the NJ IFPA, § 17:33A-4(a)(2).

243.    In creating records known to be false on October 27, 2021, wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan, Kumar, and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, Defendants Jeyamohan, Kumar, and Total Ortho violated the NJ IFPA, § 17:33A-4(a)(2).

244.    In creating records known to be false on March 25, 2022 wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, Defendants Jeyamohan, Kumar, and Total Ortho violated the NJ IFPA, § 17:33A-4(a)(2).

245.    In creating 70 separate records known to be false, wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan, Kumar, and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, Defendants Brooklyn Med and Salehin violated the NJ IFPA, § 17:33A-4(a)(2).

246.    In creating 72 separate records known to be false (visits plus "evidence of" EMGs), wherein such knowingly false records were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, to falsely justify Defendants Jeyamohan, Kumar, and Total Ortho travelling to New Jersey on April 13, 2022 to perform unjustified surgery, Defendants Lebson and NSF Chiro violated the NJ IFPA, § 17:33A-4(a)(2).

247.    In travelling to New Jersey on September 9, 2021, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Defendants Advanced and Avshalumov violated the NJ IFPA, § 17:33A-4(a)(2).

248.    In travelling to New Jersey on April 13, 2022, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Defendants Kumar, Jeyamohan, and Total Ortho violated the NJ IFPA, § 17:33A-4(a)(2).

249.    In presenting (Total Ortho) and causing to be presented (Kumar and Jeyamohan) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on October 27, 2023, Defendants Kumar, Jeyamohan, and Total Ortho further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the faxing of such records from Total Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

250.    In presenting (Schwitzer Firm) and causing to be presented (Kumar, Jeyamohan, Total Ortho, Avshalumov, Advanced) a false written statement (Verified Bill of Particulars), knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on February 4, 2022, Defendants Kumar, Jeyamohan, Total Ortho, Avshalumov, Advanced, and Schwitzer Firm further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such statement Plaintiff's Defense Counsel in support of or in connection with underlying claim for payment.

251.    In presenting (Total Ortho) and causing to be presented (Kumar and Jeyamohan) a written statement described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on October 27, 2023, Defendants Kumar, Jeyamohan, and Total Ortho further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the faxing of such records from Total Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

252.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for such violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

253.    As the conduct described above constituted a "pattern" as defined in § 17:33A-1, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

254.    It is further alleged that each of Defendants Kumar, Jeyamohan, Total Ortho, Avshalumov, Advanced, Brooklyn Med, Salehin, BAPM, Apple, NSF Chiro, Lebson, Wang,

Unicorn, CMI, McDonnell, and Schwitzer Firm further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

255.    It is further alleged that each of Defendants Kumar, Jeyamohan, Total Ortho, Avshalumov, Advanced, Brooklyn Med, Salehin, BAPM, Apple, NSF Chiro, Lebson, Wang, Unicorn, CMI, McDonnell, and Schwitzer Firm further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

256.    As a result, these Count IX Defendants are jointly and severally liable to Plaintiff for their damages herein.

**WHEREFORE**, Plaintiff demands judgment against the Count IX Defendants and each of them, jointly and severally, for:

a)      An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to §§ 17:33A-7(a) and (b), as against Defendants Kumar, Jeyamohan, Lerman, Total Ortho, Kolb, PPNY, and Schwitzer Firm, for the acts and violations set forth involving the matter of Claimant A;

b)      An award of Plaintiff's actual and consequential damages to be established at trial pursuant to § 17:33A-7(a) as against Kolb, PPNY, and Schwitzer Firm, for the acts and violations set forth involving the matter of Claimant C;

    c)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to §§ 17:33A-7(a) and (b), as against Defendants Kumar, Jeyamohan, Total Ortho, Avshalumov, Advanced, Brooklyn Med, Salehin, BAPM, Apple, NSF Chiro, Lebson, Wang, Unicorn, CMI, McDonnell, and Schwitzer Firm, for the acts and violations set forth involving the matter of Claimant D;

    d)    Plaintiff's reasonable attorneys' fees, investigative fees, expenses, costs, and interest; and,

    e)    Such other relief as the Court deems just and proper.

### COUNT X
**Common Law Fraud**

**As Against Schwitzer Defendants and**
**Medical Provider Defendants ( "Count X Defendants")**

257.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

258.    As set forth in Count I, which are incorporated by reference as if fully set forth herein, the Count X Defendants made misrepresentations of facts, and deliberately concealed and omitted materials facts that they had a duty to disclose, in connection with their lawsuits and/or claims for payment under New York law.

259.    These misrepresentations of fact by the Count X Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries, and the necessity of treatment. A list of such misrepresentations, who they were made by, and when, are detailed in the tables under Count I.

260.    The Count X Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. Count X Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. The falsity of each such representation is set forth under Count I and the corresponding Claimant sections of this Complaint, *supra*.

261.    The Count X Defendants made these misrepresentations with the intent they reach Plaintiff and be relied upon thereto, and in furtherance of the Fraud Scheme to defraud Plaintiff by submitting claims for payment of Workers' Comp and general liability insurance proceeds, knowingly falsified treatment records, inflated liens, and other submissions presented to Plaintiff through the course of the Fraud Scheme. The Schwitzer Defendants presented such misrepresentations directly to Plaintiff and/or its attorneys. The Medical Provider Defendants presented such misrepresentations in some instances directly to Plaintiff, or *via* the Schwitzer Defendants as a conduit with Plaintiff as the intended recipient..

262.    The Count X Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

263.    Plaintiff reasonably and justifiably relied, to its detriment, on the Count X Defendants' representations concerning their eligibility to receive payments of Workers' Comp and general liability insurance proceeds, the validity of such claims and treatment, and without knowledge of the Count X Defendants' scheme and artifice to defraud them; and, even in the absence of such belief, Plaintiff's hands were tied under New York law and the duty to defend to

provide a defense to its insured. Count X Defendants' conduct thus induced action by Plaintiff as required by law, regardless of belief or knowledge of veracity.

264.    The Count X Defendants knew, or should have known, that Plaintiff would rely on such representations, and planned to exploit such reliance.

265.    But for the Count X Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have incurred damages.

266.    As a matter of New York law, which requires Plaintiff to fulfill its duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected fraud, such reliance was thrust upon Plaintiff. Plaintiff was forced to take action and incur expenses it otherwise would not have taken or incurred, so influenced as a direct result of the false representations.

267.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, forced reliance upon Plaintiff to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

268.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were

after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

269.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count X Defendants were engaged in misrepresentations, omissions, and rampant fraudulent conduct; this is particularly true where Count X Defendants are considered officers of the Court and the Medical Providers have taken oaths to do no harm.

270.    As a direct and proximate cause of the Count X Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count X Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff to the Count X Defendants or caused by the Count X Defendants.

271.    Because the Count X Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Count X Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial;

b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct;

c.    Punitive damages to be established at trial; and,

d.    Such other relief as the Court deems just and proper.

## COUNT XI
### Aiding and Abetting Fraud

### Against All Defendants

272.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

273.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count X.

274.    As set forth in detail, *supra*, and in the charts set forth under Counts I, each Defendant engaged in overt acts in furtherance of the fraud, or otherwise provided substantial assistance to advance such fraud's commission.

275.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

276.    As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

277.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiff's actual and consequential damages to be established at trial;

    b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

    c.    Punitive damages to be established at trial; and,

    d.    Such other relief as the Court deems just and proper.

## COUNT XII
## General Business Law § 349

### Against Legal Service Defendants and
### Medical Provider Defendants ( "Count XII Defendants")

278.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

279.    New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

280.    It is well-established that virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349. It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

281.    As set throughout this Complaint, *supra*, each of the Count XII Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

282.    GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, and the Court may award reasonable attorney's fees to a prevailing plaintiff.

283.    The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused by the instant

deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

284.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards  - and nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (i.e., everyone).

285.    This phenomenon and its effects have recently begun to attract media attention. Legal Newsline, September 10, 2025: ‘Pincushion’: When immigrants sliced, U.S. lawyers and doctors cash in (specifically discussing the Puac matter referenced *supra*, at ¶¶ 60-62, involving Schwitzer, Kolb, and PPNY); ABC News, October 4, 2024: 7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings ("**We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board**," Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. "**We need to find a way to get it to stop**."); ABC News, March 17, 2024: Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims ("'These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,' said Assemblyman David Weprin.").

286.    The deceptive trade practices of the Count XII Defendants – the Fraud Scheme – occurred and is continuing to occur in New York, Count XII Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

287.    Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count XII Defendants are liable to Plaintiff for compensatory damages and the attorneys' fees incurred in bringing and prosecuting this Action.

**WHEREFORE**, Plaintiff demands judgment against Count XIII Defendants for:

    a.    An award of Plaintiff's actual damages to be established at trial;

    b.    Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

    c.    Such other relief as the Court deems just and proper.

## IX.    JURY TRIAL DEMAND

288.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

**Dated: October 20, 2025**                    Respectfully submitted,

                                    **THE WILLIS LAW GROUP, PLLC**

                             By: */s/ Daniel A. Johnston*
                                   **DANIEL A. JOHNSTON**
                                   **WILLIAM J. CLAY**
                                   **MICHAEL A. GRAVES**
                                   **AARON E. MEYER**
                                   1985 Forest Lane
                                   Garland, Texas 75042
                                   Telephone:  214-736-9433
                                   Facsimile:  214-736-9994
                                   Service Email: [service@thewillislawgroup.com](mailto:service@thewillislawgroup.com)
                                   ***ATTORNEYS FOR THE PLAINTIFF***
                                   **MERCHANTS MUTUAL INSURANCE COMPANY**